IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN DOES 1 THROUGH 7,

*Plaintiffs,*

v.                                          Misc Action No. 1:20-mc-00740-KPF

THE TALIBAN, AL-QAEDA,
 and THE HAQQANI NETWORK,

*Defendants.*

### ***EX PARTE* MOTION FOR WRITS OF EXECUTION**

Plaintiffs, John Does 1 through 7, file this *Ex Parte* Motion for Writ of Execution in order to enforce their Final Default Judgment entered against the Taliban, Al-Qaeda and the Haqqani Network for injuries Plaintiffs suffered in a terrorist bomb attack on January 4, 2016.  The Judgment was entered November 5, 2020 by the U.S. District Court for the Northern District of Texas, and was registered in this district on January 20, 2021.  *See* DE 1, 5.  Pursuant to 28 U.S.C. §1963, it has the same effect as a judgment of this district and may be enforced in like manner.  The entire amount of the $138,418,741.00 in compensatory damages plus interest that the Judgment awarded remains due and owing. *See* Affidavit of John Thornton, attached hereto as Exhibit A.  According to Fed. R. Civ. P. 69, "[a] money judgment is enforced by writ of execution …" and "[t]he procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Consistent with that Rule, on February 23, 2021, a general Writ of Execution was issued in favor of Plaintiffs and against the judgment debtors, the Taliban, Al-Qaeda, and the Haqqani Network.  This motion seeks a Writ

of Execution to be issued pursuant to a federal statute, specifically Section 201(a) of the

Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 note (the "TRIA"). The TRIA allows

Plaintiffs to collect their judgment by executing against the blocked assets belonging to agencies

or instrumentalities of the judgment debtors.  Plaintiffs have identified such blocked assets located

in this district.  Plaintiff requests an expedited ruling that a writ of execution be issued against

those blocked assets, as there are competing creditors.

      After the requested writ of execution is served on two garnishee entities that hold the

blocked assets, Plaintiff will file a motion for turnover order requesting the final release of the

assets pursuant to CPLR §5225 to complete the TRIA execution.

### I.      The TRIA

The TRIA states:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages[1] for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610 note, TRIA § 201(a).

> The execution may be made, provided that the following requirements are met:
>
> (1) a person has obtained a judgment against a terrorist party;
> (2) the judgment is either
>   (a) for a claim based on an act of terrorism, or
>   (b) for a claim for which a terrorist party is not immune under § 1605(a)(7);
> (3) the assets are "blocked assets" within the meaning of TRIA; and
> (4) execution is sought only to the extent of any compensatory damages.

---

[1] Plaintiffs seek to recover only compensatory damages through this TRIA execution.

*Weininger v. Castro*, 462 F. Supp. 2d 457, 479 (S.D.N.Y. 2006).  No OFAC license is required for

an execution against blocked funds pursuant to the TRIA.  *Id.* at 499.

**II.     The requirements of the TRIA are met.**

**(1)     Judgment against terrorist parties**

The judgment debtors indeed qualify as "terrorist parties" under the relevant statutory

definition.  Stepping through Section 201 of the TRIA (the section under which Plaintiffs now

move) and the statutes it directs to, it becomes clear that these organizations have been duly

designated as terrorist parties, and have committed terrorist attacks or provide material support

for those who do.  Thus, they are all terrorist parties for purposes of Section 201 of the TRIA,

which provides:

> (d) Notes Definitions.--In this section, the following definitions shall apply:
> (4)  Terrorist party.--  The term "terrorist party" means a terrorist, a terrorist
> organization (**as defined in section 212(a)(3)(B)(vi) of the Immigration and
> Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi)**)), or a foreign state designated as a
> state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979
> (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22
> U.S.C. 2371).

TERRORISM RISK INSURANCE ACT OF 2002, 107 P.L. 297, 116 Stat. 2322, 2340, 107

P.L. 297, 2002 Enacted H.R. 3210, 107 Enacted H.R. 3210 (emphasis added).  Section

212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi)) provides:

> (vi) "Terrorist organization" defined. As used in this section, the term "terrorist
> organization" means an organization—
>     (I) **designated under section 219 [8 USCS § 1189]**;
>     (II) **otherwise designated**, upon publication in the Federal Register, by the
>     Secretary of State in consultation with or upon the request of the Attorney
>     General or the Secretary of Homeland Security, as a terrorist organization,
>     after finding that the organization engages in the activities described in
>     subclauses (I) through (VI) of clause (iv); or
>     (III) **that is a group of two or more individuals**, whether organized or
>     not, **which engages in**, or has a subgroup which engages in, **the activities
>     described in subclauses (I) through (VI) of clause (iv)**.

8 U.S.C. § 1182.

3

**Al Qaeda and the Haqqani Network**

Judgment debtors al Qaeda and the Haqqani network were indeed designated Foreign

Terrorist Organizations (FTOs) under section 219 of the of the Immigration and Nationality Act,

*i.e.* 8 U.S.C. 1189.  *See* list of Foreign Terrorist Organizations published by United States

Department of State:  Bureau of Counterterrorism *available at*

*http://www.state.gov/j/ct/rls/other/des/123085.htm* (listing Haqqani Network and al-Qa'ida).  Thus,

they clearly qualify as terrorist parties under Section 201 of the TRIA.

**The Taliban**

The Taliban is a Specially Designated Global Terrorist ("SDGT") organization

pursuant to Executive Order 13268, which modified the annex to Executive Order 13224

to include the Taliban.  "The term specially designated global terrorist or SDGT means

any person whose property and interests in property are blocked pursuant to §

594.201(a)."  31 C.F.R. § 594.310.  31 C.F.R. § 594.201(a) provides the list of SDGTs

whose assets are blocked as including:

> (1) Foreign persons listed in the Annex to Executive Order 13224 of September
> 23, 2001, as may be amended; [and]

> (2) Foreign persons determined by the Secretary of State, in consultation with the
> Secretary of the Treasury, the Secretary of Homeland Security and the Attorney
> General, to have committed, or to pose a significant risk of committing, acts of
> terrorism that threaten the security of U.S. nationals or the national security,
> foreign policy, or economy of the United States;

31 C.F.R. § 594.201(a).  Subsection (2) above tracks the language of 8 U.S.C. §

1182(a)(3)(B)(vi)(II) in that it refers to a determination by the Secretary of State.

Subsection (1) refers to a Presidential designation pursuant to executive order.  The

statutory intent of the result of either determination, however, is the same:  whether an

organization is designated by the President or the Secretary of State, the result is that it is

designated an SDGT.  It certainly seems unlikely that the statutory intent was that an

SDGT designated by the Secretary of State would be a "terrorist party", but one designated by the President would not be.  Thus, it appears the Taliban was "otherwise designated", and qualifies as a terrorist party under Section 201 of the TRIA.

Alternatively, the Taliban qualifies under 8 U.S.C. § 1182(a)(3)(B)(vi)(III) because it is "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)."  Those subclauses define the term "engage in terrorist activity", and state that it means:

(I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;
(II) to prepare or plan a terrorist activity;
(III) to gather information on potential targets for terrorist activity;
(IV) to solicit funds or other things of value for—
(aa) a terrorist activity;
(bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or
(cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;
(V) to solicit any individual—
(aa) to engage in conduct otherwise described in this subsection;
(bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or
(cc) for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or
(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—
(aa) for the commission of a terrorist activity;
(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;
(cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or
(dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing

> evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

8 U.S.C. § 1182(a)(3)(B)(iv).  The bottom line is that the TRIA defines a "terrorist party" as one who engages in terrorist activity according to the above laundry list of actions. The acts for which Plaintiffs obtained their judgment against the Taliban undeniably include many acts on this list.   *See* Complaint, attached hereto as Exhibit B at pars. 8, 19, 22,24-25, 30, 32-34, 38-44, 49, 57-64, 67, 75-82, 84, 91-99, 101-102, 106-114, 117, 122-130, 133, 139-147 and 155-163.   The Taliban thus "engage[s] in terrorist activity", and qualifies as a "terrorist party" for purposes of the TRIA.[2]

### (2) **Based on an act of terrorism**[3]

The attack fits the relevant statutory definition of an act of terrorism.  Section 201 of the TRIA provides:

> (d) Notes Definitions.--In this section, the following definitions shall apply:
>   (1)  Act of terrorism.--  The term "act of terrorism" means--
>     (A)  **any act or event certified under section 102(1)**; or
>     (B)  to the extent not covered by subparagraph (A), any terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii))).

TERRORISM RISK INSURANCE ACT OF 2002, 107 P.L. 297, 116 Stat. 2322, 2339, 107 P.L. 297, 2002 Enacted H.R. 3210, 107 Enacted H.R. 3210 (emphasis added).  This attack,

---

[2] Even if the Taliban did not qualify as a terrorist party, the judgment in this matter is joint and several against all three defendants; thus writs and execution against the agencies and instrumentalities of any of the Taliban's co-judgment debtors for the full amount of the judgment is proper.

[3]  It is worth noting that the judgment itself is based on the Anti-Terrorism Act, 18 U.S.C. § 2333, and Civil RICO, 18 U.S.C. § 1961, (based upon, *inter alia*, predicate acts of terrorism). The Anti-Terrorism act provides jurisdiction for actions by U.S. nationals injured by "an act of international terrorism".  Had this matter not concerned an act of terrorism, the district court would not have had jurisdiction under the ATA in the first place.

which took place on January 4, 2016, was indeed certified as a terrorist attack under Section 102(1) of the TRIA on April 13, 2016.  This incident is on the published list of certified acts of terrorism, published at https://ovc.ojp.gov/program/international-terrorism-victim-expense-reimbursement-program-itverp/terrorist-incident-designation-list.  Had it not already been certified, this attack would qualify under subsection (B), however such analysis is not necessary given that the attack has been certified under Section 102(1) of the TRIA.

Requirements (1) and (2) are clearly met.  (Indeed it is beyond peradventure that a judgment under the Anti-Terrorism Act for injuries suffered in a massive terrorist bombing and awarded against the well-known terrorist judgment debtors would qualify as a judgment against terrorist parties based on an act of terrorism.)

### (3) Blocked assets

The Anti-Terrorism Act specifically provides that assets blocked pursuant to the Foreign Narcotics Kingpin Designation Act (21 U.S.C. 1904(b)) (the "Kingpin Act") are included in the definition of "blocked assets" for purposes of section 201 of the TRIA.  It states:

> (e) Use of blocked assets to satisfy judgments of U.S. nationals.  For purposes of section 201 of the Terrorism Risk Insurance Act of 2002 (28 U.S.C. 1610 note), in any action in which a national of the United States has obtained a judgment against a terrorist party pursuant to this section, the term "blocked asset" shall include any asset of that terrorist party (including the blocked assets of any agency or instrumentality of that party) seized or frozen by the United States under section 805(b) of the Foreign Narcotics Kingpin Designation Act (21 U.S.C. 1904(b)).

18 USCS § 2333.  The assets here belong to Samark Jose Lopez Bello ("Lopez Bello") and his front company, Yakima Trading Corporation ("Yakima" or "Yakima Trading").  On February 13, 2017, OFAC designated, and mandated the blocking of assets of, both Lopez Bello and Yakima pursuant to the Kingpin Act.  *See* https://www.state.gov/samark-jose-lopez-bello/;

https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20170213

(announcing the designations of both Lopez Bello and Yakima pursuant to the Kingpin Act).

Following the dictates of federal law, banks located in this district blocked and hold assets belonging to Lopez Bello and Yakima.  *See* discovery responses attached hereto as Exhibits C and D.  The blocked assets held by these banks were blocked pursuant to the Kingpin Act sanctions, as the banks' discovery responses indicate by reference to "31 C.F.R. § 598" or "SDNTK".  The third prerequisite to execution pursuant to the TRIA is therefore satisfied.

### (4) Of an agency or instrumentality

The TRIA allows terrorism victim judgment holders to execute on blocked assets of designated persons, entities or organizations not named in the ATA Judgment, but rather of the instrumentalities of those entities.  *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) ("Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment.").  Due to the absence of a definition for "agency or instrumentality" in the TRIA, those terms must be given their ordinary meaning.  There is "no reason to believe that any other standard is preferable or proper".  *Stansell v. Revolutionary Armed Forces of Columbia*, 771 F.3d 713, 732 (11th Cir. 2014) (specifically rejecting the rigid definitions of agency or instrumentality found in the Foreign Sovereign Immunities Act).  The Eleventh Circuit recognized that terrorist and money-laundering operations are "clandestine", that a real-world standard must apply to reach non-state actors, and that drug traffickers and money launderers "operate through layers of affiliated individuals and front companies." *Id.*.  Importantly, this standard reaches blocked parties even if they were never previously linked to the terrorist party.  *Id.* at 739 ("[t]he [blocked entities] had not previously been directly linked to [the judgment debtor] by OFAC or any other

executive or judicial authority.").  Further, according to the Eleventh Circuit, a district court can support an agency or instrumentality finding through "indirect" connections that pierce layers of companies and affiliated individuals.  *Id.* at 742 ("evidence Plaintiffs presented to the district court was sufficient to establish the required relationship between [the judgment debtor and the owner of the blocked asset], *even if that relationship was indirect*") (emphasis added).   This standard has been widely adopted.  *See Stansell v. Revolutionary Armed Forces of Colom.*, 2019 U.S. Dist. LEXIS 144631 *, 2019 WL 4040680 (D.D.C. August 26, 2019) (the Court adopts this standard for the reasons explained by the Eleventh Circuit).  This standard was also applied against the very parties against whose blocked assets Plaintiffs seek to execute here.  *See Stansell v. Revolutionary Armed Forces of Colom.*, No. 19-20896-CV-SCOLA/TORRES, 2019 U.S. Dist. LEXIS 142981, at *22-23 (S.D. Fla. Aug. 21, 2019), a report and recommendation that was adopted over the objections of Samark Jose Lopez Bello and Yakima Trading Corporation by Order, DE 254, in Case No. 1:19-cv-20896-RNS in the United States District Court for the Southern District of Florida.

Plaintiffs supply the Declaration of Brian Fonseca, an expert in national security, terrorism, and organized crime, who most recently testified before the United States Congress House Foreign Affairs Committee about the crisis in Venezuela and the role of Russia, China, and others external state and non-state actors there.  *See* Exhibit E, Declaration of Brian Fonseca at pars. 2-14.  Mr. Fonseca testifies by affidavit to the ties between the specially designated nationals whose assets Plaintiffs seek to recover, on the one hand, and the judgment debtors Al Qaeda, the Taliban and The Haggani Network on the other.  His declaration describes the convergence of criminal and terrorist groups (pars. 15-18); establishes the relationship between judgment debtor Al Qaeda and the FARC (pars. 19-29); describes the relationship between Hezbollah and the FARC (pars. 30-33); relates how the FARC and Hezbollah are part of a

broader global illicit trafficking and terrorist financing network that includes Al Qaeda, the

Taliban, and the Haqqani Network (pars. 34-40), relays the close collaboration between Al

Qaeda, the Taliban and the Haqqani Network (pars. 41-45) and establishes the relationship

between former Venezuelan Vice President Tarek Al Aissami and his functionary, writ target

Lopez Bello (whose front company is writ target Yakima Trading) and the FARC, Hezbollah and

Al Qaeda (pars. 46-51).  Fonseca relates that Lopez Bello was Al Aissami's main interlocutor to

both South American and Middle Eastern drug trafficking and money laundering operations

(par. 48).

> He concludes (at par. 53):
>
> It is my professional opinion within a high degree of certainty that South American and
> Middle Eastern terrorist and narco-terrorist groups, along with state actor Venezuela,
> have formed an alliance in the form of an illicit trafficking and money laundering network
> in which each actor plays an instrumental role that aids and abets the activities of the
> others.  Samark Jose Lopez Bello, Yakima Trading Corporation, Al Qaeda, the Haqqani
> Network, and the Taliban each play a role in this network.  It is further my professional
> opinion within a high degree of certainty that the FARC has allied itself with Al Qaeda,
> the Taliban, and the Haqqani Network.  The FARC and the South American drug
> trafficking side of the network relies heavily on Tarek El Aissami and his well-known
> frontman Samark Lopez Bello, both designated by the U.S. Department of Treasury's
> Office of Foreign Asset Control (OFAC) as Specially Designated Narcotics Traffickers
> (SDNTs).  Lopez Bello served as El Aissami's main interlocutor to South American and
> Middle Eastern drug trafficking and money laundering organizations.  El Aissami,
> through Lopez Bello, leveraged a network of multinational corporations such as Yakima
> Trading Corporation in Panama and Yakima Oil Trading, LLP in the U.K to evade
> international authorities and support FARC's and its Middle Eastern allies' drug
> trafficking and terrorist operations.  In addition to providing the drug-trafficking and
> money laundering functions that support the Middle Eastern terrorist groups, the El
> Aissami network, to which Lopez Bello and the Yakima entities are integral, is directly
> linked to Hezbollah.  Due to the direct links between the El Aissami network and Middle
> Eastern terrorist groups, and the illicit services that El Aissami frontman Lopez Bello and
> the Yakima companies provide to Al Qaeda, the Taliban, and the Haqqani Network, it is
> my opinion that Samark Jose Lopez Bello and Yakima Trading Corporation are agencies
> and instrumentalities of Al Qaeda, and through Al Qaeda as well as other connections,
> the Taliban and the Haqqani Network.

Plaintiffs have provided sufficient grounds for the issuance of writs of execution pursuant to the TRIA against the blocked assets of Lopez Bello and Yakima Trading as agencies and instrumentalities of the judgment debtors.

### III.    The writs of execution should issue *ex parte*

Finally, the writs should issue *ex parte*.  As the Southern District of Florida (quoting the Eleventh Circuit) pointed out in ruling that an *ex-parte* writ of garnishment against these same parties was proper:

> Mere attachment is a minimally intrusive manner of reducing these risks, especially because the blocked assets, by definition, already have more substantial restraints on their alienation. Because the factors weigh in favor of immediate attachment, *Claimants were not constitutionally entitled to a hearing before the writ issued*.
>
> *Stansell*, 771 F.3d at 729 (citations omitted; emphasis added). Lopez Bello is therefore incorrect when he argues he should have been notified of the *ex parte* proceedings initiated by Plaintiffs here.

*Stansell v. Revolutionary Armed Forces of Colom.*, No. 19-20896-CV-SCOLA/TORRES, 2019 U.S. Dist. LEXIS 142981, at *14 (S.D. Fla. Aug. 21, 2019), a report and recommendation that was adopted over the objections of Samark Jose Lopez Bello and Yakima Trading Corporation by Order, DE 254, in Case No. 1:19-cv-20896-RNS in the United States District Court for the Southern District of Florida.  The New York writ of execution is analogous to a Florida writ of garnishment.  Both require a separate motion for turnover order to complete the TRIA execution.  Plaintiffs will file such motion pursuant to CPLR §5225, and the owners of the assets will have opportunity to challenge the execution prior to being permanently deprived of their property (which is already restrained).

**WHEREFORE**, Plaintiffs respectfully request that the Court consider this matter in an expedited fashion, grant the motion, and:

1)  Enter the Proposed Order, attached hereto as Exhibit F.

2)  Direct the Clerk to issue the writs of execution attached hereto in Exhibits G and H.

3)  Find that the Clerk of this Court is authorized and directed to issue such further writs

and other process in aid of execution against assets belonging to the subject Specially

Designated Nationals Samark Jose Lopez Bello and Yakima Trading Corporation.

Respectfully submitted,

**do Campo & Thornton, P.A.**
Chase Bank Building
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
Telephone: (305) 358-6600
Facsimile: (305) 358-6601

By:      s/ *Orlando do Campo*
            Orlando do Campo
            Bar Code: OD1969
            od@dandtlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 30, 2021, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

s/ *Orlando do Campo*
    Orlando do Campo