UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOHN DOES 1 THROUGH 7,                                   :
                                                         :
                          Plaintiffs,                    :
                                                         :
           - against -                                   :      No. 20 Misc. 740 (KPF)
                                                         :
THE TALIBAN *et al.*,                                    :
                                                         :
                          Defendants.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                         :
IN RE: TERRORIST ATTACKS ON                              :      No. 03 MD 1570 (GBD) (SN)
SEPTEMBER 11, 2001                                       :
                                                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FIONA HAVLISH *et al.*,                                  :
                                                         :
                          Plaintiffs,                    :
                                                         :
           - against -                                   :      No. 03 Civ. 9848 (GBD) (SN)
                                                         :
SHEIKH USAMAH BIN-MUHAMMED                               :
BIN-LADEN, a.k.a. OSAMA BIN-LADEN *et al.,*              :
                                                         :
                          Defendants.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**STATEMENT OF INTEREST**
**OF THE UNITED STATES OF AMERICA**

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

ANTHONY J. COPPOLINO
Deputy Branch Director

JOSEPH E. BORSON
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel.: (202) 514-1944
Email: Joseph.Borson@usdoj.gov

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

REBECCA S. TINIO
JEANNETTE A. VARGAS
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-0179
Fax: (212) 637-2686
Email: Rebecca.Tinio@usdoj.gov
           Jeannette.Vargas@usdoj.gov

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND.......................................................................................................................5

     A.     Statutory Background ..........................................................................................5

          1.     The President's Blocking and Licensing Powers......................................5

          2.     Section 25B Certification..........................................................................8

          3.     The Foreign Sovereign Immunities Act.....................................................8

          4.     The Terrorism Risk Insurance Act of 2002 ("TRIA") ……………………10

     B.     Factual and Procedural Background ....................................................................11

          1.     Writs of Execution Served on the DAB Accounts at FRBNY .................11

          2.     The E.O. and the OFAC License .............................................................12

ANALYSIS ...........................................................................................................................14

     A.     TRIA Provides for the Attachment of Assets Only to Satisfy Judgments for Compensatory Damages..................................................................................14

     B.     The Portion of the DAB Assets Regulated by the OFAC License Is Not Subject to Attachment.........................................................................................15

     C.     The Court Should Provide the Judgment Plaintiffs a Full Opportunity to Submit Their Arguments Regarding the Attachability of the Blocked Assets Under TRIA ........................................................................................................19

i

TABLE OF AUTHORITIES

**Cases:**                                                                                     Page(s):

*Argentina v. NML Capital, Ltd.*,
   573 U.S. 134 (2014) ............................................................................................ 26

*Argentine Repub. v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) ........................................................................................ 8, 15

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) ............................................................................................ 26

*Bank of China v. Wells Fargo Bank & Union Trust Co.*,
   104 F. Supp. 59 (N.D. Cal. 1952) ........................................................................ 26

*Bank of New York v. Rubin*,
   484 F.3d 149 (2d Cir. 2007) ................................................................................ 17

*Bennett v. Islamic Repub. of Iran*,
   618 F.3d 19 (D.C. Cir. 2010) .............................................................................. 10

*Caballero v. Fuerzas Armadas Revolucionarias de Columbia*,
   No. 20-MC-0040 (W.D.N.Y. Dec. 18, 2020) ...................................................... 23

*Calderon-Cardona v. Bank of New York Mellon*,
   770 F.3d 993 (2d Cir. 2014) ........................................................................... 19, 20

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.*,
   867 F. Supp. 2d 389 (S.D.N.Y. 2011) .................................................................. 20

*Cont'l Transfert Technique, Ltd. v. Fed. Gov't of Nigeria*,
   No. 08-cv-2026 (PLF), 2019 WL 3562069 (D.D.C. Aug. 6, 2019) .................... 10, 24

*Corp. Comm'n v. Consol. Stage Co.*,
   62 Ariz. 257 (1945) .............................................................................................. 25

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ............................................................................................... 7

*D'Investissement, S.A. v. La Republica Del Ecuador*,
   823 F. Supp. 1106 (S.D.N.Y. 1993) ..................................................................... 23

*EM Ltd. v. Repub. of Argentina*,
   473 F.3d 463 (2d Cir. 2007) ................................................................................ 24

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*,
   919 F. Supp. 2d 411 (S.D.N.Y. 2013).................................................................. 6

*Estate of Heiser v. Islamic Repub. of Iran*,
   807 F. Supp. 2d 9 (D.D.C. 2011) ....................................................................... 17

*Hausler v. JP Morgan Chase, NA*,
   770 F.3d 207 (2d Cir. 2014)........................................................................ 10, 19

*Hausler v. Repub. of Cuba v. Comcast IP Phone II*,
   Case No. 09-20942-CIV-JORDAN, 2011 WL 13099669 (S.D. Fla. Apr. 26, 2011).............. 18

*Heiser v. Islamic Repub. of Iran*,
   735 F.3d 934 (D.C. Cir. 2013) ........................................................................... 19

*Karaha Bodas Co, LLC v. Perusahaan Pertambangan Minyak Dan Gas Gumi Negara*,
   313 F.3d 80 (2d Cir. 2002)................................................................................ 24

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
   830 F.3d 107 (2d Cir. 2016).............................................................................. 21

*Kirschenbaum v. Assa Corp.*,
   934 F.3d 191 (2d Cir. 2019).............................................................................. 22

*Martinez v. Repub. of Cuba*,
   149 F. Supp. 3d 469 (S.D.N.Y. 2016)................................................................. 14

*Movitz v. Todd*,
   24 F. App'x 708 (9th Cir. 2001) ........................................................................ 25

*NML Capital, LTD v. Banco Central de la Republica Argentina*,
   652 F.3d 172 (2d Cir. 2011)......................................................................... 23, 24

*Oetjen v. Central Leather Co.*,
   246 U.S. 297 (1918).......................................................................................... 26

*Panama v. Rep. Nat. Bank of N.Y.*,
   681 F. Supp. 1066 (S.D.N.Y. 1988)................................................................... 26

*Rubin v. Islamic Repub. of Iran*,
   830 F.3d 470 (7th Cir. 2016) ............................................................................. 26

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
   __ F. Supp. 3d __, Civ. A. No. 21-1946 (BAH), 2021 WL 3566594 (D.D.C. Aug. 12, 2021).. 7

*Smith ex rel. Estate of Smith v. Fed. Reserve Bank of N.Y.*,
   346 F.3d 264 (2d Cir. 2003) ................................................................................... 17

*Stansell v. Revolutionary Armed Forces of Colombia*,
   771 F.3d 713 (11th Cir. 2014) ................................................................................ 22

*State Street Corp. v. Stati*,
   No. 19-mc-91107-LTS, 2020 WL 8839775 (D. Mass. Nov. 16, 2020) .................................. 10

*The Maret*,
   145 F.2d 431 (3d Cir. 1944) .................................................................................... 26

*United States v. All Funds on Deposit with R.J. O'Brien Assocs.*,
   783 F.3d 607 (7th Cir. 2015) ............................................................................. 17, 18

*United States v. Holy Land Found. for Relief and Development*,
   722 F.3d 677 (5th Cir. 2013) ................................................................................... 17

*Walters v. Indus. & Commercial Bank of China, Ltd.*,
   651 F.3d 280 (2d Cir. 2011) ................................................................................... 26

*Weininger v. Castro*,
   462 F. Supp. 2d 457 (S.D.N.Y. 2006) ................................................................... passim

*Weinstein v. Islamic Repub. of Iran*,
   299 F. Supp. 2d 63 (E.D.N.Y. 2004) ................................................................... 16, 17

*Wyatt v. Syrian Arab Repub.*,
   83 F. Supp. 3d 192 (D.D.C. 2015) ............................................................................ 18

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
   750 F. Supp. 2d 150 (D.D.C. 2010) ............................................................................ 7

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   135 S. Ct. 2076 (2015) ......................................................................................... 26

**Statutes:**

3 U.S.C. § 301 ......................................................................................................... 1

12 U.S.C. § 611 ....................................................................................................... 8

12 U.S.C. § 632 ....................................................................................................... 8

iv

22 U.S.C. § 2371 ................................................................................................... 27

28 U.S.C. § 517 ..................................................................................................... 1

28 U.S.C. § 1602 ................................................................................................... 3

28 U.S.C. § 1603(a) ............................................................................................. 21

28 U.S.C. § 1603(b) ....................................................................................... 15, 21

28 U.S.C. § 1604 ................................................................................................... 9

28 U.S.C. § 1605(a)(7) ..................................................................................... 9, 10

28 U.S.C. § 1605A(c) ........................................................................................... 9

28 U.S.C. § 1609 ............................................................................................... 9, 15

28 U.S.C. § 1610 ............................................................................................... 9, 25

28 U.S.C. § 1610(c) ............................................................................................. 25

28 U.S.C. § 1611(b) ............................................................................................. 23

28 U.S.C. § 1611(b)(1) ..................................................................................... 9, 24

50 U.S.C. App. 5(b) ............................................................................................ 15

50 U.S.C. App. § 2405(j) .................................................................................... 27

50 U.S.C. § 1601 ................................................................................................... 1

50 U.S.C. § 1621 ................................................................................................... 5

50 U.S.C. § 1701 ................................................................................................... 1

50 U.S.C. § 1702(a)(1)(B) ............................................................................... 6, 16

National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181,
    122 Stat. 338-341 (2008) ............................................................................... 9

**Other Authorities:**

31 C.F.R. § 501.801 .............................................................................................. 6

1976 U.S.C.C.A.N. 6604 ................................................................................................ 24

Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Foreign
    Terrorist Organizations, and Specially Designated Narcotics Traffickers; Addition of Persons
    Blocked Pursuant to 21 Part 538, 31 Part 597, or Executive Order 13129, 65 Fed. Reg. 39,100
    (June 23, 2000) .................................................................................................................... 22

Executive Order 12170, Blocking Iranian Government Property, 44 Fed. Reg. 65729 .............. 16

Executive Order 14040, Declassification Reviews of Certain Documents Concerning the
    Terrorist Attacks of September 11, 2001, Fed Reg. FR 50439 .................................................... 3

Executive Order of February 11, 2022, Protecting Certain Property of Da Afghanistan Bank for
    the Benefit of the People of Afghanistan ........................................................................... *passim*

Restatement (Third) of Foreign Relations Law of the United States § 203 (1987) ...................... 25

Restatement (Third) of Foreign Relations Law of the United States § 205(1) (1987) ................. 26

## PRELIMINARY STATEMENT

The United States of America, by and through its undersigned counsel, respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517.[1]

On February 11, 2022, pursuant to his authority under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* ("IEEPA"), the National Emergencies Act, 50 U.S.C. § 1601 *et seq.* (the "NEA"), and 3 U.S.C. § 301, the President issued an Executive Order entitled "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan" ("the E.O." or "the Executive Order"). *See* Exhibit A; *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/02/11/executive-order-on-protecting-certain-property-of-da-afghanistan-bank-for-the-benefit-of-the-people-of-afghanistan/. The E.O. addresses the property and interests in property of Afghanistan's central bank, Da Afghanistan Bank ("DAB"), that are held in the United States by any U.S. financial institution, including the Federal Reserve Bank of New York ("FRBNY"), as of February 11, 2022 (the "DAB Assets"). In recognition of the "unusual and extraordinary threat to the national security and foreign policy of the United States" posed by the "widespread humanitarian crisis in Afghanistan," the E.O. blocks the DAB Assets, providing that such assets "may not be transferred, paid, exported, withdrawn, or otherwise dealt in," except as specified by the Executive Order. *Id.* at 1-2.

That same date, consistent with the provisions of the Executive Order and with foreign policy guidance from the Department of State, the Department of the Treasury's Office of

---

[1] Pursuant to 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

Foreign Assets Control ("OFAC") issued License No. DABRESERVES-EO-2022-886895-1 (the "OFAC License").  *See* Exhibit B.  The OFAC License was issued to address significant humanitarian and economic concerns and to avoid further regional instability and other conditions contrary to the foreign policy interests of the United States.  The OFAC License authorizes and compels FRBNY: (1) to transfer $3.5 billion from an identified DAB account at FRBNY to "a separate blocked account at [FRBNY] in the name of [DAB]"; (2) to further transfer that amount—"[u]pon instructions from the individual(s) certified by the Secretary of State pursuant to Section 25B of the Federal Reserve Act as having authority to receive, control, or dispose of property from or for the account of [DAB]" (the "25B-Certified Individual(s)")—so that the assets can be used "for the benefit of the People of Afghanistan"; and (3) to "engage in any transactions ordinarily incident and necessary to [such transfers], including transactions related to the liquidation of [the DAB Assets]."  *Id.* § I(a)-(c).

In these proceedings, the plaintiffs in *Doe v. Taliban*, No. 20 Misc. 740 (KPF) (ECF Entry dated September 27, 2021), and *Havlish v. Bin-Laden*, No. 03 Civ. 9848 (GBD) (SN) (ECF Entry dated January 19, 2022) (collectively, the "Judgment Plaintiffs"), have served writs of execution on the DAB Assets.  The United States understands that the Judgment Plaintiffs will assert that the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 note ("TRIA"), entitles them to execute on the DAB Assets in satisfaction of federal court judgments based upon acts of terrorism that the Judgment Plaintiffs have obtained against the Taliban.  *See, e.g.*, *Doe* (ECF No. 15).

The United States has significant interests in the disposition of these proceedings.  Most urgently, the President, the Department of State, and the Department of the Treasury have taken actions to enable the transfer of a portion of the DAB Assets so that they can be used for the

benefit of the Afghan people, in view of the acute humanitarian and economic crisis facing Afghanistan, while confirming that the rest of the DAB Assets are blocked and therefore will remain at issue in this litigation even after any transfer occurs pursuant to the OFAC License. The OFAC License's authorization and directive to make certain DAB Assets available for the benefit of the Afghan people cannot be implemented until this Court confirms, for the reasons discussed below, that the writs of execution served by the Judgment Plaintiffs are no obstacle. The humanitarian situation in Afghanistan is further deteriorating due to economic collapse, drought, the COVID-19 pandemic, and residual displacement and vulnerability stemming from decades of conflict, among other factors. The United States has significant concerns that a humanitarian and economic crisis in Afghanistan could further destabilize the region and embolden various groups that present a dire national security threat to U.S. interests.

More broadly, the United States has a strong interest in the President's constitutional authority to make decisions with respect to the recognition of foreign governments and his blocking and licensing authority under IEEPA, and in ensuring the proper construction of TRIA and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ("FSIA"). Finally, the United States recognizes that these proceedings arise in the context of efforts of numerous U.S. victims of terrorist attacks who continue to seek accountability and compensation for those horrific acts. President Biden has publicly acknowledged the enduring pain of the families and loved ones of those who have been killed in terrorist attacks on American and foreign soil— including families and loved ones who have brought claims in this case, as well as many others—and the importance of their efforts to pursue accountability for such attacks. *See*, *e.g.*, Executive Order 14040 on Declassification Review of Certain Documents Concerning the Terrorist Attacks of September 11, 2001, 86 Fed. Reg. 50,439 (Sept. 3, 2021); Statement by

President Joe Biden on the Executive Order Directing Declassification Review of Documents Related to the September 11, 2001 Terrorist Attacks ("My heart continues to be with the 9/11 families who are suffering, and my Administration will continue to engage respectfully with members of this community."), https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/03/statement-by-president-joe-biden-on-the-executive-order-directing-declassification-review-of-documents-related-to-the-september-11-2001-terrorist-attacks/.

In service of those objectives, the United States sets forth herein relevant background and considerations and makes three particular observations:

First, the scope of the attachments being sought by plaintiffs in this litigation must be calculated in a manner consistent with the text that Congress enacted.  Irrespective of its other requirements, TRIA permits claimants to attach assets only to satisfy judgments for compensatory—rather than punitive—damages.  The *Havlish* writ appears to seek attachment for punitive awards totaling more than $4.5 billion and should be revised to the extent of its overbreadth to conform to the clear text of the statute.

Second, the portion of the DAB Assets authorized by the OFAC License to be transferred for the benefit of the Afghan people, in view of the urgent humanitarian and economic crisis in Afghanistan, is not properly subject to attachment in this litigation.  Under the precedent of this Circuit, assets that are regulated by an OFAC license are not blocked within the meaning of TRIA and are, therefore, not subject to attachment under TRIA.  The Court should therefore confirm that the DAB Assets regulated by the OFAC License are not subject to writs of attachment and that the funds can be transferred, as authorized and directed by OFAC and instructed by the 25B-Certified Individual(s), to satisfy the urgent and acute needs in Afghanistan that catalyzed the issuance of the E.O. and the OFAC License.  Given the ongoing

crisis, to the extent the Court cannot immediately resolve all issues associated with the writs, the United States respectfully urges the Court to first address any issues relating to the OFAC License and the transfers it authorizes.

Third, even after accounting for the portion of the DAB Assets subject to the OFAC License, billions of dollars of assets remain at issue in this litigation.  The Court should afford the Judgment Plaintiffs a full opportunity—in keeping with the statutory framework Congress enacted in TRIA—to make submissions addressing the legal requirements of TRIA and setting forth their arguments regarding the attachability of the unlicensed DAB Assets.  Once those submissions are received, the Court should evaluate the Judgment Plaintiffs' claims in light of settled legal principles, described herein, and against the backdrop of the President's prerogatives to conduct the Nation's foreign policy.

## BACKGROUND

### A.  Statutory Background

#### 1.  The President's Blocking and Licensing Powers

Under the NEA, the President may declare a national emergency and exercise certain special powers and authorities respecting that emergency, as delineated by the statute.  50 U.S.C. § 1621.  The President must declare the emergency and "specif[y] the provisions of law under which he proposes that he, or other officers will act . . . either in the declaration of a national emergency, or by one or more contemporaneous or subsequent Executive orders."  *Id.* § 1631.

IEEPA gives the President authority to take certain actions to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701(a).  To address declared

emergencies and threats, the President may, *inter alia*, "regulate, direct and compel, nullify, void, prevent, or prohibit" transactions involving "any property in which any foreign country or a national thereof has any interest," *id.* § 1702(a)(1)(B), which is typically effected via issuance of an Executive Order.  *See, e.g.*, *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 417 (S.D.N.Y. 2013) (identifying several Executive Orders issued pursuant to IEEPA).  The President (through his designee, typically the Department of the Treasury's Office of Foreign Assets Control (OFAC)) may also "regulate" assets by licensing transactions, including by the owners or authorized agents of the assets, that would otherwise be prohibited.  *See* 31 C.F.R. § 501.801 (describing OFAC's licensing authority).  For example, between September and December 2021, OFAC issued six licenses (not implicating the DAB Assets) specifically to facilitate the provision of humanitarian assistance (including the export of agricultural commodities, medicine, medical devices, and personal, non-commercial remittances) to the people of Afghanistan notwithstanding prohibitions on transactions involving the Taliban and the Haqqani Network.  *See* https://home.treasury.gov/news/press-releases/jy0372 (General Licenses 14 and 15); https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20211210_33 (General License 16); https://home.treasury.gov/news/press-releases/jy0545 (General Licenses 17, 18, and 19).  These licenses seek to provide clarity to organizations operating in Afghanistan that there are no comprehensive sanctions on Afghanistan by the United States, and that export or reexport of goods or services to Afghanistan, moving or sending money into and out of Afghanistan, or activities in Afghanistan are not prohibited, provided that such transactions or activities do not involve sanctioned individuals or entities such as the Taliban.  *See* OFAC Frequently Asked Questions ("FAQs") No. 951 ("Is Afghanistan

subject to comprehensive sanctions?"), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/951.

Of particular importance here is the President's authority to "block" assets within the United States that belong to foreign parties.  When property is blocked, "[t]itle . . . remains with the target, but the exercise of powers and privileges normally associated with ownership is prohibited without authorization from OFAC."  *See* OFAC FAQs No. 9 ("What do you mean by 'blocking?'"), *available at* https://home.treasury.gov/policy-issues/financial-sanctions/faqs/9 ("Blocking immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property.").

The blocking and licensing powers stem from the President's long-recognized discretion and authority in the arena of foreign policy.  *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 678-80 (1981).  In view of the President's constitutional authority, courts have accorded significant deference to the Executive's conduct of foreign policy via blocking and licensing actions.  *See, e.g.*, *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) (quoting *Regan v. Wald*, 468 U.S. 222, 242 (1984) (opining that "courts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders" and citing cases); *Strait Shipbrokers Pte. Ltd. v. Blinken*, __ F. Supp. 3d __, No. 21-cv-1946 (BAH), 2021 WL 3566594, at *7 (D.D.C. Aug. 12, 2021) ("Deference for agency decision-making is heightened in the context of executive blocking decisions, which lie at the intersection of national security, foreign policy, and administrative law." (citation omitted)).

### 2.    Section 25B Certification

The Edge Act, 12 U.S.C. § 611 *et seq.*, amended Section 25 of the Federal Reserve Act to

authorize the Board of Governors of the Federal Reserve to charter corporations "for the purpose

of engaging in international or foreign banking."  12 U.S.C. § 611.  Section 25(b) of the Edge

Act provides:

> Whenever (1) any Federal Reserve bank has received any property from or for the
> account of a foreign state which is recognized by the Government of the United
> States, or from or for the account of a central bank of any such foreign state, and
> holds such property in the name of such foreign state or such central bank; (2) a
> representative of such foreign state who is recognized by the Secretary of State as
> being the accredited representative of such foreign state to the Government of the
> United States has certified to the Secretary of State the name of a person as having
> authority to receive, control, or dispose of such property; and (3) the authority of
> such person to act with respect to such property is accepted and recognized by the
> Secretary of State, and is certified by the Secretary of State to the Federal Reserve
> bank, the payment, transfer, delivery, or other disposal of such property by such
> Federal Reserve bank to or upon the order of such person shall be conclusively
> presumed to be lawful and shall constitute a complete discharge and release of any
> liability of the Federal Reserve bank for or with respect to such property.

12 U.S.C. § 632.

The DAB Assets at issue are housed in accounts held at FRBNY for DAB, which is the

central bank of the foreign state of Afghanistan.  *See Doe* (ECF No. 36) (stating that the accounts

at issue are held by FRBNY for DAB); https://www.dab.gov.af/departments (describing DAB's

functions as the central bank of Afghanistan).  The Department of State is presently following

the 25B process to designate the 25B-Certified Individual(s), who will not be representatives (or

members) of the Taliban.

### 3.    The Foreign Sovereign Immunities Act

The FSIA establishes a comprehensive and exclusive framework for obtaining and

enforcing judgments against a foreign state in civil suits in U.S. courts.  *See, e.g.*, *Argentine

Repub. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-35 (1989).  The FSIA provides that

a "foreign state" is "immune from the jurisdiction" of federal and state courts except as provided by the exceptions to immunity in 28 U.S.C. §§ 1605-1607.  28 U.S.C. § 1604.  In 1996, Congress amended the FSIA to include the so-called "terrorism exception" to sovereign immunity, which was codified at 28 U.S.C. § 1605(a)(7).  Under that exception, a foreign state would not have immunity for certain terrorism-related lawsuits if the Secretary of State had designated the foreign state as a state sponsor of terrorism.

In 2008, Congress repealed FSIA section 1605(a)(7)'s terrorism exception to immunity and replaced it with section 1605A.  *See* National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub. L. No. 110-181, § 1083(a), (b)(1)(A)(iii) and (3)(D), 122 Stat. 338-341 (2008).  The new section created a private right of action for U.S. citizens injured by state sponsors of terrorism.  *See* 28 U.S.C. § 1605A(c).  Moreover, like its predecessor, section 1605A abrogates foreign states' sovereign immunity from damages suits arising from certain terrorist acts, so long as the foreign state was designated a state sponsor of terrorism at a prescribed point in time.  *See id.* § 1605A(a), (c).[2]

The FSIA also addresses the kinds of foreign sovereign property that are and are not immune from attachment by judgment creditors.  The general rule is that "the property in the United States of a foreign state shall be immune from attachment."  *See* 28 U.S.C. § 1609.  Section 1610 sets out exceptions to the general immunity from attachment of foreign state property.  But Section 1610's exceptions to attachment immunity are inapplicable when one of the conditions in Section 1611 is satisfied, including when the property sought to be attached "is that of a foreign central bank or monetary authority held for its own account."  *Id.* § 1611(b)(1);

---

[2] Afghanistan is not (and has never been) designated by the United States as a state sponsor of terrorism.  *See State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism.

*see also, e.g.*, *Cont'l Transfert Technique, Ltd. v. Fed. Gov't of Nigeria*, No. 08-cv-2026 (PLF), 2019 WL 3562069, at *13 (D.D.C. Aug. 6, 2019) *appeal dismissed*, 2020 WL 1268963 (D.C. Cir. Mar. 4, 2020); *State Street Corp. v. Stati*, No. 19-mc-91107-LTS, 2020 WL 8839775, at *8 (D. Mass. Nov. 16, 2020) *adopting report and recommendation*, 2021 WL 1010697 (D. Mass. Feb. 21, 2021).

### 4. The Terrorism Risk Insurance Act of 2002 ("TRIA")

In 2002, Congress passed TRIA, Pub. L. No. 107-297, 116 Stat. 2322 (2002), *reprinted in relevant part at* 28 U.S.C. § 1610 note, which permits attachment of certain blocked assets of a terrorist party to satisfy an award of compensatory damages notwithstanding the sovereign immunity protections afforded under sections 1609-1611 of the FSIA.  TRIA provides:

> Notwithstanding any other provision of law . . . , in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a).

TRIA defines "terrorist party" to include "a terrorist, a terrorist organization . . . or a foreign state designated as a state sponsor of terrorism." *Id.* § 201(d)(4).  As set forth above, a judgment holder seeking to attach assets under TRIA must establish that the assets are: (1) blocked, and (2) assets "of" that terrorist party (or "of" an agency or instrumentality of the terrorist party).  *See also, e.g.*, *Hausler v. JP Morgan Chase, NA*, 770 F.3d 207, 211 (2d Cir. 2014).  When its conditions are satisfied, TRIA section 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA.  *See, e.g., Bennett v. Islamic*

*Repub. of Iran*, 618 F.3d 19, 21 (D.C. Cir. 2010); *Weininger v. Castro*, 462 F. Supp. 2d 457, 499

(S.D.N.Y. 2006) (TRIA "overrides the immunity conferred in [28 U.S.C.] § 1611").

## B.  Factual and Procedural Background

### 1.   Writs of Execution Served on the DAB Accounts at FRBNY

At least two writs of execution have been served on the accounts at FRBNY held for

DAB.  The *Doe* Plaintiffs served a writ in the amount of $138,418,741, *see Doe*, ECF No. 27,

which is the total amount of compensatory damages awarded in their underlying judgment

against the Taliban, Al-Qaeda, and the Haqqani Network.  *See id.*, ECF No. 5 (final default

judgment issued in *John Does 1 Through 7 v. Taliban*, No. 4:20-CV-00605-P (N.D. Tex.)).  The

*Havlish* Plaintiffs originally served a writ in the amount of $7,045,632,402.79, but appear to

have recently obtained issuance of a substitute writ in the revised amount of $6,839,548,468.75.

*See Havlish*, ECF No. 526-1; ECF Entry dated January 19, 2022.  The *Havlish* Plaintiffs'

underlying Order and Judgment against numerous defendants in their case totals $6,048,513,805

(exclusive of prejudgment interest awarded by the Court on certain categories of damages, as

well as postjudgment interest).  *Id.*, ECF No. 317 (the "*Havlish* Judgment").  While no publicly

filed document details the calculation of the amount claimed in the *Havlish* Plaintiffs' revised

writ of execution, it appears to include punitive damages.  (The *Havlish* Judgment awards a total

of $1,362,277,884 in three categories of compensatory damages, and $4,686,235,921 in punitive

damages.  *See id.*)

In addition to these writs from the *Doe* and *Havlish* plaintiffs (who in total number 164

individual plaintiffs), the United States is aware of thousands of other plaintiffs with default

judgments of liability against the Taliban arising from the terrorist attacks of September 11,

2001, who have pending motions for judgments of money damages against the Taliban and

related defendants.  *See, e.g.*, *Ashton et al. v. al Qaeda Islamic Army et al.*, No. 02 Civ. 6977
(GBD) (SN) (ECF Nos. 1576, 1584, 1586, 1588, 1597, 1600, 1601); *Bauer et al. v. al Qaeda
Islamic Army et al.*, No. 02 Civ. 7236 (GBD) (SN) (ECF Nos. 132, 135); *Burlingame v. Bin
Laden et al.*, No. 02 Civ. 7230 (GBD) (SN) (ECF Nos. 182, 187, 190); *Burnett et al. v. Al
Baraka Inv. & Dev. Corp. et al.*, No. 03 Civ. 9849 (GBD) (SN) (ECF Nos. 941, 945); *In re
Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD) (SN) (ECF No. 7496*)*; *O'Neill v.
Repub. of Iraq*, No. 04 Civ. 1076 (GBD) (SN) (ECF No. 604).[3]

### 2. The E.O. and the OFAC License

On February 11, 2022, the President issued an Executive Order entitled "Protecting
Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan."  *See* Ex.
A.  Citing his authority under IEEPA and other statutes, *id.* at 1, the President finds in the E.O.:

> [T]hat the widespread humanitarian crisis in Afghanistan – including the urgent
> needs of the people of Afghanistan for food security, livelihoods support, water,
> sanitation, health, hygiene, shelter and settlement assistance, and COVID-19-
> related assistance, among other basic human needs – and the potential for a
> deepening economic collapse in Afghanistan constitute an unusual and
> extraordinary threat to the national security and foreign policy of the United States.
> I hereby declare a national emergency to deal with that threat.  In addition, I find
> that the preservation of certain property of [DAB] held in the United States by
> United States financial institutions is of the utmost importance to addressing this
> national emergency and the welfare of the people of Afghanistan.

*Id*.

As a means of addressing the declared national emergency, the E.O. blocks "[a]ll
property and interests in property of DAB that are held, as of the date of this order, in the United
States by any United States financial institution, including [FRBNY]," meaning that any such
assets "may not be transferred, paid, exported, withdrawn, or otherwise dealt in," except as

---

[3] The United States takes no position at this time on the question of priority as between those
individuals who possess such judgments or who may obtain judgments at some future date.

specified in the E.O. *Id.* § 1(a). The E.O. directs that any assets described in Section 1(a) shall be promptly transferred "into a consolidated account held at [FRBNY]," and specifies that Section 1(a) does not prevent transactions involving the blocked assets pursuant to "statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order." *Id.* § 1(b), (c). Furthermore, the E.O. "and actions taken pursuant" thereto supersede any other Executive Order that may arguably have applied with respect to the DAB Assets. *See id.* § 2 ("This order and actions taken pursuant to this order shall supersede any previously issued Executive order to the extent such order blocks, regulates, or otherwise affects the property and interests in property identified in section 1(a) of this order.").

    Also on February 11, 2022, and expressly pursuant to the E.O., OFAC issued License No. DABRESERVES-EO-2022-886895-1 to FRBNY. *See* Ex. B. The OFAC License authorizes FRBNY "[t]o transfer [$3.5 billion] from the consolidated blocked account [FRBNY] holds for [DAB] in accordance with Sections 1(a) and 1(b) of E.O. of February 11, 2022, to a separate blocked account at [FRBNY] in the name of [DAB] (the 'Account')"; "[u]pon instructions from the [25B-Certified Individual(s)], to transfer up to [$3.5 billion] from the Account, in one or multiple transfers, for the benefit of the people of Afghanistan"; and "[t]o engage in any transactions ordinarily incident and necessary to [the aforementioned transfers instructed by the 25B-Certified Individual(s)], including transactions related to the liquidation of assets held in the Account, such as securities, bonds, or gold." *Id.* § I. Any other transactions involving any property or account blocked pursuant to the E.O., except as specified in Section I of the OFAC License, are prohibited. *Id.* § III. In sum, the OFAC License authorizes FRBNY to transfer $3.5 billion of the DAB Assets as instructed by the 25B-Certified Individual(s), in order to address the national emergency declared in the E.O.

**ANALYSIS**

In order to aid the Court's assessment of the issues relating to the disposition of the DAB Assets, this Statement sets forth analysis in three areas: (1) the scope of the existing writs that have been served on the DAB accounts at FRBNY; (2) the effect of the OFAC License on the licensed DAB Assets; and (3) relevant considerations in assessing the application of TRIA to this matter.

**A. TRIA Provides for the Attachment of Assets Only to Satisfy Judgments for Compensatory Damages.**

As an initial matter, the Court should require the Judgment Plaintiffs to substantiate the amounts of their writs. By its text, TRIA permits the attachment of blocked assets of a terrorist party only "to the extent of any *compensatory* damages for which such terrorist party has been adjudged liable." TRIA § 201(a) (emphasis added). Punitive damages are therefore not subject to attachment under TRIA. *See, e.g.*, *Martinez v. Repub. of Cuba*, 149 F. Supp. 3d 469, 471 n.2 (S.D.N.Y. 2016) (excluding punitive damages from the calculation of the total amount plaintiff sought to attach under TRIA, because "TRIA Section 201 permits attachment only to the extent of compensatory damages.").

As applied to the Judgment Plaintiffs, the *Doe* writ corresponds exactly to the underlying judgment for compensatory damages, but the *Havlish* writ appears to encompass both compensatory and punitive damages. Even before the Court adjudicates the other TRIA requirements, the *Havlish* writ would need to be revised to limit its scope to compensatory damages.

Furthermore, any attempt to execute on the DAB Assets to satisfy a punitive damages award, even if a writ of execution has been served that on its face encompasses punitive damages, would be invalid, because punitive damages are not included within the exception to

the FSIA that TRIA provides.  Except where TRIA applies, the FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts."  *Amerada Hess*, 488 U.S. at 434 (1989); *see also* 28 U.S.C. § 1603(b).  DAB is the central bank of the State of Afghanistan.  Under the FSIA, the assets of a foreign central bank are "immune from attachment arrest and execution," except as provided in sections 1610 or 1611 of the FSIA.  28 U.S.C. § 1609.  The FSIA provides no exception to sovereign immunity that would permit attachment of the DAB assets to satisfy punitive damages awarded in these cases.  While TRIA supersedes the limitations on execution immunity set out in the FSIA, *see Weininger*, 462 F. Supp. 2d at 483, TRIA cannot provide a basis for attachment of the DAB Assets with respect to punitive damages, because TRIA authorizes attachment only to satisfy compensatory damages.

**B.  The Portion of the DAB Assets Regulated by the OFAC License Is Not Subject to Attachment.**

Moreover, the amount of the DAB Assets that is licensed by OFAC cannot be attached by the Judgment Plaintiffs.  Pursuant to well-established precedent in this Circuit, when assets are "regulated" by an OFAC license, they are not "blocked" for purposes of TRIA and are therefore beyond the coverage of TRIA's attachment provision.  Accordingly, the $3.5 billion in DAB Assets that OFAC has licensed to be transferred for the benefit of the Afghan people cannot be attached by the Judgment Plaintiffs.

As noted above, TRIA authorizes a judgment creditor to attach only the "blocked assets" of a terrorist party, or of its agency or instrumentality, to satisfy a terrorism judgment.  TRIA § 201(a).  Assets are "blocked" under TRIA if they have been "*seized or frozen* by the United States under section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of [IEEPA]."  *Id.* § 201(d)(2)(A) (emphasis added).  IEEPA, in turn, authorizes the President to take a wide range of actions, spanning beyond seizure or freezing; it

15

authorizes the President to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" the acquisition, use, transfer, or other dealings of property subject to U.S. jurisdiction in which a foreign country or national has an interest.  50 U.S.C. § 1702(a)(1)(B).

In a line of cases beginning with *Weinstein v. Islamic Repub. of Iran*, 299 F. Supp. 2d 63 (E.D.N.Y. 2004), courts have concluded that IEEPA authorizes actions that do not "necessarily involve a seizing or freezing of property," and that "not every action regarding property under the authority of the IEEPA . . . results in the property being 'blocked' under the TRIA."  *Id.* at 75.  In *Weinstein*, the court assessed the status of certain Iranian assets.  In 1979, President Carter exercised his authority under IEEPA to block all property and interests in property of the Government of Iran.  Blocking Iranian Government Property, E.O. 12170, 44 Fed. Reg. 65,729 (Nov. 15, 1979).  In 1981, to implement the Algiers Accords, OFAC took a variety of actions, including issuing a general license authorizing certain transactions with Iran.  *See Weinstein*, 299 F. Supp. 2d at 67.

Against that backdrop, the *Weinstein* court determined that, even though E.O. 12170 remained in effect, the assets licensed by OFAC in 1981 were no longer "blocked" for purposes of TRIA insofar as the license "ha[d] the effect of removing a prohibition."  *Id.* at 74; *see also id.* at 68 (the license identified certain transactions as "authorized," and "removed the prohibition" of the underlying sanctions); *id.* at 73 (the license "removed the effect of the blocking order").  The court rejected a reading of IEEPA that would have deemed "all assets 'regulated' or 'licensed' by OFAC under the IEEPA" to still be "blocked assets" under TRIA.  *Id.* at 74-75.  Rather, the court agreed that assets were "blocked" only if they were subject to a "'freezing' of assets that imposes an 'across-the-board prohibition against transfers or transactions of any kind

with regards to the property.'" *Id.* at 75 (quoting U.S. Treasury Dep't, *Foreign Assets Control Regulations for the Financial Community*, at 4 (Dec. 27, 2002)); *see also* OFAC FAQs No. 9, *available at* https://home.treasury.gov/policy-issues/financial-sanctions/faqs/9.  And assets were "[s]eized," in turn, only if there was a "transfer [of] *possessory* interest in the property." *Weinstein*, 299 F. Supp. 2d at 75 (quoting *Smith ex rel. Estate of Smith v. Fed. Rsrv. Bank of N.Y.*, 346 F.3d 264, 272 (2d Cir. 2003)).  Accordingly, "[g]iven that not every type of action authorized by the IEEPA necessarily involves a seizing or freezing of property, it follows that not every action regarding property under the authority of the IEEPA, including assets that may be 'regulated' or 'licensed,' results in the property being 'blocked' under the TRIA." *Id.*

The Second Circuit embraced the *Weinstein* approach in *Bank of New York v. Rubin*, 484 F.3d 149, 150 (2d Cir. 2007), adopting an opinion that had incorporated the "persuasive analysis" of *Weinstein*.  *See id.*  Other courts of appeals have similarly concluded that an OFAC license renders assets unblocked and therefore unattachable under TRIA.  In *United States v. Holy Land Foundation for Relief and Development*, 722 F.3d 677, 686-87 (5th Cir. 2013), the Fifth Circuit concluded that assets that were blocked pursuant to an Executive Order but also subject to an OFAC specific license were not subject to attachment under TRIA.  The Seventh Circuit reached a similar conclusion.  *See United States v. All Funds on Deposit with R.J. O'Brien Assocs.*, 783 F.3d 607, 622-24 (7th Cir. 2015) (funds formally blocked under IEEPA, but also subject to an OFAC specific license that authorized "final . . . transfer, or disposition" of those funds, were not subject to attachment under TRIA).  Numerous district courts have reached the same conclusion with respect to assets regulated by both general and specific licenses.  *See, e.g.*, *Estate of Heiser v. Islamic Repub. of Iran*, 807 F. Supp. 2d 9, 18 n.6 (D.D.C. 2011) (TRIA is inapplicable to assets that are "made under a general license" because such assets are

"regulated," rather than "seized or frozen") (quoting 31 C.F.R. § 560.508, TRIA § 201(d)(2)(A));

*Wyatt v. Syrian Arab Repub.*, 83 F. Supp. 3d 192, 197 (D.D.C. 2015) (funds that were

"authorized under a specific license" were immune from attachment, and "[b]ecause the funds

are subject to an OFAC license and may now be transferred without further OFAC intervention,

they are no longer 'frozen or seized' as required by [TRIA]"); *Hausler v. Repub. of Cuba v.*

*Comcast IP Phone II*, Case No. 09-20942-CIV-JORDAN, 2011 WL 13099669, at *4 (S.D. Fla.

Apr. 26, 2011) (funds were not "blocked assets" under TRIA because they were authorized

pursuant to an OFAC specific license); R&R on Mots. For Summ. J., *Martinez v. Rep. of Cuba*,

NO. 19-22095-CIV-MORENO/TORRES, ECF No. 61, at 15-16, *aff'd*, ECF No. 71 (assets

sought to be attached under TRIA were "authorized for transfer to Cuba" under OFAC licenses,

and thus were "not subject to an across-the-board prohibition on transfer" and not "blocked"

under TRIA).[4]

    As applied here, the OFAC License authorizes specific transfers of, and transactions

related to the liquidation of, $3.5 billion of the DAB Assets. *See supra* Part B.2 (Background).

Those assets are not frozen or otherwise subject to an "across-the-board prohibition on transfer;"

---

[4] In *R.J. O'Brien*, Judge Manion wrote separately to propose a distinction between general and specific licenses, opining that only the former would remove assets from TRIA attachability. *See* 784 F.3d at 632-33 (Manion, J., concurring in part and dissenting in part). Judge Manion considered a "general license" to be "not so much a license as a regulation preventing assets from being blocked in the first place," while a specific license is a "license issued under the authority of the regulations that is necessary to unblock assets that the regulations have at first blocked." *Id.* But the distinctions between general and specific licenses do not bear on the operative legal standard; both types of licenses are authorizations from OFAC to engage in specified activities or transactions involving certain blocked persons or property, and either can be issued concurrently with or after a blocking action. And as noted herein, courts—including the *R.J. O'Brien* majority—have consistently held that assets regulated by specific licenses are not attachable under TRIA. *See id.* at 622-24; *see also, e.g.*, *Wyatt*, 83 F. Supp. 3d at 197; *see generally* OFAC FAQs No. 74, *available at* https://home.treasury.gov/policy-issues/financial-sanctions/faqs/74 ("What is a license?") (describing the characteristics of general and specific licenses).

they therefore are not "blocked" for purposes of TRIA and are unavailable for attachment under TRIA.[5]

## C. The Court Should Provide the Judgment Plaintiffs a Full Opportunity to Submit Their Arguments Regarding the Attachability of the Blocked Assets Under TRIA.

Leaving aside the assets regulated by the OFAC License that are therefore not blocked (and not attachable) for TRIA purposes, there remain substantial DAB Assets that are certainly "blocked assets," subject to the prohibitions of the E.O.  And the Judgment Plaintiffs have "obtained a judgment against a terrorist party on a claim based upon an act of terrorism."  TRIA § 201.  So with respect to those two requirements, the Judgment Plaintiffs have satisfied the applicable standards under TRIA.

The question remaining for the Court is therefore whether the unlicensed DAB Assets are "blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)."  *Id.*; *see also Hausler*, 770 F.3d at 212 (citing *Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 1001 (2d Cir. 2014)); *Heiser v. Islamic Repub. of Iran*, 735 F.3d 934, 937-40 (D.C. Cir. 2013).

On that question, the United States respectfully urges that the Judgment Plaintiffs should be afforded a full opportunity—consistent with the purpose and standards of TRIA—to submit their arguments as to why they believe this legal requirement is satisfied.  The United States has a compelling interest in permitting victims of terrorism to obtain compensation to the greatest degree permitted under the law.  The United States does not, at this stage, take a position

---

[5] OFAC will not actually direct the execution of the authorized transfers while the Court reviews the pending writs of execution on the DAB Assets.  Indeed, the OFAC License makes clear that it "does not excuse [FRBNY] from the need to comply with any applicable orders, rulings, writs, or other judicial process of the United States federal courts."  *See* Ex. B. at 1 ¶ 5.

regarding whether the Judgment Plaintiffs have satisfied the remaining requirement for attachment under TRIA but identifies below considerations relevant to the Court's analysis of whether the requirement is satisfied.

*Ownership*.  In assessing whether the DAB Assets constitute the "blocked assets of [a] terrorist party" or the "blocked assets of any agency or instrumentality of that terrorist party," the word "of" plays an important role.  TRIA's standard requires an inquiry into whether a terrorist party (or an agency or instrumentality thereof) has an ownership interest in the DAB Assets. *See, e.g.*, *Heiser*, 735 F.3d at 937-40 (applying TRIA § 201 only against assets that the terrorist party owns).  As explained in greater detail below, determinations of ownership for purposes of TRIA implicate significant issues of foreign policy that sound in federal law, both as pertains to the governance of the international banking system and the prerogative of the President to recognize and to conduct diplomacy with foreign states.

*Terrorist Party*.  In assessing whether the DAB Assets, as Afghan central bank assets, constitute the "blocked assets of [a] terrorist party," itself, TRIA § 201(d)(4), "a foreign state is a 'terrorist party' for purposes of TRIA § 201(d) when it is 'designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 . . . or section 620A of the Foreign Assistance Act of 1961,'" *Calderon-Cardona*, 770 F.3d at 999 (quoting *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 867 F. Supp. 2d 389, 394 (S.D.N.Y. 2011)).  The State of Afghanistan has not been designated as a state sponsor of terrorism, nor have its agencies or instrumentalities been designated under other counterterrorism sanctions authorities.   A non-state entity is a "terrorist party" if it satisfies the definition specified in 8 U.S.C. § 1182(a)(3)(B)(vi).  TRIA § 201(d)(4).  The Taliban satisfies that definition.

***Agency or Instrumentality***.  In assessing whether the DAB Assets constitute the "blocked assets of any agency or instrumentality of that terrorist party," it will be necessary for the Court to consider the meaning of "agency or instrumentality" in this context.  Although TRIA does not define "agency or instrumentality," *see id.* § 201(d), the FSIA provides a starting point, defining "agency or instrumentality of a foreign state" as "any entity":

> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).  The DAB is an agency or instrumentality of the State of Afghanistan under the FSIA's definition and thus is to be treated as a "foreign state" for purposes of the FSIA.  28 U.S.C. § 1603(a) ("A 'foreign state', . . . includes . . . an agency or instrumentality of a foreign state as defined in subsection (b).").

Courts have held that the meaning of "agency or instrumentality" in TRIA cannot, however, be fully coextensive with the FSIA's definition because TRIA's definition of "terrorist party" encompasses non-state actors, whereas the FSIA applies only to foreign sovereigns.  For example, the Second Circuit has cautioned that TRIA's definition of an "agency or instrumentality" should not be read to "require[] a foreign state principal."  *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Repub. of Iran*, 138 S. Ct. 816 (2018) (citation omitted).  In a case concerning whether an entity holding blocked assets was the agency or instrumentality of a foreign state that had been designated as a state sponsor of terrorism, the *Kirschenbaum* court granted the terms "agency or instrumentality" their "ordinary meanings."  In evaluating whether the non-state entity acted as the "agency or instrumentality" of the designated state sponsor of terrorism, the

Second Circuit held that a plaintiff must establish that a defendant "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, *or* (3) was owned, controlled, or directed by the terrorist party." *Id.* at 135 (citing *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 723 (11th Cir. 2014)); *see also, e.g.*, *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 198-99 (2d Cir. 2019) (concluding that a corporation was an "agency or instrumentality" of a designated state sponsor of terrorism because it was undisputed that the corporation was an alter ego of the state and was "owned, controlled, and directed" by the state); *Levin v. Bank of New York Mellon*, No. 09 Civ. 5900 (JPO), 2019 WL564341, at *4 (S.D.N.Y. Feb. 12, 2019) (holding that a genuine issue of material fact existed as to whether a private individual was an agent or instrumentality of Iran).[6]

    *Kirschenbaum* arose in a different posture than is presented here. The Second Circuit had no occasion in that case to consider whether, and under what circumstances (if any), an agency or instrumentality of a foreign state can simultaneously also be an agency or instrumentality of a non-state entity. As discussed below, the relevant legal considerations may differ when a court is asked to assess whether a foreign state, including its agency or instrumentality, can also act as an agency or instrumentality of a non-state entity.[7]

---

[6] In describing these judicial holdings, the United States does not adopt them as its own interpretations of the governing legal standards.

[7] In 2000, OFAC determined DAB "to be owned or controlled by, or to act for or on behalf of, the Taliban." *See* Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers; Addition of Persons Blocked Pursuant to 21 Part 538, 31 Part 597, or Executive Order 13129, 65 Fed. Reg. 39,100 (June 23, 2000). Notably, TRIA was enacted after this action was taken and after DAB was removed in 2002 from the Specially Designated Nationals and Blocked Persons List (*see* https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20020212).

A district court has applied *Kirschenbaum*'s agency or instrumentality standard to assess whether an agency of a foreign government is also an agency or instrumentality of a terrorist party.  In *Caballero v. Fuerzas Armadas Revolucionarias de Columbia*, No. 20-MC-0040-LJV (W.D.N.Y. Dec. 18, 2020), the court issued a sealed order on a sealed, *ex parte* motion seeking to attach assets held by Venezuelan state-owned oil company PDVSA, on the theory that PDVSA was an agency or instrumentality of the terrorist group FARC.  *See Caballero*, ECF No. 15.  In light of the sealed posture of *Caballero*, the district court did not consider or pass upon the considerations identified in this Statement—particularly whether TRIA might limit the circumstances in which a court could determine that an agency or instrumentality of a foreign state not designated as a state sponsor of terrorism could nevertheless be deemed an agency or instrumentality of a terrorist party.

**Central Bank Considerations.**  In considering the position of the Judgment Plaintiffs, the Court should be mindful of the developed body of law as to ownership of assets in the context of foreign central banks.  As a general rule, "[a]ny funds in an account in the name of a foreign central bank are . . . funds 'of' that central bank."  *Weston Compagnie de Finance et D'Investissement, S.A. v. La Republica Del Ecuador* ("*Weston*"), 823 F. Supp. 1106, 1112 (S.D.N.Y. 1993); *see also NML Capital, LTD v. Banco Central de la Republica Argentina*, 652 F.3d 172, 195 (2d Cir. 2011).  Some courts have refined this principle into a presumption, at least in the context of the FSIA's provision governing property of foreign central banks (28 U.S.C. § 1611(b)): "[A]n account that is registered in the name of a foreign central bank is *presumed* to be the 'property of' that foreign central bank under Section 1611 absent specific evidence

---

OFAC's 2000 determination, made solely in the sanctions context, rested on a different standard than the "agency or instrumentality" analysis under TRIA, which calls for a distinct analysis. OFAC has not made a similar, more recent determination with respect to DAB.

overcoming the presumption and establishing that the central bank does not own the account."

*Cont'l Transfert Technique*, 2019 WL 3562069, at \*7.  "That presumption can be rebutted only

by providing evidence that the Account is not, in fact, the property of the foreign central bank," a

burden that is "substantial."  *Id.* at \*10 (citation omitted).  This mode of reasoning accords with

and, indeed, is based upon, New York state law.  *See EM Ltd. v. Repub. of Argentina*, 473 F.3d

463, 473-74 (2d Cir. 2007) ("[Under New York law] [w]hen a party holds funds in a bank

account, possession is established, and the presumption of ownership follows") (quoting *Karaha

Bodas Co, LLC v. Perusahaan Pertambangan Minyak Dan Gas Gumi Negara*, 313 F.3d 80, 86

(2d Cir. 2002)).

There are federal-law implications, under the FSIA and TRIA, if the assets at issue are

deemed to be the property of a central bank.  The FSIA provides that property of a central bank

held for its own account is immune from attachment and execution unless the parent foreign

government has "explicitly waived its immunity from attachment in aid of execution."  *See* 28

U.S.C. § 1611(b)(1) ("the property of a foreign state shall be immune from attachment and from

execution, if . . . the property is of a foreign central bank or monetary authority held for its own

account"); *see also, e.g.*, *NML Capital*, 652 F.3d at 189 (this provision "reflects Congress's

understanding that while the 'funds of foreign central banks' are managed through those banks'

accounts in the United States, those funds are, in fact, the 'reserves of the foreign states'

themselves") (quoting H.R. Rep. No. 94-1487 at 31, *as reprinted in* 1976 U.S.C.C.A.N. 6604,

6630) (brackets omitted); *EM Ltd. v. Repub. of Argentina*, 473 F.3d 463, 473 (2d Cir. 2007)

(discussing protections provided to foreign central banks under FSIA).

Under TRIA, the FSIA's immunities and exemptions are inapplicable, but there would be

a series of potential implications to a determination that the DAB Assets are the property of a

central bank.  To the extent the assets of a foreign central bank represent the foreign state's reserves, such assets belong necessarily to the foreign state and thus would not be the assets of a private party.[8]

**_Recognition and Sovereign Immunity Issues._**  If the Court determines that attachability turns on whether the Taliban is the Government of Afghanistan or that the DAB Assets constitute foreign state assets, a series of principles of hornbook law will prove instructive.

*First*, there is a distinction between a foreign government and a foreign state, and "[a] state can . . . recognize or treat an entity as a state while denying that a particular regime is its government."  RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 203 cmt. a.  Accordingly, there is a distinction between property owned by the state, and property owned by a regime that comprises the government of that state.  This principle accords with more general principles of corporate and agency law such as the idea that corporate property (by analogy, the property of the state) is not the property of the shareholders or directors of the corporation (the leaders of the state), but of the corporation itself.  *See*, *e.g.*, *Movitz v. Todd*, 24 Fed. App'x 708, 709 (9th Cir. 2001) ("By the very nature of the corporation the corporate property is vested in the corporation itself and not in its stockholders.") (quoting *Corp. Comm'n v. Consol. Stage Co.*, 62 Ariz. 257 (1945)).  And in this context, the assets of a central bank are considered those of the foreign state itself, not its government.  *See supra*.

---

[8] As noted above, while TRIA allows attachability of state assets in certain circumstances, it only does so with respect to designated state sponsors of terrorism.  *See* TRIA § 201(d)(4).

Moreover, to the extent that the DAB Assets are the property of the State of Afghanistan, the Court may consider whether the Judgment Plaintiffs have provided adequate notice to the State consistent with the provisions of FSIA.  *See* 28 U.S.C. §§ 1608, 1610(c).

*Second*, the authority to recognize a foreign government rests exclusively with the President and is not a matter for judicial inquiry.  *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2089 (2015) ("[T]he Court has long considered recognition to be the exclusive prerogative."); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918).  Here, the United States has not yet made a decision as to whether to recognize the Taliban or any other entity as the Government of Afghanistan or as part of such a government.

*Third*, as a general rule, "a regime not recognized as the government of a state is not entitled to property belonging to that state located in the United States."  RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 205(1); *see also Repub. of Panama v. Rep. Nat. Bank of N.Y.*, 681 F. Supp. 1066, 1071 (S.D.N.Y. 1988); *Bank of China v. Wells Fargo Bank & Union Trust Co.*, 104 F. Supp. 59, 66 (N.D. Cal. 1952), *aff'd*, 209 F.2d 467 (9th Cir. 1953); *The Maret*, 145 F.2d 431, 442 (3d Cir. 1944).  Thus, under the Restatement, certain questions of ownership can be answered by looking to which entity has been recognized by the United States.

*Fourth*, exceptions to execution immunity are, as a general matter, to be narrowly defined.  This principle:

> is both well established and based on a critical diplomatic reality: Seizing a foreign state's property is a serious affront to its sovereignty . . . Correspondingly, judicial seizure of a foreign state's property carries potentially far-reaching implications for American property abroad.

*Rubin v. Islamic Repub. of Iran*, 830 F.3d 470, 480 (7th Cir. 2016); *see also Repub. of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142 (2014) (discussing "narrower" exceptions to execution immunity under FSIA); *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 289 (2d Cir. 2011) (collecting cases noting that limits on execution immunity are intended to promote

foreign relations and comity).  Accordingly, the Judgment Plaintiffs' theory of ownership must be measured against a benchmark that accounts for the risk of reciprocal challenges to American property abroad.

Synthesizing these principles, the Judgment Plaintiffs must establish a theory of ownership by the Taliban that would not require this Court—either expressly or by implication—to make its own determination as to the identity of Afghanistan's government or to make its own determination as to whether Afghanistan is a state sponsor of terrorism.[9]

The United States appreciates the opportunity to submit its views and to describe its interests in this matter.

---

[9] The text of TRIA reinforces the distinct role of the Executive Branch in making determinations as to foreign states.  In defining which kinds of "terrorist party" assets could be attached under TRIA, Congress provided distinct categories for non-state actors ("terrorist" and "terrorist organization") and state actors ("a foreign state designated as a state sponsor of terrorism"). TRIA § 201(d)(4).  Where a state is not designated as a state sponsor of terrorism, TRIA does not authorize the attachment of a foreign state's assets to satisfy a judgment against the foreign state. Permitting a foreign state's assets to be attached indirectly to satisfy the judgment against a non-state terrorist organization would supplant the discretion that Congress afforded to the Executive Branch in designating state sponsors of terrorism.  *See* 50 U.S.C. App. § 2405(j); 22 U.S.C. § 2371.  In applying *Kirschenbaum*, the *Caballero* court did not pass upon whether the asset-holder's status as a state-owned entity required a different analysis.

Dated: New York, New York
      February 11, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

ANTHONY J. COPPOLINO
Deputy Branch Director

By: _/s/ Joseph E. Borson_
    JOSEPH E. BORSON
    Trial Attorney
    U.S. Department of Justice
    Civil Division, Federal Programs Branch
    1100 L Street, NW
    Washington, DC 20005
    Tel.: (202) 514-1944
    Email: Joseph.Borson@usdoj.gov

By: _/s/ Rebecca S. Tinio_
    REBECCA S. TINIO
    JEANNETTE A. VARGAS
    Assistant United States Attorneys
    86 Chambers Street, Third Floor
    New York, New York 10007
    Tel.: (212) 637-0179
    Fax: (212) 637-2686
    Email: Rebecca.Tinio@usdoj.gov
          Jeannette.Vargas@usdoj.gov