UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| JOHN DOES 1 THROUGH 7, | : |
| Plaintiffs, | : |
| - against - | : No. 20 Misc. 740 (GBD) |
| THE TALIBAN *et al.*, | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | : No. 03 MD 1570 (GBD) (SN) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| FIONA HAVLISH *et al.*, | : |
| Plaintiffs, | : |
| - against - | : No. 03 Civ. 9848 (GBD) (SN) |
| SHEIKH USAMAH BIN-MUHAMMED BIN-LADEN, a.k.a. OSAMA BIN-LADEN *et al.,* | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO INTERVENE**

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, 157 U.S. Government employees killed or injured in the August 7, 1998, Al Qaeda bombings of the U.S. Embassies in Nairobi, Kenya and Dar-es-Salaam, Tanzania, their family members, and the personal representatives of their estates, (the "Intervenors"), move to intervene as Plaintiffs in the above-referenced matters for the purpose of defending an interest in certain funds of the foreign state of Afghanistan and the Central Bank of Afghanistan (Da Afghanistan Bank, "DAB"). Those funds are currently blocked and maintained by Executive Order in a consolidated account held at the Federal

1

Reserve Bank of New York ("Afghan funds"). The U.S. Government employees who bring this motion were specifically targeted and killed or injured by the same apparatus of terrorism—Osama Bin Laden's Al Qaeda network which was safely harbored by the Taliban led government of Afghanistan at the time of the 1998 attack—as the current Plaintiffs in the above captioned actions. The Plaintiffs sought and obtained a default judgment against the Taliban as a "non-sovereign defendant." If the Court determines nonetheless that the current Plaintiffs have an interest in the Afghan funds, then so do Intervenors.

The Intervenors seek to assert claims nearly identical to those asserted by the current Plaintiffs, and that arise out of an earlier terrorism attack launched by and supported by the same Defendants in these proceedings. Plaintiffs will not be prejudiced by the intervention of these Intervenors, who are simply additional victims of Defendants' terrorism targeted at America and U.S. Government employees and diplomatic facilities around the world. Furthermore, Defendants will not be prejudiced by the Court's decisions regarding the disposition of the Afghan funds.

Accordingly, as discussed in more detail below, Intervenors are entitled to intervene in these actions as a matter of right under Rule 24(a)(l) and Rule 24(a)(2), or, in the alternative, should be allowed to intervene permissively under Rule 24(b).[1]

**STATEMENT OF FACTS**

On August 7, 1988, terrorists driving "truck bombs" detonated deadly explosives in simultaneous and catastrophic attacks on the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. Those attacks killed hundreds of people and injured over a thousand. The

---

[1] Given the similarity of the pending judgment execution efforts against the funds of the Central Bank of Afghanistan by the Doe Plaintiffs in *John Does 1 Through 7 v. The Taliban, et al.,* No. 20-mc-740 (GBD) and the Havlish Plaintiffs in *Havlish et al. v. Osama bin Laden et al.*, No. 03-cv-09848 (GBD), reference to the Plaintiffs in this Memorandum generally extends to both groups of judgment creditors.

Intervenors in this motion are 157 U.S. Government employees killed or injured in these attacks, their immediate family members, and the personal representatives of their estates.

On December 11, 2003, the Havlish Plaintiffs filed their original Complaint and asserted claims on behalf of those killed or injured in the 9/11 attacks and their family members under applicable law. Plaintiffs' right to relief is based upon Defendants' support of Al Qaeda. Intervenors' right to relief in their original cases also arose from a group of defendants' support of Al Qaeda prior to the 1998 bombings. For both the 9/11 attacks and the 1998 Embassy bombings, Bin Laden and Al Qaeda's leadership sat safely ensconced in Afghanistan when the actual long-plotted attacks occurred and received the protection of the Taliban led government of Afghanistan.

In August 2008, Intervenors filed a lawsuit against the Republic of Sudan, the Islamic Republic of Iran, and various governmental agencies of Sudan and Iran, under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, seeking damages as a result of Sudan and Iran's material support of al Qaeda leading to the August 1998 Embassy bombings. Three additional lawsuits were filed by U.S. Government employees killed or injured in the same attack; the plaintiffs from all four cases comprise the Intervenors at issue in this Motion.[2]

On November 30, 2011, after a three-day evidentiary bench trial, the Honorable John D. Bates of the United States District Court for the District of Columbia entered a judgment on liability finding that the Governments of Sudan and Iran provided material support and resources to Osama Bin Laden and al Qaeda for acts of terrorism against the United States. Based on the evidentiary hearing, which included the presentation of live testimony, videotaped testimony, affidavits, and

---

[2] *Amduso v. Republic of Sudan*, Civil Action No. 08-1361, (D.D.C.); *Wamai v. Republic of Sudan*, Civil Action No. 08-1349, (D.D.C.); *Onsongo v. Republic of Sudan*, Civil Action No. 08-1380, (D.D.C.); *Opati v. Republic of Sudan*, Civil Action No. 12-1224, (D.D.C.).

original documentary and video evidence, Judge Bates concluded that "[w]ith the support of Sudan and Iran, al Qaeda killed and attempted to kill thousands on site in the 1998 U.S. embassy attacks in Nairobi, Kenya and Dar es Salaam, Tanzania," including Petitioners. *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 146 (D.D.C. 2011).

On July 25, 2014, in all four cases, Judge Bates assessed damages and ordered that final judgment be entered in favor of the Intervenors for their injuries and damages caused by the Governments of Sudan and Iran. Judge Bates found that it had been established that Sudan and Iran "were responsible for supporting, funding, and otherwise carrying out the bombings in Nairobi and Dar es Salaam." *See Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42, 46 (D.D.C. 2014). On July 28, 2014, the Final Judgments were certified in the District of Columbia and then registered in the Southern District of New York on July 29 and 30, 2014.[3]

On September 13, 2021, Plaintiffs in this case filed a Writ of Execution against assets held in the name of the government of Afghanistan at the Federal Reserve of New York. ECF #526-1. The United States filed a Statement of Interest regarding the treatment of the Afghan funds currently in the Federal Reserve Bank of New York on February 11, 2022 in this case. ECF #563.

On February 11, 2022, the President of the United States issued an Executive Order, ECF #563 Exh. A, which:

> addresses the property and interests in property of Afghanistan's central bank, Da Afghanistan Bank ("DAB"), that are held in the United States by any U.S. financial institution, including the Federal Reserve Bank of New York ("FRBNY"), as of February 11, 2022 (the "DAB Assets"). In recognition of the "unusual and extraordinary threat to the national security and foreign policy of the United States" posed by the "widespread humanitarian crisis in Afghanistan," the E.O. blocks the DAB Assets, providing that such assets "may not be transferred, paid, exported, withdrawn, or otherwise dealt in," except as specified by the Executive Order.

---

[3] *Amduso v. Republic of Sudan, et al.*, Case No. 1:14-mc-00233-P1 (S.D. N.Y. July 29, 2014); *Onsongo, et al. v. Republic of Sudan, et al.*, Case No. 1:14-mc-00230-P1 (July 29, 2014); *Opati, et al. v. Republic of Sudan, et al.*, Case No. 1:14-mc-00231-P1 (S.D.N.Y. July 29, 2014); *Wamai v. Republic of Sudan, et al.*, Case No. 1:14-mc-00232-P1 (S.D.N.Y. July 30, 2014).

4

Statement of Interest of the United States of America, ECF #563 at 1.  The President stated in his February 11 Executive Order the following:  "I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims.  This property is blocked under this order." February 11, 2022 Exec. Order at 1 (ECF #563 Exh. A).  In further explanation, the U.S. Government issued on February 11 a "Fact Sheet" concerning the President's Executive Order that included the following statement:

> Many U.S. victims of terrorism, including relatives of victims who died in the September 11, 2001 terrorist attacks, have brought claims against the Taliban and are pursuing DAB assets in federal court. Because some of these plaintiffs currently have writs of execution against the DAB assets, the court will need to issue a further decision regarding the scope of those writs. Even if funds are transferred for the benefit of the Afghan people, more than $3.5 billion in DAB assets would remain in the United States and are subject to ongoing litigation by U.S. victims of terrorism. Plaintiffs will have a full opportunity to have their claims heard in court.

White House Fact Sheet, "Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan," (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/.

In light of the President's February 11, 2022 Executive Order and U.S. Government's Statement of Interest, the Intervenors seek to intervene to secure their interests in the subject funds and an equitable distribution of any such funds through the U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund") to compensate all victims of state sponsored terrorism holding final judgments against any state sponsor of terrorism.

5

**ARGUMENT**

I. **Victims of Al Qaeda Terrorism Prior to 2002 May Properly Intervene in this Action as of Right.**

Intervenors have the same connection and interest in the assets held in the name of the Central Bank and foreign state of Afghanistan at the Federal Reserve of New York as do Plaintiffs in this case. Plaintiffs do not hold judgment against the assets, the Afghanistan Central Bank, or the foreign state of Afghanistan. Such action would have required that they proceed under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* and satisfy the requirements of the FSIA, (i) in obtaining jurisdiction against the foreign state of Afghanistan, *see* 28 U.S.C. §§ 1605, 1605A, 1605B; (ii) in completing service of their complaint, *see* 28 U.S.C. § 1608(a); (iii) in completing service of their judgment, *see* 28 U.S.C. § 1608(e); and (iv) in satisfying the burden of proof necessary to obtain the judgment, *see* 28 U.S.C. § 1608(e). Instead, the Plaintiffs sought and obtained a judgment against the Taliban as "a non-sovereign party"[4] even though the Taliban controlled and directed the government of Afghanistan in the years leading to, and at the time of, the September 2001 attacks.[5]

The Plaintiffs sought and the Court directed that judgment be entered against "certain non-sovereign defendants, including Osama bin [L]aden, the Taliban, and al Qaeda."[6] Yet, the Plaintiffs now rely on that October 2012 judgment against the non-sovereign Taliban to attach the funds of the foreign state of Afghanistan and its central bank currently held by the Federal

---

[4] Memorandum Decision and Order, No. 03-cv-09848 (GBD), Dkt. #316, at 1 (Oct. 3, 2012); Order and Judgment, No. 03-cv-09848 (GBD), Dkt. #317 (filed Oct. 16, 2012).

[5] *See also* Order of Judgment, No. 03-cv-09848 (GBD), Dkt. #295 at 3 (Dec. 22, 2011) (entering default judgment on liability against "Non-Sovereign Defendants," including "The Taliban, a/k/a The Islamic Emirate of Afghanistan").

[6] Memorandum Decision and Order, Dkt. #316 at 1. The Plaintiffs at the same time sought and the Court directed that judgment be entered against "certain sovereign defendants, including the Islamic Republic of Iran" and other Iranian agents, agencies and instrumentalities. *Id.* Neither the foreign state of Afghanistan nor any agency or instrumentality of Afghanistan was among those "certain sovereign defendants."

Reserve System.[7]  Even if the Plaintiffs had followed the FSIA in obtaining their judgment against the non-sovereign Taliban, the FSIA prohibits all judgment creditors from attachment and execution upon the property or funds of a foreign state where the subject "property is that of a foreign central bank or monetary authority held for its own account." 28 U.S.C. § 1611(b)(1).

Further, the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (2002) ("TRIA"), does not authorize and support judgment execution against the blocked assets of the Central Bank of Afghanistan and the foreign state of Afghanistan because they have never been a "terrorist party" within of the meaning of TRIA, § 201(d)(4). "The State of Afghanistan has not been designated as a state sponsor of terrorism, nor have its agencies or instrumentalities been designated under other counterterrorism sanctions authorities." Statement of Interest of the United States of America, Dkt. #563 at 20 (Feb. 11, 2022).  Under like circumstances, the Court of Appeals for the Second Circuit denied an attempt to execute against the property of a foreign state.  In *Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 999 (2d Cir. 2014), *cert. denied*, 577 U.S. 1113 (2016), the Court of Appeals rejected an effort to attach North Korean funds pursuant to TRIA because North Korea was not a designated state sponsor of terrorism at the time the judgment was entered and, thus, not a "terrorist party" within the meaning of TRIA.

Plaintiffs' justification for their seizure of the assets lies in their injuries caused by Al Qaeda, which the then-government of Afghanistan sheltered and provided with safe harbor prior to, at the time of, and for a short period after the September 2001 terrorist attacks.  Intervenors have the same claim.

---

[7] *See* Feb. 14, 2022 Declaration by Plaintiffs' Counsel in Support of Motion to Lift Stay of Judicial Enforcement of Writ of Execution and Exhibit 1, No. 03-cv-09848, Dkt. #556, #556-1 (attaching Writ of Execution in reliance on the October 16, 2012 Judgment).

Intervenors therefore seek a declaration from the Court. In view of the fact that neither Plaintiffs, the Intervenors, nor other judgment creditors have an explicit right to the Afghan funds, the only equitable solution would be that a distribution, if any, of the Afghan Funds be to all victims of state-sponsored terrorism holding valid final judgments via the United States Victims of State Sponsored Terrorism Fund (USVSST Fund).[8]

Pursuant to Federal Rule of Civil Procedure 24(a)(2), the Intervenors are entitled to intervene in this action under Federal Rule ofCivil Procedure 24(a)(2). That rule provides:

> On timely motion, the court must permit anyone to intervene who: … (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the mov'nt's ability to protect its interests, unless parties adequately represent that interest.

Thus, Rule 24(a)(2) contains four elements: (1) timeliness; (2) a cognizable interest; (3) the possible impairment of that interest; and (4) a lack of adequate representation. *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994). The Intervenors demonstrably satisfyall of the criteria for intervention as of right.

"Motions to intervene are highly fact-specific and tend to resist comparison to prior cases." *Floyd v. City of New York*, 302 F.R.D. 69, 83 (S.D.N.Y. 2014), *aff'd in part, appeal dismissed in part*, 770 F.3d 1051 (2d Cir. 2014) (citing *Bay Casino, LLC v. M/V Royal Empress*, 199 F.R.D. 464, 466 (E.D.N.Y. 1999)). In deciding whether an applicant possesses a right to intervene, "courts are guided by practical and equitable considerations in an effort to balance 'efficiently administrating legal disputes by resolving all related issues in one lawsuit, on the onehand, and keeping a single lawsuit from becoming unnecessarily complex, unwieldy or prolonged, on the other hand.'" *Floyd*, 302 F.R.D. at 83 (quoting *Pitney Bowes*, 25 F.3d at 69).

In this case, those equitable considerations counsel strongly in favor of granting

---

[8] *See generally,* http://www.usvsst.com/

Intervenors' request to intervene as of right.

### 1. The Motion to Intervene is Timely

Not until February 11, 2022, and the actions of the President and United States on that day, did there exist a plausible avenue of recovery against the Afghan funds. Although an intervention as of right is generally mandatory if its requirements are satisfied, "the determination of the timeliness of a motion to intervene is within the discretion of the district court." *Farmland Dairies v. Comm'r of the N.Y. State Dep't of Agric. & Mkts.*, 847 F.2d 1038, 1043–44 (2d Cir. 1988); *see also In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 198 (2d Cir. 2000) ("A district court has broad discretion in assessing the timeliness of a motion to intervene, which defies precise definition." (internal quotation marks and citation omitted)). The timeliness requirement "is flexible," *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 594–95 (2d Cir. 1986), and should be determined "from all the circumstances," *Pitney Bowes*, 25 F.3d at 70. Accordingly, a district court "must not consider merely the length of time the litigation or proceeding has been pending." *Yonkers Bd. of Educ.*, 801 F.2d at 594–95; *see also Cook v. Bates*, 92 F.R.D. 119, 122 (S.D.N.Y. 1981) ("While an application for intervention of right must be 'timely' [, i]n the absence of prejudice to the opposing party, even significant tardiness will not foreclose intervention."). "Since in situations in which intervention as of right the would-be intervenor may be seriously harmed if intervention is denied, courts should be reluctant to dismiss such a request for intervention as untimely, even though they might deny the request if the intervention were merely permissive." Wright *et al.*, 7C Fed. Prac. & Proc. Civ. at § 1916.

To assist trial courts in determining the timeliness of a motion to intervene, the Second Circuit has developed the following four nonexclusive factors that courts should consider: "(1) how long the applicant had notice of the interest before [he] made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied;

9

and (4) any unusual circumstances militating for or against a finding of timeliness." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001) (internal quotation marks and citation omitted). Of these four factors, "the most significant criterion in determining timeliness is whether the delay in moving for intervention has prejudiced any of the existing parties." *Hartford Fire Ins. Co. v. Mitlof*, 193 F.R.D. 154, 160 (S.D.N.Y. 2000) (internal quotation marks and citation omitted). All of these factors support Intervenors' Motion.

Intervenors would suffer substantial prejudice if their motion to intervene is denied. Their total final judgments are worth more than $4.3 billion in compensatory damages, and it is unlikely that sufficient collectible assets will become available in the future. Accordingly, if this Court were to deny Intervenors' motion to intervene, this Court would likely forever deny justice to many victims of terrorism, who are equally deserving of justice as the 9/11 plaintiffs.

In contrast to the substantial prejudice that Intervenors would suffer if their motion to intervene were denied, if the motion to intervene is granted, any prejudice to the existing parties would be minimal. Intervenors all have final judgments and their damages have been reduced to a final number, thus granting the motion to intervene would not raise new or distinct factual issues for resolution.

The strength of the equities at issue here constitutes an unusual circumstance that weighs strongly in favor of granting Intervenors' motion to intervene as of right. *See Dow Jones & Co. v. U.S. Dep't of Justice*, 161 F.R.D. 247, 253 (S.D.N.Y. 1995) (holding that "unusual circumstances" justified granting a motion by a widow to intervene as of right in a Freedom of Information Act case seeking to compel disclosure of her husband's suicide note due to the amount of pain that such a disclosure would cause their family). Denying the motion to intervene is likely tantamount to permanently denying Intervenors' ability to assert its interests. Moreover, granting the motion to intervene serves an important public policy function by signaling that, in

cases like this one involving the property of a foreign state which has not previously been held liable, compensation (a) should be allocated, if at all, equitably to all terrorism victims but only consistent with law and (b) should not be determined by a race to the courthouse where the Government agrees or determines not to take an ultimate position "at this stage."

> **2. Intervenors Have a Substantial Interest in the Distribution of the Funds Subject to this Litigation and that Interest Would Be Impaired Were Their Intervention Motion Denied**

"The right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 130 (D.C. Cir. 1972). An applicant possesses an interest sufficient to intervene by right if that interest is "direct, substantial, and legally protectable." *Bridgeport Guardians, Inc. v. Delmonte*, 602 F.3d 469, 473 (2d Cir. 2010) (internal quotation marks and citation omitted). Nevertheless, Rule 24's "interest test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Cnty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (internal quotation marks and citation omitted). Accordingly, an applicant's interest in intervention is sufficient, for instance, "when the intervenor claims an identifiable interest in funds that are the subject of litigation." 7C Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 1908.1 (3d ed. 2014). Rule 24's impairment requirement is similarly based on "the practical disadvantage suffered, and does not require the would-be intervenor to go so far as to show that res judicata *principles* would affect any later suit they might bring." *Allco Fin. Ltd. v. Etsy*, 300 F.R.D. 83, 87 (D. Conn. 2014) (internal quotation marks and citation omitted).[9]

---

[9] "In *Restor–A–Dent Dental Lab., Inc.*, [725 F.2d 871, 874 (2d Cir. 1984),] the [Second Circuit] concluded that the 1966 amendments to Fed. R. Civ. P. 24(a) were intended to expand the right to intervene beyond those situations where the proposed intervenor 'is or may be bound by a judgment in the action' or where the

Whatever the ultimate nature and extent of their interest in funds of the foreign state of Afghanistan and its central bank, the interest of the Intervenors and Plaintiffs is the same. Both groups of victims were injured as a result of the provision of safe harbor and support to Al Qaeda by the Taliban-led government of Afghanistan and therefore have the same interest in the subject Afghan funds. Neither the Plaintiff nor the Intervenors secured a judgment against the foreign state of Afghanistan.

### 3. **Impairment**

Moreover, Intervenors' interest in the limited funds would be significantly impaired were their intervention motion denied. As discussed above, the total value of the final judgments resulting from Al Qaeda terrorism far exceeds the value of the available collectible assets. Intervenors' final judgments exceed $4 billion in compensatory damages. Accordingly, denying Intervenors' motion, and distributing the Afghan funds in their absence, would impair their ability to achieve redress—through any mechanism—for the injuries they and other similarly situated judgment creditors have suffered at the hands of Al Qaeda. Intervenors have shown that Rule 24(a)'s impairment prong is satisfied.

### 4. **Intervenors' Interests Are Not Adequately Represented by the Existing Parties**

Although the burden to demonstrate the inadequacy of representation of interests is on the intervenor, that burden is minimal and not onerous. *Hoblock v. Albany Cnty. Bd. Of Elections*, 233 F.R.D. 95, 99 (N.D.N.Y. 2005); *see also U.S. Postal Serv. v. Brennan*, 579 F.2d

---

'applicant is so situated as to be adversely affected by adistribution or other disposition of property in the custody of the court or of an officer thereof.'" *Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 100 (E.D.N.Y. 1996) (quoting original Fed. R. Civ. P. 24(a)(2) and (3)). After the 1966 amendments, an applicant need only show that she "would be substantially affected in a practical sense by the determination made in an action." Fed. R. Civ. P. 24 advisory committee's note, 1966 Amendment, Federal Civil Judicial Procedure and Rules, at 104.

188, 191 (2d Cir. 1978). In determining whether a proposed intervenor's interest is being adequately represented by existing parties, courts in this Circuit often look to whether there is evidence of "(1) collusion; (2) adversity of interest; (3) possible nonfeasance; or (4) incompetence." *Dorsett v. Cnty. of Nassau*, 283 F.R.D. 85, 93 (E.D.N.Y. 2012) (internal quotation marks and citation omitted); *see also British Airways Bd. v. Port Auth. of N.Y. & N.J.*, 71 F.R.D. 583, 585 (S.D.N.Y. 1976).

Here, while the Intervenors' claims are substantially similar to those in the original action and arise out of similar incidents, the current Plaintiff victims are represented by separate counsel who represent only the interests of their clients. The existing parties seek to further their individual interests in recovery. Given the limited funds available, those efforts necessarily come at the expense of other victims of the Iran-sponsored Al Qaeda terrorism. By contrast, Intervenors are pursuing a fair and equitable distribution of Afghan funds that ensures that all of Al Qaeda's victims are compensated for their injuries. This Court should conclude that because an "adversity of interests" exists between Intervenors and the existing parties, Intervenors have adequately demonstrated that they are not adequately represented in this litigation.

## II. This Court Should Permit These Victims of Terrorism to Intervene in this Action Under Rule 24(b).

Even if this Court denies Intervenors' motion to intervene as of right under Rule 24(a), it should grant their request for permissive intervention pursuant to Rule 24(b). Permissive intervention may be granted when an intervenor "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). In analyzing Rule 24(b)(1), "the words claim or defense are not to be read in a technical sense, but only require some interest on the part of the applicant." *Dow Jones*, 161 F.R.D. at 254. A district court has "broad discretion" in deciding whether to grant permissive intervention. *N.Y. News, Inc. v. Kheel*, 972 F.2d 482, 487 (2d Cir. 1992). "The principal guide in deciding whether to grant permissive intervention is 'whether the intervention will unduly delay or prejudice the adjudication of the rights of the original

parties.'" *Pitney Bowes*, 25 F.3d at 73 (quoting former Fed. R. Civ. P. 24(b)(2)).

Permissive intervention is warranted here because Intervenors have the same or similar interest in the Afghan funds as the Plaintiffs and both Intervenors and Plaintiffs were injured by the same party which facilitated the August 1998 and September 2001 acts of terrorism. Moreover, as previously explained, Intervenors' intervention motion is timely and prompted by The President's recent Executive Order and Justice Department's Statement of Interest. Accordingly, if this court denies Intervenors' request to intervene as of right, it should nonetheless grant their request for permissive intervention.

## CONCLUSION

For the reasons set forth above, the Intervenors respectfully request this Court togrant their Motion to Intervene and declare that neither Intervenors nor Plaintiffs have an explicit right to the Afghan funds, thereby leaving any equitable distribution of the Afghan funds to victims of state-sponsored terrorism holding valid final judgments to the USVSST Fund.

Respectfully submitted,

Dated: February 16, 2022

*Adam Drexler*
Harry Rothenberg (HR 6795)
Adam Drexler (AMD 7743)
The Rothenberg Law Firm LLP
450 7th Avenue, 44th Floor
New York, New York 10123
(212) 563-0100
harry@injurylawyer.com, adrexler@injurylawyer.com

Nancy Guy Armstrong Miller
David Dickens
The Miller Firm, LLC
108 Railroad Avenue
Orange, VA 22960
(540) 672-4224

Steven R. Perles
Perles Law Firm, P.C.
816 Connecticut Avenue, N.W., 12th Floor
Washington, DC 20006
 (202) 955-9055

Gavriel Mairone
MM-Law LLC
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
(312) 253-7444

| | |
|---|---|
| William Wheeler | John Arthur Eaves, Jr. |
| Wheeler & Franks Law Firm, P.C. | Eaves Law Firm, LLC |
| 114 S. Broadway | 101 North State Street |
| Tupelo, MS 38804 | Jackson, MS 39201 |
| (662) 636-6055 | (601) 355-7961 |