# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOHN DOES 1 THROUGH 7,                          :
                                                :
Plaintiffs,                                     :
                                                :
- against -                                     : No. 20 Misc. 740 (GBD)
                                                : INTERVENOR COMPLAINT
THE TALIBAN *et al.*,                           :
                                                :
Defendants.                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: TERRORIST ATTACKS ON                     : No. 03 MD 1570 (GBD) (SN)
SEPTEMBER 11, 2001                              : INTERVENOR COMPLAINT
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FIONA HAVLISH *et al.*,                         :
                                                :
Plaintiffs,                                     :
                                                :
- against -                                     : No. 03 Civ. 9848 (GBD) (SN)
                                                : INTERVENOR COMPLAINT
SHEIKH USAMAH BIN-MUHAMMED                      :
BIN-LADEN, a.k.a. OSAMA BIN-LADEN *et al.,*     :
                                                :
Defendants.                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MILLY AMDUSO *et al.*,                          :
(see attached Appendix A for complete           :
list of Intervenors)                            :
                                                :
Intervenors.                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## **INTERVENOR COMPLAINT**

Intervenors, Milly Amduso, Winfred Wamai, Mary Onsongo, and Monicah Opati *et al.*,

file this lawsuit is an effort to obtain equal justice for the victims of terrorist attacks sponsored by

Al Qaeda when the government of Afghanistan supported and protected it.  Milly Amduso,

Winfred Wamai, Mary Onsongo, and Monicah Opati are the lead plaintiffs from the following

lawsuits: *Amduso v. Republic of Sudan*, Civil Action No. 08-1361, (D.D.C.); *Wamai v. Republic of Sudan*, Civil Action No. 08-1349, (D.D.C.); *Onsongo v. Republic of Sudan*, Civil Action No. 08-1380, (D.D.C.); *Opati v. Republic of Sudan*, Civil Action No. 12-1224, (D.D.C.).  All plaintiffs from these lawsuits obtained final judgments, are listed in the final orders awarding damages attached as Appendix A to the Intervenor Complaint, and file as Intervenors to this action.

1.     Pursuant to Rule 24 of the Federal Rules of Civil Procedure, 157 U.S. Government employees killed or injured in the August 7, 1998 Al Qaeda bombings of the U.S. Embassies in Nairobi, Kenya and Dar-es-Salaam, Tanzania, their family members, and the personal representatives of their estates, (the "Intervenors"), move to intervene as plaintiffs in the above-referenced matters for the purpose of defending an interest in the funds of the foreign state of Afghanistan and the Central Bank of Afghanistan (Da Afghanistan Bank, "DAB") that are currently blocked and maintained by Executive Order in a consolidated account held at the Federal Reserve Bank of New York ("Afghan funds").  These victims were killed or injured by the same apparatus of terrorism—Osama Bin Laden's Al Qaeda network which was safely harbored by the Taliban led government of Afghanistan in the years leading to and at the time of the 1998 attacks—as the current Plaintiffs in the above captioned actions.[1]

The Plaintiffs sought and obtained a default judgment against the Taliban as a "non-sovereign defendant."[2]   If the Court determines nonetheless that the current

---

[1] Given the similarity of the pending attachment and judgment execution efforts against the funds of the Central Bank of Afghanistan by the Doe Plaintiffs in *John Does 1 Through 7 v. The Taliban, et al.,* No. 20-mc-740 (GBD) and the Havlish Plaintiffs in *Havlish et al. v. Osama bin Laden et al.*, No. 03-cv-09848 (GBD), reference to the Plaintiffs in this intervenor complaint extends to both groups of judgment creditors. The Doe Plaintiffs obtained a default judgment in the Northern District of Texas against The Taliban as a non-state actor "arising from acts of international terrorism committed jointly by the Taliban, Al-Qaeda, and the Haqqani Network, in Afghanistan on January 4, 2016." *John Does 1 Through 7 v. The Taliban, et al.*, No. 20-cv-00605, Dkt. #1 at 1 (N.D. Tex. March 20, 2020).

[2] Memorandum Decision and Order, No. 03-cv-09848 (GBD), Dkt. #316, at 1 (Oct. 3, 2012) ("Havlish matter").  The Court in the Havlish matter directed that judgment be entered against "certain non-sovereign

Plaintiffs have a right to the Afghan funds, then likewise so do Intervenors.  As neither Intervenors nor Plaintiffs have an explicit right to the funds of the foreign state of Afghanistan and its central bank, an equitable solution concerning any possible distribution of Afghan Funds should be entrusted to the political branches and involve all victims of state-sponsored terrorism holding valid final judgments and eligible for compensation through the congressionally established U.S. Victims of State Sponsored Terrorism Fund.

2.      On February 11, 2022, the President of the United States issued an Executive Order, ECF# 563 Ex. A, which:

> addresses the property and interests in property of Afghanistan's central bank, Da Afghanistan Bank ("DAB"), that are held in the United States by any U.S. financial institution, including the Federal Reserve Bank of New York ("FRBNY"), as of February 11, 2022 (the "DAB Assets"). In recognition of the "unusual and extraordinary threat to the national security and foreign policy of the United States" posed by the "widespread humanitarian crisis in Afghanistan," the E.O. blocks the DAB Assets, providing that such assets "may not be transferred, paid, exported, withdrawn, or otherwise dealt in," except as specified by the Executive Order.

Statement of Interest of the United States of America, ECF# 563 at 1.  The President stated in his February 11 Executive Order the following:  "I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims.  This property is blocked under this order."  In further explanation, the U.S. Government issued on February 11 a "Fact Sheet" concerning the President's Executive Order that included the following statement:

> Many U.S. victims of terrorism, including relatives of victims who died in the September 11, 2001 terrorist attacks, have brought claims against the Taliban and are pursuing DAB assets in federal court. Because some of these plaintiffs currently have writs of execution against the DAB assets, the court will need to issue a further decision regarding the scope of those writs. Even if funds are transferred for the benefit of the Afghan people, more than $3.5 billion in DAB assets would remain in the United States and are subject to ongoing

---

defendants, including Osama bin [L]aden, the Taliban, and al Qaeda" and, as sought by the Havlish Plaintiffs, also against "certain sovereign defendants, including the Islamic Republic of Iran" and other Iranian agents, agencies and instrumentalities. *Id.*

litigation by U.S. victims of terrorism. Plaintiffs will have a full opportunity to have their claims heard in court.

White House Fact Sheet, "Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan," (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/.

3.      In light of the President's February 11, 2022 Executive Order, the Intervenors file this Intervenor Complaint to secure their interests in the subject funds and an equitable distribution of any such funds through the U.S. Victims of State Sponsored Terrorism Fund (USVSST Fund).[3] Congress intended the USVSST Fund to control the distribution of funds of a terrorist state blocked and seized by the U.S. Government to compensate victims of state sponsored terrorism holding final judgments against any state sponsor of terrorism.

4.      Jurisdiction in this Court arises pursuant to 28 U.S.C. §§ 1605A, 1330(a), 1331 and 1332(a)(2).

5.      The Intervenors in this case include 157 current and former employees and contractors of the U.S. Government employed at the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania.   Among those U.S. Government employees and contractors are U.S. nationals and non-U.S. nationals, including 34 who were killed in the August 1998 bombings of the U.S. Embassies in Kenya and Tanzania and more who have died since 1998 as a result of their injuries suffered in the bombings.  Each of those persons was an "employee of the Government of the United States" or "an individual performing a contract awarded by the United States Government" and was "acting within the scope of" employment at the time of the bombings which

---

[3] *See generally,* http://www.usvsst.com/

killed and injured them.[4]

6.      This Court has subject-matter jurisdiction over the claims set forth in this Complaint in Intervention pursuant to 28 U.S.C. § 1332(d). This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the underlying action arises under the laws and treaties of the United States, including the Foreign Sovereign Immunities Act of 1976, 28 U.S.C § 1601 *et seq*. (the "FSIA"); the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322(2002) ("TRIA"); the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq.; and 28 U.S.C. § 1963,and the Complaint in Intervention asserts claims that form a part of the same case or controversy under Article III of the United States Constitution in accordance with 28 U.S.C. § 1367.

7.      Upon information and belief, venue of this proceeding is properly set in this judicial district pursuant to 28 U.S.C. § 1391(f)(1), which provides, in pertinent part, that a civil action against a foreign state may be brought in any judicial district in which a substantial part of property that is the subject of the action is situated. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the underlying action seeks to enforce a judgment that has been registered in this judicial district, because the property that is the subject of the Complaint in Intervention is located in this district, and because a substantial part of the events or omissions giving rise to the claims asserted in the Complaint in Intervention occurred in this district.

## **PARTIES**

8.      Intervenor, Milly Amduso was an employee of the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya.

---

[4] All Intervenors who are or were U.S. Government employees or contractors are referenced herein as "employees" for brevity and clarity.

9.     Intervenor, Winfred Wamai is a Citizen of Kenya, and her husband was an employee of the U.S. Government who was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya, resulting in her injuries as well.

10.     Intervenor, Mary Onsongo is a Citizen of Kenya, and her husband was an employee of the U.S. Government who was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya, resulting in her injuries as well.

11.     Intervenor, Monicah Opati is a citizen of Kenya, and her mother was the late Caroline Setla Opati, who was an employee of the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya.   Intervenor brings this action in her own right, in her capacity as Executrix and as a beneficiary of the Wrongful Death, Survival and other claims and on behalf of her siblings, Rael Angara Opati and Selifah Ongecha Opati.

12.     The remaining 563 Intervenors are identified and listed in Appendix A to this Intervenor Complaint which is adopted and incorporated herein.  Appendix A consists of the final judgments awarding more than $4 billion in compensatory damages to the Intervenors that were issued in July 2014 by the U.S. District Court for the District of Columbia and subsequently registered in this Court.  Intervenors have obtained final judgments for compensatory damages against Sudan, Iran, and others in the United States District Court for the District of Columbia that have been affirmed on appeal and have been registered in this District.

## FACTS

**A.     The history, organization, and function of Al Qaeda:**

13.     In or about 1989, OSAMA BIN LADEN, MUHAMMAD ATEF, and others founded an international terrorist group that became known as "AL QAEDA" ("the Base").

OSAMA BIN LADEN was the "emir" (prince) of AL QAEDA and was its leader at all relevant times. Members of AL QAEDA pledged an oath of allegiance (called a "bayat") to OSAMA BIN LADEN and AL QAEDA.

14.     From 1989 until about 1991, AL QAEDA was headquartered in AFGHANISTAN and in Peshawar, Pakistan. In or about 1991, the leadership of AL QAEDA, including OSAMA BIN LADEN, relocated to the Sudan. AL QAEDA was headquartered in the Sudan from approximately 1991 until approximately 1996 but also maintained offices in various parts of the world. In 1996, OSAMA BIN LADEN and other members of AL QAEDA relocated to AFGHANISTAN.

15.     OSAMA BIN LADEN and AL QAEDA violently opposed the United States for several reasons. First, the United States was regarded as an "infidel" because it was not governed in a manner consistent with the group's extremist interpretation of Islam. Second, the United States was viewed as providing essential support for other "infidel" governments and institutions, particularly the governments of Saudi Arabia and Egypt, the nation of Israel, and the United Nations organization, which were regarded as enemies of the group. Third, AL QAEDA opposed the involvement of the United States armed forces in the Gulf War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In particular, AL QAEDA opposed the continued presence of American military forces in Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) following the Gulf War. Fourth, AL QAEDA opposed the United States Government because of the arrest, conviction and imprisonment of persons belonging to AL QAEDA or its affiliated terrorist groups or those with whom it worked. For these and other reasons, OSAMA BIN LADEN declared "*jihad*," or holy war, against the United States, which he undertook from

Afghanistan with the material support of the Taliban through AL QAEDA and its affiliated organizations.

16.  AL QAEDA functioned both on its own and through some of the terrorist organizations that operated under its umbrella, including: Egyptian Islamic Jihad, which was led by Ayman al-Zawahiri, and at times, the Islamic Group (also known as "el Gamaa Islamia" or simply "Gamaa't"), and a number of jihad groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, and the Kashmiri region of India and the Chechnyan region of Russia. AL QAEDA also maintained cells and personnel in a number of countries to facilitate its activities, including in Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

17.  AL QAEDA had a command and control structure which included a "*majlis al shura*" (or consultation council) which discussed and approved major undertakings, including terrorist operations.

18.  AL QAEDA had a "military committee" which considered and approved "military" matters.

19.  OSAMA BIN LADEN and AL QAEDA also forged alliances with the National Islamic Front in the Sudan, with representatives of IRAN, and its associated terrorist group Hezbollah, and with representatives of the government of IRAQ for the purpose of working together against their perceived common enemy in the West, the United States.

20.  Since at least 1989, OSAMA BIN LADEN and the terrorist group AL QAEDA sponsored, managed, and financially supported training camps in AFGHANISTAN. Those camps were used to instruct members and associates of AL QAEDA and its affiliated terrorist groups in

the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These camps were also used to train others in security and counterintelligence methods, such as the use of codes and passwords, and to teach members and associates of AL QAEDA about traveling to perform operations. For example, AL QAEDA instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its members and associates to monitor media reports of its operations to determine the effectiveness of their terrorist activities.

21.     Since in or about 1996, OSAMA BIN LADEN and others operated AL QAEDA from their headquarters in AFGHANISTAN.  During this time, OSAMA BIN LADEN and others forged close relations with, and relied upon the material support and security provided by, the TALIBAN and MUHAMMAD OMAR in AFGHANISTAN.  OSAMA BIN LADEN openly informed other AL QAEDA members and associates outside AFGHANISTAN of their mutual support, assistance, and alliance with the TALIBAN and MUHAMMAD OMAR.

**B.     The "fatwahs" and the "jihad" terrorist campaign against Americans:**

22.     One of the principal goals of AL QAEDA was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) and Somalia by violence. These goals eventually evolved into a declaration of *jihad* against America and all Americans. Members of AL QAEDA issued "*fatwahs*" (rulings on Islamic law) indicating that such attacks on Americans were both proper and necessary.

23.     At various times from in or about 1992 through and beyond the August 1998 bombing attacks upon the U.S. embassies in Kenya and Tanzania, OSAMA BIN LADEN, working

together with members of the *fatwah* committee of AL QAEDA, disseminated *fatwahs* to other members and associates of AL QAEDA. These *fatwahs* directed that United States citizens should be attacked and murdered.

24.     On various occasions, OSAMA BIN LADEN and other co-conspirators advised members of AL QAEDA that it was proper to engage in violent actions against "infidels" (nonbelievers), even if others might be killed by such actions, because if the others were "innocent," they would go to paradise, and if they were not "innocent," they deserved to die.

**C.     The sovereign nation defendants furnished critical aid to underwrite the terrorist conspiracy against the United States:**

25.     In furtherance of the conspiracy, the named Defendants and unknown John Doe Defendants committed the following acts:

a.      At various times from at least as early as 1990, Defendants and their unknown co-conspirators provided military and intelligence training in various areas, including AFGHANISTAN, IRAQ, IRAN, Pakistan, and the Sudan, for the use of AL QAEDA and its affiliated groups.

b.      At various times from at least as early as 1989, Defendants and others known and unknown, engaged in financial and business transactions on behalf of AL QAEDA, including, but not limited to: purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing communications and electronics equipment; transferring funds between corporate accounts; and transporting currency and weapons to members of AL QAEDA and its associated terrorist organizations in various countries throughout the world.

c.      In the early 1990s, the government of Sudan sent overtures to Bin Laden and Al Qaeda, inviting the group to relocate from Afghanistan to the Sudan. Jamal Ahmed Al-Fadl, a top Al Qaeda lieutenant who served Bin Laden in Afghanistan as well as the Sudan, learned of the

impending relationship between Al Qaeda and the Sudanese government for the first time at one of the meetings in Peshawar, Pakistan that occurred between the Sudanese government, Bin Laden and other Al Qaeda members.  The representatives of the Sudanese government promised the support of that government should Al Qaeda come to the Sudan.  Al Qaeda thereafter used Sudanese Airways planes to ferry anti-tank rockets and Stinger missiles from Afghanistan to the Sudan.

       d.      The government of the Sudan is run by President Field Marshall Omar Hassan al-Bashir, the head of state of the Sudan, through an alliance of the military and the National Congress Party, formerly the National Islamic Front.

       e.      Al-Fadl went to the Sudan to secure residential and commercial property for Al Qaeda.  The purpose of some of the property was to provide a safe place to train Al Qaeda militants.

       f.      Essam Al Riddi, a pilot who worked for Bin Laden in 1993, stated that he purchased a plane for Bin Laden; oversaw its refurbishment; and flew it to Khartoum in 1993.

       g.      While Al Riddi stayed in Khartoum, he dined with Bin Laden and had several discussions with him.  Bin Laden was staying in a large villa in Khartoum, with an office and a guesthouse.  The Sudanese government provided security for Al Qaeda.  15-20 Sudanese men dressed in Sudanese army fatigues, using jeeps with Sudanese army license plates, were stationed at the villa.

       h.      Al Qaeda provided Al Riddi with a plane from the Sudan Airlines to ferry militants to Nairobi.  Bin Laden discussed the possibility of Al Riddi transporting some Stinger missiles from Pakistan to the Sudan.

       i.      Bin Laden assured him that the Sudanese and Pakistani intelligence agencies would cooperate with the weapons transfer.

j.      The training that Al Qaeda engaged in the Sudan included explosives training.  The loud noises drew the local police after complaints from neighbors and Al Fadl was among those arrested.  He was quickly released, due to the close relationship between Al Qaeda, and the Sudanese intelligence service, a Defendant in this action.  According to Al-Fadl:

> [W]e call the intelligence office because we have relationship with them, and the intelligence office came and they tell the local police we take care of that, and don't worry about that.  And they take us to the jail, and they say you shouldn't do that, we tell you to refresh[5], not to make real explosives.

k.      Al-Fadl saw a letter from President al-Bashir that explained the relationship between Al Qaeda and the Sudanese intelligence.  With the explicit approval of Bin Laden, Al-Fadl also personally worked with the Sudanese intelligence officers.

l.      The Sudanese intelligence officers and government officials, at all times, acted within the scope of their office or agency during the activities described in this Complaint.

m.      The intelligence officers were organized into a "delegation office" to meet the needs of the Al Qaeda group in the Sudan.  There was an explicit fear that agents from foreign governments or informants would disclose Al Qaeda's location and activities in the Sudan.  Some of these informants were consequently jailed in the Sudan.  Al-Fadl would identify suspicious foreigners to the Sudanese intelligence as Al Qaeda sought to keep its presence and activities in the Sudan secret.

n.      The delegation office, staffed with Sudanese intelligence officers, also helped provide security for Al Qaeda and facilitated the movement of weapons in and out of the country.  On one particular trip, the weapons were taken out of the country by delivering four crates of

---

[5] "Refresh" meant refresher courses for the militants who had already received training in the past.

weapons to a hangar at a Sudanese military base, and then to a port facility owned by the Sudanese army.

o.    The letter from President al-Bashir was absolutely essential to the operations of the Al Qaeda terrorist group, which was secretly training in the Sudan.  The letter allowed Al Qaeda members, such as Al Fadl, to bypass tax and customs collection on international shipments and guaranteed their shipments, coming or going, would not be inspected.

p.    Weapons and explosive shipments moved through a quay protected by the Sudanese military in Port Sudan into a barracks used by Sudanese armored and mechanized infantry.  The letter would allow shipments from overseas to bypass inspection at a port and then travel back to Khartoum without inspection by the local police at the numerous checkpoints along the way.

q.    The delegation office, the Sudanese government's go-between with Al Qaeda, also protected Al Qaeda members, such as Al-Fadl, from the interference of Sudanese immigrations office at the airport.  This was important because if Al Qaeda members were caught abroad and their passports were stamped with Sudanese immigration markings, it would be clear to foreign agents where the organization was located.

r.    Al Qaeda also set up a number of companies that provided it with critical income so that it could continue its growth and evolution into a lethal organization with global reach. However, Al Qaeda did not come to Sudan to operate as a regular capitalist enterprise.  Rather, the purpose of the investment in Sudanese business activity was as an adjunct to its mission of aggression against the West, as explicitly stated by Bin Laden himself:

. . . [O]ur agenda is bigger than business.  We not going to make business here, but we need to help the government and the government help our group, and this our purpose.

–14–

s.      Among the Sudanese companies founded by Al Qaeda were: Laden International Company for import and export; Taba Investment for currency exchange; Hijra Construction Company, which built the largest road existing in Sudan; and the Al Themar al Mubaraka, which ran the farm where Al Qaeda trained its militants in explosives.  The Hijra Construction Company purchased explosives for its road and bridge building activities.

t.      Al Qaeda also had extensive holdings in Khartoum, including business offices, guesthouses, farms, and residential houses.  Bin Laden even had a bank account in Khartoum in his true name.   Al Qaeda purchased some of the companies directly from the Sudanese government.  The funding that these companies provided to Al Qaeda was critical to its survival and continued existence. At a meeting, which included Bin Laden, the fluctuation of Sudanese currency caused great concern as most of Al Qaeda's income was derived from this business activity.

u.      Al Qaeda's position regarding the United States was clear, as early as, in 1992 when Bin Laden issued a fatwa against the United States due to its presence in the Gulf region during the First Gulf War and its actions in Somalia.  The discussion surrounding the fatwa included an explicit allowance for the murder of innocent civilians.  Al Qaeda provided support to groups in Somalia, Yemen, the Philippines, Tajikistan, and Pakistan, among others.

v.      The partnership forged with the Sudanese government derived benefits for both parties, as do all successful partnerships.  The Sudanese government employed Al Qaeda to manufacture chemical weapons in a section of Khartoum, called Hilat Koko, for use against the rebels in southern Sudan.  Al-Fadl traveled to the chemical weapons manufacturing area with a Sudanese military officer, who explained the need for chemical weapons by the Sudanese government.

w.     Al Qaeda also provided communications equipment and Kalashnikov rifles for the Sudanese army, founded by the Islamic National Front, to fight the Christian rebels in the south. Al-Fadl, as part of this arrangement, also worked directly for the Sudanese government.  For example, a Sudanese intelligence officer who also worked in the immigration office approached Al-Fadl and asked him to spy on a government opposition leader.  Al-Fadl arrested the opposition leader and tried to turn him away from his work against the Sudanese government.  The Sudanese intelligence officer advised Al-Fadl to lie to the opposition leader, to tell him that Al-Fadl had quit Al Qaeda and had stopped working with the government.  Al-Fadl reported back to the head of the delegation office, the group of Sudanese intelligence officers that protected Al Qaeda; facilitated communications with the Sudanese government; and provided logistical support.

x.     Dr. Abdullah Mohamed Yusef, a member of the Islamic National Front, through which President al-Bashir ran the Sudanese government, organized travel, documents and funneled economic aid to Al Qaeda while it was located in the Sudan.

y.     Al Qaeda entered into a transaction to purchase uranium through the former President of the Sudan, currently an officer in the Sudanese army.  The quality of the uranium was tested in Hilat Koko, the section of Khartoum where the government was partnered with Al Qaeda in the manufacture of chemical weapons.  Al-Fadl discussed the uranium test with a member of the Sudanese government, whose brother "runs" the building where the chemical weapon manufacture was housed.

z.     Without the material support, assistance, and aid provided by Sudanese government officials acting within the scope of their agency, employment or office, Al Qaeda could not have carried out the United States embassy bombings that caused Intervenors' injuries.  Such material

support, assistance, and aid fits within the definition of material support as described by 18 U.S.C. § 2339A.

aa.     The Defendants not only knew that Al Qaeda was attempting to conceal itself in the Sudan, but facilitated and furthered Al Qaeda's concealment through the activities of the Sudanese intelligence services.  The scale of support that Defendants furnished Al Qaeda was substantial.  The regime invited Al Qaeda to roost in the Sudan and knew of, at least from 1992 onward, Al Qaeda's anti-US crusade.

bb.     The then and current regime of Sudan explicitly allied itself with Al Qaeda for an illegal and unlawful purpose.  The regime conspired with Al Qaeda in the manufacture of weapons and training of terrorists, all the while knowing of Al Qaeda's anti-US crusade.  The provision of support to a terrorist organization is illegal and unlawful.  The explicit purpose of their agreement was to make each stronger.  The U.S. Embassy bombings greatly enhanced Al Qaeda's worldwide reputation and attracted money, recruits, and support from those allied against the United States.

cc.     At various times from at least 1990, IRAN has provided material support to OSAMA BIN LADEN and AL QAEDA, often through its state-sponsored terrorist organization, Hezbollah.  That support included advice and assistance in planning attacks against American targets. Information was often shared and exchanged between AL QAEDA and IRAN.

dd.     For many years, the Department of State has included IRAN among the *"state sponsors of terrorism."* Indeed, more than once in recent years, the Department of State has described IRAN as *"the most active"* among state sponsors of terrorism. The formation of Hezbollah and its emergence as a major terrorist organization was the product of direct intervention by Iranian operatives, including the Iranian Revolutionary Guards and the Defendant, the Iranian

Ministry of Information. The above referred to activities of Hezbollah were financed, technologically supported, and commanded by Iranian military/intelligence operatives.

ee.     In October 2001, an OSAMA BIN LADEN operative, Ali Mohamed, confessed in Federal District Court in New York that he and senior Bin Laden operatives had met with Hezbollah security chief Imad Mughniyeh who is believed to have carried out the bombings of the U.S. Embassy in Beirut and the Marine barracks in 1983.

ff.     On many occasions, Bin Laden had praised the 1983 Beirut Marine barracks bombing conducted by Hezbollah and Iranian agents.  Bin Laden sought out Hezbollah and their Iranian commanders for their tactical expertise for large scale operations.  In 1993-4, Al Qaeda operatives received specialized-explosives training in Lebanon from Hezbollah operatives.

gg.     In June 1996, Iran's Ministry of Information and Security hosted a meeting of terrorist leaders in Tehran that included Mughniyeh and senior aides to OSAMA BIN LADEN. Senior aides to OSAMA BIN LADEN subsequently met with Mughniyeh on several occasions.

hh.     The purpose of the meetings between Bin Laden, Al Qaeda, Hezbollah operatives, and Iranian agents was to share information on how to build a technologically advanced bomb that could destroy a building.  Al Qaeda did not have the know-how, prior to its contacts with Hezbollah operatives and Iranian agents, to conduct the 1998 embassy bombings.

ii.     Based on evidence developed in connection with the war in Afghanistan, senior officials in the U.S. Government, including Secretary of Defense Donald Rumsfeld, believed that AL QAEDA and TALIBAN members previously took refuge in IRAN.

26.     The officials, agents, and employees of the foreign sovereign Defendants were acting within the scope of their agency, office, or employment when they provided support to the

terrorists and terrorist group that destroyed the two U.S. embassies.  They did so because, for various reasons, it was the policy of their respective governments to aid Al Qaeda.

**D.     The events leading up to the Embassy bombings:**

27.     On or about 1994, MOHAMED SADEEK ODEH moved to Mombasa, Kenya, to set up businesses with AL QAEDA money which was used to support AL QAEDA members in Kenya.  While in Kenya, ODEH was visited by MUHAMMED ATEF, the military commander of AL QAEDA.

28.     In or about 1994, WADIH EL HAGE moved to Nairobi, Kenya, and established businesses and other organizations (*e.g.*, "Help Africa People") in Kenya.  While in Kenya, WADIH EL HAGE met repeatedly with one of Al Qaeda's military commanders, the late Abu Ubaidah al Banshiri.

29.     On or about October 25, 1994, Khalid Al Fawwaz, a member of AL QAEDA, transferred the Kenyan business "Asma Limited" to the late Abu Ubaidah al Banshiri.

30.     In or about 1996, in Mombasa, Kenya, Fahid Ali Msalam, a member of AL QAEDA, displayed explosives and detonators obtained in Tanzania to MOHAMED SADEEK ODEH.

31.     Beginning in the latter part of 1993, Anas Al Liby and other members of AL QAEDA began contemplating an attack against the U.S. Embassy in Nairobi, Kenya, in retaliation for the United States' participation in Operation Restore Hope in Somalia.

32.     In or about the latter part of 1993, Anas Al Liby and others conducted a visual and photographic surveillance of the U.S. Embassy at Nairobi, Kenya.

33.     In or about 1994, Anas Al Liby, together with other members of AL QAEDA reviewed files concerning possible terrorist attacks against: (i) the U.S. Embassy at Nairobi,

Kenya; (ii) the building then housing the U.S. Agency for International Development in Nairobi, Kenya; and (iii) British, French, and Israeli targets in Nairobi, Kenya.

34.      In or about 1994, members of AL QAEDA also contemplated possible terrorist attacks against targets in various countries other than Kenya.

35.      In or about 1994, KHALFAN KHAMIS MOHAMED traveled to an AL QAEDA camp in Afghanistan where he received training in explosives.

36.      Beginning in or about 1996, MOHAMED RASHED DAOUD AL-'OWHALI traveled to an AL QAEDA camp in Afghanistan where he received training in explosives, hijacking, kidnapping, assassination and intelligence techniques.

37.      In or about 1996, following his training in a number of camps in Afghanistan affiliated with AL QAEDA, MOHAMED RASHED DAOUD AL-'OWHALI met with OSAMA BIN LADEN and asked him for a "mission."

38.      In late February or early March 1997, WADIH EL HAGE, met and spoke with Mustafa Mohamed Fadhil, a member of AL QAEDA, and provided him with a new policy from OSAMA BIN LADEN to militarize the East African cell of AL QAEDA.

39.      On or about June 23, 1997, WADIH EL HAGE requested that $10,000 be transferred to an account in Kenya.  On or about July 3, 1997, this money was transferred to an account in Kenya controlled by WADIH EL HAGE.

40.      In or about March or April 1998, in Dar es Salaam, Tanzania, KHALFAN KHAMIS MOHAMED met with Mustafa Mohamed Fadhil, a member of AL QAEDA, and agreed to participate in a "jihad job."

41.      In or about May 1998, Fazul Abdullah Mohamed, a member of AL QAEDA, rented a villa at 43 New Runda Estates in Nairobi, Kenya.

42.     On or about May 4, 1998, KHALFAN KHAMIS MOHAMED applied for a Tanzanian passport in the name "Zahran Nassor Maulid."

43.     In or about June 1998, MOHAMED RASHED DAOUD AL-'OWHALI, and an individual known as "Azzam" filmed a videotape to celebrate their anticipated "martyrdom" in a bombing operation to be conducted against United States interests in East Africa.

44.     On or about June 19, 1998, "Azzam," using a passport in the name of "Gihad Ali," traveled from Karachi, Pakistan, to Nairobi, Kenya.

45.     In or about June 1998, KHALFAN KHAMIS MOHAMED and Fahid Ali Msalam, purchased a white Suzuki Samurai ('the Suzuki Samurai") at a location in Dar es Salaam, Tanzania.

46.     In or about June 1998, KHALFAN KHAMIS MOHAMED and Fahid Ali Msalam, rented house number 213 in the Ilala District of Dar es Salaam, Tanzania.

47.     In or about late June or early July 1998, Fahid Ali Msalam and Sheikh Ahmed Salim Swedan, a member of AL QAEDA, purchased a Toyota Dyna truck ("the Nairobi Bomb Truck") in Mombasa, Kenya, and made alterations to the back of the truck.

48.     In or about July 1998, Ahmed Khalfan Ghailani, a member of AL QAEDA, and Sheikh Ahmed Salim Swedan purchased a 1987 Nissan Atlas truck ("the Dar es Salaam bomb truck") in Dar es Salaam, Tanzania.

49.     In or about July 1998, Sheikh Ahmed Salim Swedan arranged for mechanical and welding work to be done on the Dar es Salaam bomb truck at various locations in Dar es Salaam, Tanzania.

50.     In or about July 1998, Sheikh Ahmed Salim Swedan purchased two large truck batteries from a location in Dar es Salaam, Tanzania.

51.    In or about July 1998, Ahmed Khalfan Ghailani and Fahid Ali Msalam purchased oxygen and acetylene tanks in Dar es Salaam, Tanzania.

52.    On or about July 31, 1998, MOHAMED RASHED DAOUD AL-'OWHALI, using a passport in the alias "Khaled Salem Saleh Bin Rashed," traveled from Karachi, Pakistan, to Nairobi, Kenya, arriving on August 2, 1998.

53.    In or about late July 1998, in Dar es Salaam, Tanzania, KHALFAN KHAMIS MOHAMED, Mustafa Mohamed Fadhil, and others, participated in the grinding of TNT.

54.    During the last week of July and the first week of August 1998, Mustafa Mohamed Fadhil, KHALFAN KHAMIS MOHAMED, and Fahid Ali Msalam met at the residence located at house 213 in the Ilala District of Dar es Salaam, Tanzania, to make final preparations for the bombing of the U.S. Embassy in Dar es Salaam, Tanzania.

55.    In or about late July or early August 1998, Mustafa Mohamed Fahil, KHALFAN KHAMIS MOHAMED, Fahid Ali Msalam, and Ahmed Khalfan Ghailani loaded boxes of TNT, gas cylinder tanks, batteries, detonators, fertilizer, and sand bags into the back of the Dar es Salaam bomb truck.

56.    On or about August 1, 1998, Abdullah Ahmed Abdullah, a member of AL QAEDA, advised MOHAMED SADEEK ODEH that all members of AL QAEDA had to leave Kenya by Thursday, August 6, 1998.

57.    In or about early August 1998, Abdullah Ahmed Abdullah and MOHAMED SADEEK ODEH traveled from Mombasa, Kenya, to Nairobi, Kenya.

58.    During the first week of August 1998, Abdullah Ahmed Abdullah, Fazul Abdullah Mohammed, and MOHAMED RASHED DAOUD AL-'OWHALI, together with "Azzam" and

other members of AL QAEDA, met at the villa located at number 43 New Runda Estates in Nairobi, Kenya, to make final preparations for the bombing of the U.S. Embassy at Nairobi, Kenya.

59.     On or about August 1, 1998, Ahmed Khalfan Ghailani checked into the Hilltop Hotel in Nairobi, Kenya.  On or about August 2, 1998, MOHAMMED SADEEK ODEH and Fazul Abdullah Mohammed, together with other members of AL QAEDA, met at the Hilltop Hotel in Nairobi, Kenya.

60.     On or about August 2, 1998, Sheikh Ahmed Salim Swedan and Mustafa Mohamed Fadhil left Nairobi, Kenya, for Karachi, Pakistan.

61.     On or about August 3, 1998, Fahid Ali Msalam purchased air travel tickets to Pakistan for himself and MOHAMED SADEEK ODEH.

62.     On or about August 4, 1998, Abdullah Ahmed Abdullah, Fazul Abdullah Mohammed, and MOHAMED RASHED DAOUD AL-'OWHALI, together with "Azzam" and other members of AL QAEDA, reconnoitered the U.S. Embassy in Nairobi, Kenya.

63.     On or about August 6, 1998, Abdullah Ahmed Abdullah and Ahmed Khalfan Ghailani left Nairobi, Kenya, for Karachi, Pakistan.

64.     On or about August 6, 1998, MOHAMED SADEEK ODEH and Fahid Ali Msalam left Nairobi, Kenya, for Karachi, Pakistan.

**E.     The bombing at the U.S. Embassy in Nairobi, Kenya:**

65.     On August 7, 1998, at approximately 9:30 a.m. local time, Fazul Abdullah Mohammed drove a pick-up truck from the villa located at 43 New Runda Estates to the vicinity of the U.S. Embassy in Nairobi, Kenya.  Meanwhile, MOHAMED RASHED DAOUD AL-'OWHALI rode in the Nairobi Bomb Truck driven by "Azzam" (a Saudi national) containing a large bomb to the U.S. Embassy in Nairobi, Kenya.  MOHAMED RASHED DAOUD AL-

'OWHALI possessed four stun-type grenades, a handgun, bullets, and keys to the padlocks on the Nairobi bomb truck.

66.     On August 7, 1998, at approximately 10:30 a.m., MOHAMED RASHED DAOUD AL-'OWHALI got out of the Nairobi bomb truck as it approached the rear of the U.S. Embassy building and threw a stun grenade in the direction of a security guard before attempting to flee.

67.     On August 7, 1998, at approximately 10:30 a.m., "Azzam" drove the Nairobi bomb truck to the rear of the U.S. Embassy building and fired a handgun at the windows of the Embassy building.

68.     On August 7, 1998, at approximately 10:30 a.m., "Azzam" detonated the explosive device contained in the Nairobi bomb truck at a location near the rear of the Embassy building, demolishing a multi-story secretarial college and severely damaging the U.S. Embassy building and the Cooperative Bank Building, causing a total of more than 213 deaths and injuries to more than 4,000 people, including Intervenors.

**F.     The bombing at the U.S. Embassy in Dar es Salaam, Tanzania:**

69.     In or about March 1998, al Qaeda operatives Khalfan Khamis Mohamed ("Khalfan") and Mustafa Mohamed Fadhil ("Fadhil") met in Dar Es Salaam, Tanzania and agreed to participate in a "jihad job".

70.     On or about May 4, 1998, Khalfan applied for a Tanzanian passport in the name of Zahran Nassor Maulid.

71.     In June 1998, Khalfan and Fahid Mohammed Ally Msalam ("Msalam") purchased a white Suzuki Samurai at a location in Dar es Salaam and rented a house in the Ilala District of Dar es Salaam, Tanzania.

72.     Throughout the summer of 1998, Fadhil, Khalfan, Msalam and Ahmed Khalfan Ghailani ("Ghailani") met at a residence on Amani Street in Dar es Salaam to discuss the bombing of the United States Embassy in Tanzania.

73.     In or about July 1998, Ghailani and Ahmed Salim Swedan ("Swedan") purchased a 1987 Nissan Atlas truck in Dar es Salaam, Tanzania, arranged for mechanical and welding work on the truck, and purchased two large truck batteries, oxygen, and acetylene tanks.

74.     In July 1998, Mohamed Sadeek Odeh ("Odeh") was advised by Ahmed Mohamed Hamed Ali ("Ali") that Bin Laden had formed a united front against the United States with other Islamic extremist groups.

75.     Prior to August 2, 1998, Abdullah Ahmed Abdullah ("Abdullah") provided Odeh with a false passport to facilitate his travel to Afghanistan for the purpose of meeting with Bin Laden and other al Qaeda operatives.

76.     During the last week of July and first week of 1998, Fadhil, Khalfan, Msalam and another operative known as "Ahmed the German" met at a residence in the Ilala District of Dar es Salaam to make final preparations for the bombing of the United States Embassy in Tanzania.

77.     In July or August 1998, Khalfan, Msalam, Ghailani, Fadhil, and others loaded boxes of TNT, cylinder tanks, batteries, detonators, fertilizer, and sand bags into the back of the 1987 Nissan Atlas Truck.

78.     On or about August 7, 1998, KHALFAN KHAMIS MOHAMED accompanied "Ahmed the German" (an Egyptian national) in the Dar es Salaam Bomb Truck during a portion of the ride to the U.S. Embassy.

79.     At approximately 10:40 a.m. on August 7, 1998, "Ahmed the German" detonated an explosive device located within the 1987 Nissan Atlas in the vicinity of the United States

Embassy in Dar es Salaam, Tanzania. The explosion severely damaged the United States Embassy and resulted in the death of at least 11 persons and injured at least 85.

80.     Intervenors' and/or Intervenors' decedents' deaths and injuries were caused by a willful and deliberate act of terror by al Qaeda, acting under direct and indirect sponsorship and/or direction, and with the direct material support and resources of the Defendants.

81.     In the early hours, prior to the bombing, facsimiles were sent to London, England, claiming responsibility for the embassy bombings in the name of the "Islamic Army for the Liberation of the Holy Places", which claimed that the Dar es Salaam bombing was carried out by an Egyptian national.

82.     Khalfan, Fadhil, Msalam, Ali, Ghailani, Swedan, and Ahmed the German were members of al Qaeda and perpetrated the bombing of the United States Embassy in Dar es Salaam, Tanzania at the direction of and/or on behalf of al Qaeda. Throughout August 7, 2008 and August 8, 2008, two al Qaeda operatives, Adel Abdel Bary ("Bary") and Ibrahim Eidarous ("Eidarous"), participated in the dissemination of claims of responsibility for the bombings of the United States Embassies in Dar es Salaam.

83.     The actions of the agents and co-conspirators of the Taliban inflicted mental distress upon the families of the Intervenors. The material support rendered to al Qaeda and co-conspirators of al Qaeda fits within the definition of material support as described by 18 U.S.C. § 2339A.

84.     Osama Bin Laden and senior elements of Al Qaeda relocated to Afghanistan in 1996.  The Taliban leader invited Bin Laden to move to Kandahar in 1997.  Bin Ladin eventually enjoyed a strong financial position in Afghanistan, thanks to Saudi and other financiers associated with the Golden Chain. Through his relationship with Mullah Omar—and the monetary and other

benefits that it brought the Taliban—Bin Ladin was able to circumvent sanctions, restrictions, and attempts to apprehend him; Mullah Omar would stand by him even when other Taliban leaders raised objections. Bin Ladin appeared to have in Afghanistan a freedom of movement that he had lacked in Sudan, gave an inflammatory interview to CNN in March 1997 during which Bin Laden declared war on the United States,  and issued a number of fatwas prior to the 1998 Embassy bombings from inside the country without repercussion from the Taliban and Afghan authorities. Al Qaeda members could travel freely within the country, enter and exit it without visas or any immigration procedures, purchase and import vehicles and weapons, and enjoy the use of official Afghan Ministry of Defense license plates.  Al Qaeda also used the Afghan state-owned Ariana Airlines to courier money into the country.

85.     The Taliban opened the doors to all who wanted to come to Afghanistan to train in the camps. The alliance with the Taliban provided al Qaeda a sanctuary in which to train and indoctrinate fighters and terrorists, import weapons, forge ties with other jihad groups and leaders, and plot and staff terrorist schemes. While Bin Ladin maintained his own al Qaeda guesthouses and camps for vetting and training recruits, he also provided support to and benefited from the broad infrastructure of such facilities in Afghanistan made available by the Taliban led government of Afghanistan to al Qaeda, Bin Laden, and the global network of Islamist movements. In addition to training fighters and special operators, this larger network of guesthouses and camps provided a mechanism by which al Qaeda could screen and vet candidates for induction into its own organization. Thousands flowed through the camps, but no more than a few hundred seem to have become al Qaeda members. From the time of its founding, al Qaeda had employed training and indoctrination to identify "worthy" candidates.

**CAUSE OF ACTION**

## COUNT I
## Declaratory Judgment pursuant to 28 U.S.C. § 2201

86.     Intervenor repeats and re-alleges the allegations contained in the forgoing

paragraphs as if fully set forth herein.

87.     28 U.S.C. § 2201 provides in relevant part that "[i]n a case of actual controversy

within its jurisdiction, . . . any court of the United States . . . may declare the rights and other

legal relations of any interested party seeking such declaration, whether or not further relief is or

could be sought.   Any such declaration shall have the force and effect of a final judgment or

decree  .   .   .   . "

88.     28 U.S.C. § 2202 permits "[f]urther necessary or proper relief" to be awarded

"based on a declaratory judgment or decree . . . against any adverse party whose rights have been

determined by such judgment."

89.     Intervenors have the same connection and interest in the assets held in the

name of the central bank of Afghanistan at the Federal Reserve of New York as do Plaintiffs in

this case.  Plaintiffs do not hold judgment against the assets, the Afghanistan Central Bank,

the foreign state of Afghanistan, or any other person with a valid legal claim to the assets.

Such judgment would have required that they proceed under the Foreign Sovereign

Immunities Act, 28 U.S.C. § 1602 *et seq.,* which imposes unique restrictions and requirements

which appear not to have been followed fully by the Plaintiffs here:  (i) in obtaining jurisdiction

against the foreign state of Afghanistan and its agency or instrumentality the Central Bank

of Afghanistan, *see* 28 U.S.C. §§ 1605, 1605A, 1605B; (ii) in completing service of their

complaint, *see* 28 U.S.C. § 1608(a); (iii) in completing service of their judgment, *see* 28 U.S.C.

§ 1608(e); and (iv) in satisfying the burden of proof necessary to obtain the judgment, *see* 28

U.S.C. § 1608(e).  Instead, the Plaintiffs sought and obtained a judgment against the Taliban

as "a non-sovereign party," even though the Taliban controlled and directed the government of Afghanistan in the years leading to, and at the time of, the September 2001 attacks.

90.     Additionally, the FSIA prohibits all judgment creditors from attachment and execution upon the property or funds of a foreign state where the subject "property is that of a foreign central bank or monetary authority held for its own account," unless the foreign central bank or its parent foreign government "has explicitly waived its immunity" from attachment or execution. 28 U.S.C. § 1611(b)(1).

91.     The Terrorism Risk Insurance Act of 2002 ("TRIA") does not authorize and support judgment execution against the blocked assets of the Central Bank of Afghanistan and the foreign state of Afghanistan because the Afghan Central Bank and State have never been a "terrorist party" within of the meaning of TRIA, § 201(d)(4).  "The State of Afghanistan has not been designated as a state sponsor of terrorism, nor have its agencies or instrumentalities been designated under other counterterrorism sanctions authorities." Statement of Interest of the United States of America, Dkt. #563 at 20 (Feb. 11, 2022).

92.     Plaintiffs' justification for their attachment and attempted execution lies in their injuries caused by Al Qaeda, which the Taliban led government of Afghanistan sheltered and provided with safe harbor prior to, at the time of, and for a time after the September 2001 attacks.  Intervenors have the same claim.

### PRAYER FOR RELIEF

**WHEREFORE,** the Intervenors respectfully request this Court tograant their Motion to Intervene and declare that neither Plaintiffs nor Intervenor have an explicit right to the Afghan funds, thereby leaving any equitable distribution of Afghan Funds to victims of state-sponsored terrorism holding valid final judgments to the USVSST Fund.

·    Such other and further relief as this Honorable Court may determine to be just and appropriate under the circumstances.

Respectfully submitted this 16th day of February 2022.

Dated:  February 16, 2022

*Adam Drexler*
Harry Rothenberg (HR6795)
Adam Drexler (AMD7743)
The Rothenberg Law Firm LLP
450 7th Avenue, 44th Floor
New York, New York 10123
(212) 563-0100
harry@injurylawyer.com,
adrexler@injurylawyer.com

Nancy Guy Armstrong Miller
David Dickens
The Miller Firm, LLC
108 Railroad Avenue
Orange, VA 22960
(540) 672-4224

Steven R. Perles
Perles Law Firm, P.C.
816 Connecticut Avenue, N.W., 12th Floor
Washington, DC 20006
 (202) 955-9055

Gavriel Mairone
MM-Law LLC
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
(312) 253-7444

William Wheeler
Wheeler & Franks Law Firm, P.C.
114 S. Broadway
Tupelo, MS 38804
(662) 636-6055

John Arthur Eaves, Jr.
Eaves Law Firm, LLC
101 North State Street
Jackson, MS 39201
(601) 355-7961