UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN DOES 1 THROUGH 7,

    *Judgment Creditors,*

v.

THE TALIBAN, AL-QAEDA,
 and THE HAQQANI NETWORK,

    *Judgment Debtors,*

and

THE FEDERAL RESERVE BANK OF
 NEW YORK,

    *Garnishee.*

Misc Action No. 1:20-mc-00740-GBD

**MEMORANDUM OF LAW IN SUPPORT OF THE DOE CREDITORS' MOTION
FOR TURNOVER OF ASSETS
FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK**

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................... iii

I.   Introduction ............................................................................................................. 1

II.  Background ............................................................................................................. 4

    A.   Factual Background ......................................................................................... 4

        1.   The Judgment ......................................................................................... 4

        2.   Changes In Afghanistan And Its Central Bank .................................... 5

        3.   Doe Writ Enforcement Procedural History .......................................... 8

    B.   Statutory and Regulatory Background ............................................................ 9

        1.   The Taliban And The Federal Sanctions Regime ................................ 9

        2.   TRIA ..................................................................................................... 11

III. Legal Standard ....................................................................................................... 12

IV.  Argument ............................................................................................................... 14

    A.   The Taliban Is A Terrorist Party Within The Meaning of TRIA ................... 15

    B.   The Doe Creditors Have A Judgment Against The Taliban Based On An Act Of Terrorism ........................................................................................................ 15

    C.   The DAB Assets Are "Blocked Assets" Within The Meaning Of TRIA ...... 16

    D.   The DAB Assets Are Blocked Assets Of DAB, Which Is An Agency Or Instrumentality Of The Taliban, And Is The Taliban's Alter Ego ................. 16

        1.   DAB Holds The DAB Assets ................................................................ 16

        2.   DAB Is An Agency Or Instrumentality Of The Taliban Under TRIA ... 17

        3.   Treating DAB As An Agency Or Instrumentality Of The Taliban Is Consistent With Binding Case Law, Statutory Text, And Congressional Purpose ................................................................................................. 20

        4.   Alternatively, DAB Is The Taliban's Alter Ego .................................. 23

    E.   The Doe Creditors Are Entitled To Possess The DAB Assets ..................... 24

    F.   There Is No Question Of Priority .................................................................. 24

V.   Conclusion ....................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Banco Nacional de Cuba v. Chem. Bank N.Y. Tr. Co.,* 658 F.2d 903 (2d Cir. 1981)................... 23

*Bennett v. Islamic Repub. of Iran,* 618 F.3d 19 (D.C. Cir. 2010) ................................................. 12

*Caballero v. FARC*, No. 18-CV-25337, 2021 WL 3927826 (S.D. Fla. Aug. 24, 2021) ............. 19

*Caballero v. FARC*, No. 20-CV-1939, 2021 WL 6339256 (D. Conn. Jan. 14, 2021)...... 19, 22, 24

*Caballero v. FARC*, No. 20-MC-0040, 2021 WL 307558 (W.D.N.Y. Jan. 29, 2021) ................ 22

*Clark v. Martinez,* 543 U.S. 371 (2005) ....................................................................................... 22

*Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45 (S.D.N.Y. 2019). ........................................................................................................................ 13

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018)............................ 13

*Doe v. ELN,* No. 10-CV-21517, 2013 U.S. Dist. LEXIS 186742 543(S.D. Fla. Sep. 12, 2013).. 22

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*, 919 F. Supp. 2d 411 (S.D.N.Y. 2013) ................................................................................................................... 14, 24

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232 (D.R.I. 2004)..... 19

*Harrison v. Republic of Sudan*, 802 F.3d 399 (2d Cir. 2015)................................................. 13, 24

*Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17 (S.D.N.Y. 2015) ....... 14, 17, 23, 24

*Hill v. Republic of Iraq,* No. 99-CV-3346, 2003 WL 21057173, (D.D.C. Mar. 11, 2003) .......... 24

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70 (2d Cir. 2002).............................................................................. 17

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016).........*passim*

*Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 200 (2d Cir. 2019).................................................. 23

*Knox v. PLO*, 306 F. Supp. 2d 424 (S.D.N.Y. 2004).................................................................... 4

*Miller v. City of Ithaca*, No. 10-cv-597, 2019 WL 2502712 (N.D.N.Y. June 17, 2019)............. 17

*Phoenician Trading Partners LP v. Iseson*, No. 04-CV-2178, 2004 WL 3152394 (E.D.N.Y. Dec. 11, 2004) ..................................................................................................................................... 1

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).............................................................. 14

*Smith v. Fed. Rsrv. Bank of N.Y.*, 280 F. Supp. 2d 314 (S.D.N.Y. 2003) ............................. 12, 20

*Smith v. FRB*, 346 F.3d 264 (2d Cir. 2003) ........................................................................ 12

*Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169, 2005 WL 3518010 (D.D.C. Feb. 2, 2005) .................................................................................................................................... 15

*Stansell v. FARC*, 771 F.3d 713 (11th Cir. 2014) ...................................................................... 18

*United States v. Santos*, 553 U.S. 507 (2008) .............................................................................. 22

*Weininger v. Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006) ............................................. 12, 14, 24

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) ................................... 11, 16, 24

**Statutes**
8 U.S.C. § 1182 ............................................................................................................................ 15

28 U.S.C. § 1610 note. ..................................................................................................... *passim*

28 U.S.C. § 1602 ............................................................................................ 12, 20, 21, 22, 23

50 U.S.C. § 1701 .................................................................................................... 9, 10, 16

50 U.S.C. § 1702 .................................................................................................................... 16

N.Y. C.P.L.R. § 5225 ..................................................................................................... *passim*

N.Y. C.P.L.R. § 5227 .................................................................................................................. 1

N.Y. C.P.L.R. § 5332 .................................................................................................................. 9

**Rules and Regulations**
31 C.F.R. § 594.201 .......................................................................................................... 11, 15

31 C.F.R. § 594.310 .......................................................................................................... 11, 15

31 C.F.R. § 594.311 .................................................................................................................. 15

64 FR 36759 ............................................................................................................................ 10

66 FR 49079 ............................................................................................................................ 11

67 FR 44751 ............................................................................................................................ 11

87 FR 8391 ................................................................................................................. 16

Fed. R. Civ. P. 69(a) .................................................................................................. 1,12

**Other Authorities**
148 Cong. Rec. S11524 ............................................................................................ 12

148 Cong. Rec. S11528 ............................................................................................ 12

2021 Daily Comp. Pres. Doc. 313 (April 14, 2021) ................................................. 5

Exec. Order No. 13129 ............................................................................................ 10

Exec. Order No. 13268 ........................................................................................ 11, 15

Exec. Order No. 14064 .............................................................................. 1, 7, 14, 16, 17

Exec. Order No. 13224 ............................................................................................ 11

H. Doc. No. 106-268 (2000) ........................................................................ 3, 10, 18, 19

H. Doc. No. 107-16 (2001) ...................................................................................... 10, 22

H. Rep. No. 107-779 (2002) . ................................................................................... 12

OFAC License No. DABRESERVES-EO-2022-886895-1 ...................................... 2, 9

Judgment Creditors John Does 1-7 (the "Doe Creditors"), by and through their undersigned counsel, respectfully submit this memorandum of law in support of their Motion for Turnover of Assets from Garnishee the Federal Reserve Bank of New York ("FRBNY").

## I.    Introduction

On February 11, 2022, the President of the United States took a series of coordinated actions intended both to benefit the "welfare of the people of Afghanistan"[1] and to "clear a legal path" for the resolution of legal claims by U.S. victims of terrorism against the Taliban.[2] According to the White House, the steps were intended to permit U.S. claimants "a full opportunity to have their claims heard in U.S. courts."[3] Among other things, the steps taken that day blocked the property of Da Afghanistan Bank ("DAB") at FRBNY, ensuring that the property is subject to execution under the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322.

As a result, the Doe Creditors now move this Court, pursuant to N.Y. C.P.L.R. §§ 5225(b) and 5227,[4] Federal Rule of Civil Procedure 69(a), and Section 201 of TRIA for an order compelling the FRBNY to turn over to the Doe Creditors those blocked assets of DAB in its possession (the "DAB Assets") sufficient to satisfy the outstanding amount of their judgment for compensatory damages against the Taliban, amounting to $138,056,445.37, plus further post-judgment interest that may accrue. Decl. of John Thornton ("Thornton Decl.") ¶ 4.

---

[1] Exec. Order No. 14,064, 87 Fed. Reg 8391 (Feb. 11, 2022).

[2] Charlie Savage, *Spurning Demand by the Taliban, Biden Moves to Split $7 Billion in Frozen Afghan Funds*, N.Y. TIMES (Feb. 11, 2022), https://www.nytimes.com/2022/02/11/us/politics/taliban-afghanistan-911-families-frozen-funds.html.

[3] Background Press Call by Senior Admin. Officials on U.S. Support for the People of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/background-press-call-on-u-s-support-for-the-people-of-afghanistan/.

[4] Because Sections 5225 and 5227 are "essentially interchangeable," it is common practice to move for a turnover order under both provisions. *See Phoenician Trading Partners LP v. Iseson*, No. 04-CV-2178, 2004 WL 3152394, at *3 (E.D.N.Y. Dec. 11, 2004) (citation omitted).

The DAB Assets are subject to execution under TRIA. TRIA applies in cases where "a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism." TRIA § 201(a). The Doe Creditors were civilian contractors in Afghanistan and were victims of an act of terrorism, a suicide bomb attack on January 4, 2016. They have obtained a judgment against a terrorist party, the Taliban, on a claim based on that act of terrorism. Under Section 201 of TRIA, they may therefore execute against assets of the Taliban or its agencies or instrumentalities, such as DAB.

It is undisputed that the Taliban has taken control of DAB, and it is binding law that an entity controlled by a terrorist party is an agency or instrumentality of that terrorist party under TRIA. It is also undisputed that DAB owns the funds in its account at the FRBNY, which is estimated to hold $3.5 billion dollars in assets.[5] Because the Taliban now has an interest in these assets through its agency or instrumentality (or alter ego), DAB, they are subject to execution to the extent of the Doe Creditors' compensatory damages under TRIA and state law. Notably, the United States does not say otherwise. *See Doe* Dkt. 49 ("U.S. Statement") 19-20.

The United States raises several interesting questions in its Statement of Interest related to the nearly unprecedented situation at issue. The circumstances giving rise to this motion are indeed highly unusual: A terrorist group seized control of a central bank and is now using that institution for its own purposes, potentially including the facilitation of further acts of terrorism.[6] The only

---

[5] *See* https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/ ("Even if funds are transferred for the benefit of the Afghan people, more than $3.5 billion in DAB assets would remain in the United States and are subject to ongoing litigation by U.S. victims of terrorism.") The United States ordered even more of DAB's property—all of its property in the United States—to be consolidated at the FRBNY. Exec. Order No. 14,064. On February 25, 2022, the Court issued an order permitting the transfer of $3.5 billion of DAB's assets out of FRBNY, subject to the terms of OFAC License No. DABRESERVES-EO-2022-886895-1. *Doe* Dkt. 65.

[6] Expert Decl. of Alex B. Zerden ("Zerden Decl.") ¶ 14, 40–42, 48. Because of these circumstances, the United States cut off the Taliban's ability to withdraw DAB funds on account at the FRBNY last August. Jeff Stein, *Biden administration freezes billions of dollars in Afghan reserves, depriving Taliban of cash*, Wash. Post (Aug. 17, 2021), https://www.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/.

similar circumstances in memory occurred when the same terrorist group seized control of the same bank in the 1990s and used it for its own purposes—including the facilitation of acts of terrorism. Then, the same facts led the United States to conclude that DAB was "controlled by the Taliban" and to find that the Taliban "ha[d] an interest" in DAB. H. DOC. NO. 106-268, at 4 (2000). But despite this case's extraordinary facts, what the law requires is rather ordinary: the reasoned application of settled law. As described further below, this Court can and should adjudicate this motion under binding law. Notably, it can (and should) do so without any need to address any novel or complex issues that implicate difficult constitutional questions or unsettled legal standards.[7]

There was never any mystery about who attacked the Doe Creditors. The Taliban took responsibility for the attack, claiming its target was a "place of vulgarity and profanity".[8] The Doe Creditors timely sought justice against the Taliban and its co-conspirators in the Courts. Now, the Doe Creditors have seen the very entity, the Taliban, and even the very individuals involved in planning and financing the bomb attack, again come to control Afghanistan and DAB. The Taliban

---

[7] It is worth noting that the Doe Creditors do not have a judgment against the State of Afghanistan (which is not a designated state sponsor of terrorism) and have never sought relief under the FSIA against the Taliban (which is not a recognized government of any state). Nor need they do so now (as the FSIA is expressly preempted by TRIA in all respects relevant to these proceedings). Under TRIA, the Court need not make any findings impacting the President's recognition authorities, the status of any state assets, or on any other issue outside of its Article III competencies in a manner impacting the Executive Branch's foreign policy prerogatives or as might be required under the FSIA. As the Government correctly notes: "When its conditions are satisfied, TRIA section 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA." U.S. Statement 10.

[8] *See* Hassib, Sayed, *Taliban claim Kabul bomb attack on compound used by foreigners*, Reuters (July 31, 2016), https://www.reuters.com/article/us-afghanistan-blast/taliban-claim-kabul-bomb-attack-on-compound-used-by-foreigners-idUSKCN10B0WA.

are up to their old ways.[9] But now, the Taliban's victims have a way to fight back—by using the legal tools Congress granted them to achieve a measure of justice.[10]

## II.    Background

### A.    Factual Background

#### 1.    The Judgment

On November 5, 2020, Doe Creditors obtained a Judgment in the United States District Court for the Northern District of Texas against the Taliban, Al-Qaeda, and the Haqqani Network for an amount totaling One Hundred Thirty-Eight Million Four Hundred Eighteen Thousand Seven Hundred Forty-One Dollars and zero cents ($138,418,741) in compensatory damages, jointly and severally, for an act of terrorism committed by the Judgment Debtors. On January 20, 2021, Doe Creditors registered the Judgment in this district. *Doe* Dkt. 5. On February 23, 2021, the Clerk of this Court issued a Writ of Execution in favor of Doe Creditors against the Taliban, Al-Qaeda and the Haqqani Network for the amount of the judgment. On November 2, 2021, Doe Creditors collected $362,430.13 from blocked assets of an agency/instrumentality of Al Qaeda. As of March 21, 2022, the Doe Creditors hold outstanding judgments for compensatory damages in the amount of $138,284,213.26, on which post-judgment interest continues to run. Thornton Decl. ¶ 4.

---

[9] *See, e.g.*, Dan De Luce et al., *Taliban Keep Close Ties with Al Qaeda Despite Promise to U.S.*, NBC News (Feb. 17, 2021),     https://www.nbcnews.com/politics/national-security/taliban-keep-close-ties-al-qaeda-despite-promise-u-s-n1258033; *see also* Hearing to Receive Testimony on Security in Afghanistan and in the Regions of South and Central Asia, S. Comm. on Armed Servs., 117th Cong., 1st Sess. (Oct. 26, 2021), https://www.armed-services.senate.gov/imo/media/doc/21-80_10-26-2021.pdf at 35 (statement of Dr. Colin Kahl, Under Secretary for Policy, U.S. Dep't of Defense) (al Qaeda could develop capability to attack U.S. from Afghanistan "within 1 to 2 years"). *See also*, Zerden Decl. ¶ 41-42.
[10] As the Southern District of New York described the purpose of TRIA:
> In fact, at its core, the statute embodies a precept that goes to the heart of its design, a principle of survival. It manifests that for American victims of international terrorism, finality comes to rest not in violence, but in justice, and that, when all is said and done, the larger and more enduring end lies in the judicial remedy the law uniquely prescribes to survive and redress the terrorist's assault.

*Knox v. PLO*, 306 F. Supp. 2d 424, 448 (S.D.N.Y. 2004)

### 2.        Changes In Afghanistan And Its Central Bank

DAB holds substantial asset reserves in accounts in foreign central banks, including FRBNY. As of August 15, 2021, approximately $7 billion of DAB's asset reserves were held at the FRBNY.[11]

On Sunday, August 15, 2021, as the United States was completing its withdrawal from Afghanistan,[12] the former government of Afghanistan collapsed and its leaders fled the country.[13] The Taliban arrived in the capital city of Kabul and quickly took physical and operational control of certain Afghan government offices, agencies, and instrumentalities for the Taliban's own benefit.[14] Most significantly for present purposes, the Taliban's takeover of these facilities included control of DAB.[15]

The Taliban now completely controls DAB.[16] One of the Taliban's first acts in Kabul was installing, as DAB's Acting Governor, a staunch Taliban loyalist whose only prior financial experience was serving as head of the Taliban's finance commission—a body the Taliban tasked with managing money from narcotics trafficking and collecting illegal taxes the Taliban imposed on businesses and farmers in areas where the Taliban ran shadow governments.[17] The Taliban also installed as the First and Second Deputy Governors, the number two and three leadership positions

---

[11] *See* Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on the Taliban*, N.Y. Times (Aug. 18, 2021), https://www.nytimes.com/2021/08/18/business/afghan-central-bank.html

[12] On February 29, 2020, the United States and the Taliban signed the Doha Agreement to bring the decades-long war in Afghanistan to an end and facilitate the transition to a "new post-settlement Afghan Islamic government." Agreement for Bringing Peace to Afghanistan, Taliban-United States, Feb. 29, 2020, https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-Bringing-Peace-to-Afghanistan-02.29.20.pdf. That transition accelerated with extraordinary speed after April 14, 2021, when President Biden announced the United States would withdraw all U.S. forces from Afghanistan by September 11, 2021. Remarks on United States Military Operations in Afghanistan, 2021 DAILY COMP. PRES. DOC. 313 (April 14, 2021). The Taliban rapidly took control of most territory in Afghanistan during the summer of 2021.

[13] *See* Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban Takeover in Afghanistan: Frequently Asked Questions* 10, 12–13 (2021), https://crsreports.congress.gov/product/pdf/R/R46879.

[14] Zerden Decl. ¶ 39; Thomas, *supra* note [13], at 10, 13–14.

[15] Zerden Decl. ¶ 39; *see* Thomas, *supra* note [13], at 40.

[16] Zerden Decl. ¶ 14, 39, 49, 51, 54-55, 74, 86, 91, 98, 103, 110, 115-25, 126-35, 137-139, 143

[17] Zerden Decl. ¶ 55 (concerning Haji Mohammed Idris, DAB's Acting Governor).

at DAB, individuals who are personally sanctioned by the United States, the United Nations, and other jurisdictions for terrorist activities undertaken as members of the Taliban.[18] DAB's organizational structure assigns those sanctioned terrorists significant operations and management responsibilities.[19] In fact, DAB's First Deputy Governor, Noor Ahmad Agha, is charged with supervising DAB's anti-money laundering and countering the funding of terrorism functions.[20]

The Taliban permeates every level of DAB. The Taliban is driving essential technical experts who work for DAB out of the country[21] and replacing them with loyalists who do not have the requisite education, experience, and expertise to operate a central bank independently and competently.[22] Many DAB staff remain at the bank only because the Taliban compels them to work.[23] The private business sector reports encountering more and more frequently Taliban-affiliated staff at all levels of DAB.[24]

The Taliban Council of Ministers' open control over DAB removes any illusion that DAB is independent of the Taliban.[25] The Council of Ministers consists of the heads of all Taliban government ministries, and, like DAB's leadership, includes individuals sanctioned for Taliban terrorist activities.[26] The Council of Ministers has directed DAB policy.[27] The Taliban's Deputy

---

[18] Noor Ahmad Agha is DAB's First Deputy Governor. He was sanctioned for his activities as the leader of the Taliban's military council and as a finance officer. Among other things, Agha had responsibilities for financing Taliban commanders and funding improvised explosive devices. Zerden Decl. ¶ 59-67. Abdul Qadeer Ahmad is DAB's Second Deputy Governor. He was sanctioned for, among other things, providing funds to Taliban commanders who carried out terrorist attacks in Afghanistan, collecting financial aid from the Taliban's domestic and foreign sponsors, distributing funds to Taliban shadow governors, and collecting Taliban revenues from narcotics trafficking. Id. at ¶ 73-82.
[19] Zerden Decl. ¶ 55, 59-67, 73-82.
[20] Zerden Decl. ¶ 69.
[21] Zerden Decl. ¶ 88.
[22] Zerden Decl. ¶ 55, 59-67, 73-82, 85.
[23] Zerden Decl. ¶ 86, 88-89.
[24] Zerden Decl. ¶ 85.
[25] Zerden Decl. ¶ 92-95.
[26] Zerden Decl. ¶ 93; *see also* Reuters, Taliban Name New Afghan Government, Interior Minister on U.S. Sanctions List (Sept. 7, 2021), https://www.reuters.com/world/india/taliban-fire-air-scatter-kabul-protesters-no-reports-injuries-2021-09-07/.
[27] Zerden Decl. ¶ 92.

Prime Minister has chaired meetings at DAB.[28] And Taliban officials have begun discussing proposals to subordinate DAB under the Taliban-controlled Ministry of Finance.[29] In fact, DAB is now so completely fused with the Taliban that U.S. officials have begun discussing the need to stand up a brand new central bank that is wholly separate from the Taliban.[30]

On the same day the Taliban took control of Afghanistan's capital, including the facilities of DAB, the United States locked down DAB's assets at the FRBNY to prevent them from being withdrawn by a Taliban-controlled DAB or otherwise transferred to the Taliban.[31]

On February 11, 2022, President Biden signed an executive order designating "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, a[s] blocked[.]" Exec. Order No. 14,064 § 1(a). The order further provides that all U.S. financial institutions must transfer all property and interests in property of DAB in the United States to the FRBNY. *Id.* § 1(b). Contemporaneously with the issuance of that order, the Government issued a license through the Treasury Department's Office of Foreign Assets Control which authorizes, directs, and compels the FRBNY, upon further instructions, to transfer up to $3.5 billion of DAB's blocked assets "for the benefit of the people of Afghanistan, or to a United Nations fund, programme, specialized agency, or other entity or body for the benefit of the people of Afghanistan." *Doe* Dkt. 49-2 at 2. The remainder of the blocked assets were left behind so that victims of terrorism, using TRIA, could "have their claims heard in U.S. courts."

---

[28] Zerden Decl. ¶ 94.
[29] Zerden Decl. ¶ 138.
[30] Zerden Decl. ¶ 105.
[31] *See* Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan: Background and Issues for Congress* 39 (2021), https://crsreports.congress.gov/product/pdf/R/R46955; Stein, *supra* note 6.

### 3. Doe Writ Enforcement Procedural History

On August 26, 2021, less than two weeks after the Taliban takeover of DAB, Doe Creditors filed an Emergency Motion for a Writ of Execution specifically directed to "The Taliban, including the blocked assets of Da Afghanistan Bank held by the Federal Reserve Bank or any other financial institution." *Doe* Dkt. 15.[32] On August 30, the United States notified the Honorable Katherine Polk Failla, before whom this matter was then pending, that it was considering filing a Statement of Interest and requested that the Court defer any ruling on the motion. *Doe* Dkt. 18. The same day, the Court granted the Government's request. *Doe* Dkt. 19. On September 7, 2021, Doe Creditors filed a letter motion requesting that the Court expedite consideration of their motion, citing the prejudice they were suffering by the Court's delay associated with the issuance of their writ. *Doe* Dkt. 20. On September 8, 2021, the Court denied the motion to expedite. *Doe* Dkt. 21. On September 21, 2021, Doe Creditors filed a letter informing the Court that on September 16, 2021, the Government had filed a letter motion in *Havlish et al. v. Bin Laden, et al.*, Case No. 03 Civ. 9848, stating that the Havlish creditors had served a Writ of Execution on FRBNY. *Doe* Dkt. 25. On September 23, 2021, the Court stated that it "reads Plaintiff's correspondence as seeking reconsideration of the Court's denial of Plaintiff's request to expedite the issuance of their requested writ of execution." *Doe* Dkt. 26. The Court instructed Doe Creditors to submit documents to the clerk for the issuance of a writ, but stayed any judicial enforcement of the writ upon its issuance. *Id*. On September 27, 2021, the clerk issued the requested writ, and it was duly served on FRBNY, first by process server, then by the U.S. Marshal. *See* Exhibit A, Writ of

---

[32] Doe Creditors had prior, on February 23, 2021, obtained a Writ of Execution directed to its three judgment debtors: the Taliban, Al-Qaeda and the Haqqani Network only. After Doe Creditors encountered difficulty in obtaining a writ directed more specifically to the blocked assets of Da Afghanistan Bank, they served this earlier writ on FRBNY on September 20, 2021. Given that Doe Creditors subsequently obtained and served their requested writ in time to establish a sufficient priority position to secure recovery, Doe Creditors will not relate these efforts further.

Execution; *see also Doe* Dkt. 27, Affidavit of Service, *Doe* Dkt. 67, Process Receipt and Return from the United States Marshals Service.[33] On October 14, 2021, the Government informed the Court that it intended to file a Statement of Interest. *Doe* Dkt. 29. Also on October 14, 2021, Doe Creditors filed a Motion for *Nunc Pro Tunc* Issuance and Service of Writ. *Doe* Dkt. 30.

In light of the stay, the Doe Creditors sought and the Court granted an extension of the *Doe* Writ, which provides that the writ "is hereby extended and shall not expire until further order of the Court." *Doe* Dkt. 40, 41 at 2. The Government maintained that the DAB Assets were "subject to and restrained by" the *Doe* writ during this time. *Doe* Dkts. 42 at 2, 47 at 2; *see also* U.S. Statement 3. The Government filed a Statement of Interest on February 11, 2022. *Doe* Dkt. 49.

On February 25, 2022, the Court ordered that the $3.5 billion in DAB assets regulated by OFAC License No. DABRESERVES-EO-2022-886895-1 "are not judicially restrained[.]" *Doe Dkt.* 65. It further ordered that, with respect to the DAB assets not regulated by the OFAC License, "the Havlish writ dated August 27, 2021, and the Doe writ dated September 27, 2021 … remain in effect pending further order of this Court." *Id.*

### B.      Statutory and Regulatory Background

#### 1.      The Taliban And The Federal Sanctions Regime

Congress enacted the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95–223, 91 Stat. 1625, 50 U.S.C. § 1701 *et seq.*, at the end of 1977. The law provides that whenever the United States is faced with an "unusual and extraordinary threat … to [its] national security, foreign policy, or economy" which "has its source in whole or substantial part outside

---

[33] Levy was accomplished by service because the FRBNY has refused to turn the DAB's assets over to the Marshal. N.Y. C.P.L.R. § 5232(a) (property not capable of delivery is levied upon service by marshal). This is precisely the sort of case where levy by service is appropriate. *See also* Siegel, *New York Practice*, § 497 (6th ed.) ("Any situation in which the sheriff cannot readily lay hands on the property interest involved, and by some means take immediate actual or at least constructive custody of it, should be deemed to involve property 'not capable of delivery' and therefore to permit levy by service under subdivision (a) of CPLR 5232[.]").

the United States," the President may "declare[] a national emergency with respect to such threat" and implement measures to regulate international economic transactions. 50 U.S.C. § 1701.

The Taliban is an Islamic fundamentalist terrorist group that has twice taken control of territory and institutions in Afghanistan, including DAB. The first time the Taliban did so, in the late 1990s, President Clinton declared a national emergency and exercised his power under IEEPA to block (1) "all property or interests in property of the Taliban," (2) all property or interests in property of anyone determined by the executive "to be owned or controlled by" or "to act for or on behalf of" the Taliban, and (3) all property or interests in property of anyone found "to provide financial, material, or technological support for, or services in support of" anyone owned, controlled by, or acting for or on behalf of the Taliban. Exec. Order No. 13,129 § 1, 64 Fed. Reg. 36,759 (July 7, 1999). Months later, the administration added DAB to the list of persons blocked under this order. H. DOC. NO. 106-268, at 4; *see also* H. DOC. NO. 107-16, at 4 (2001) (same). In his report to Congress, President Clinton stated that DAB "ha[s] been found to be controlled by the Taliban, and to be [an] entit[y] in which the Taliban has an interest." *Id.* Notably, the United States did not recognize the Taliban as the government of Afghanistan at the time that the United States nevertheless recognized that the Taliban controlled DAB (even though DAB was Afghanistan's central bank).[34]

After the September 11 attacks, President George W. Bush took immediate action pursuant to IEEPA to block terrorists from accessing any property in the United States or within the control of any U.S. person. On September 23, 2001, he directed that "all property and interests in property" in the United States in which certain identified terrorists had any interest were henceforth blocked.

---

[34] *See* Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-center/press-releases/Pages/po943.aspx. After the fall of the Taliban at the end of 2001, the Treasury Department issued a license authorizing the new Afghan government to access the DAB assets. *Id.*

Executive Order 13,224 § 1, 66 Fed. Reg. 49,079. Nine months later, he added the Taliban to the list of persons blocked pursuant to that order, thereby deeming the Taliban a "Specially Designated Global Terrorist" or "SDGT." Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002); 31 C.F.R. §§ 594.201(a), 594.310. The Taliban remains a blocked person and an SDGT to this day.

## 2.    TRIA

Shortly after the September 11 attacks, Congress became frustrated with the executive's longstanding sanctions rules that had the effect of preventing enforcement of money judgments issued to victims of terrorism against the assets of terrorist groups. Congress enacted a new law with the specific purpose of allowing victims of terrorism to obtain relief from blocked terrorist funds. Terrorism Risk Insurance Act of 2002 ("TRIA") § 201, Pub. L. No. 107–297, 116 Stat. 2322, 2337–2340 (codified at 28 U.S.C. § 1610 note). TRIA provides in operative part that:

> *Notwithstanding any other provision of law,* and except as provided in subsection (b), in every case in which a person has obtained a *judgment against a terrorist party* on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7)], the blocked assets of that terrorist party (*including the blocked assets of any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

*Id.* § 201(a) (emphasis added).

As Senator Tom Harkin, one of the primary sponsors of TRIA, explained: "[t]he purpose of [Section 201] is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties … [TRIA] establishes once and for all, that such judgments are to be enforced against any assets available in the U.S., and that *the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act*." *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (quoting

148 Cong. Rec. S11524, S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin)) (emphasis added). The conference committee's report echoed this theme: "The purpose of Section 201 is to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties. It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced." H. REP. NO. 107-779, at 27 (2002) (Conf. Rep.).

It is settled law that TRIA preempts the Foreign Sovereign Immunities Act ("FSIA"). *See Smith v. Fed. Rsrv. Bank of N.Y.*, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003) ("[T]o the extent that a foreign country's sovereign immunity potentially conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict."), *aff'd*, 346 F.3d 264 (2d Cir. 2003); *Weininger v. Castro*, 462 F. Supp. 2d 457, 477, 488 (S.D.N.Y. 2006) (TRIA overrode FSIA immunity for Central Bank of Cuba); *accord Bennett v. Islamic Repub. of Iran,* 618 F.3d 19, 21 (D.C. Cir. 2010); *see also* U.S. Statement 10 ("When its conditions are satisfied, TRIA [§] 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA.").

## III.    Legal Standard

The procedure for enforcement of writs of execution is governed by Federal Rule of Civil Procedure 69(a)(1), which provides that proceedings on execution "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." In the state of New York, C.P.L.R. Section 5225(b) provides the relevant procedure for enforcement of a judgment "against a third party who 'is in possession or custody of money or other personal

property' in which the judgment debtor has an interest." *See CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir. 2018).[35]

In ordinary turnover proceedings, "N.Y. C.P.L.R. § 5225(b) requires a two-part showing before the Court can order [a] third party to turn over the money to the judgment creditor. The first prong requires that the judgment creditor show the judgment debtor has an interest in the property that the creditor is trying to reach. To satisfy the second prong, the Court must find either that the judgment debtor is entitled to the possession of such property, or that the judgment creditor's rights to the property are superior to those of the party who controls or possesses that property." *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019).

But in this case, the Court must also consider the effect of TRIA, which supersedes other laws by virtue of its preamble. Under that federal statute, assets in which a blocked terrorist party has an interest, "including the blocked assets of any agency or instrumentality of that terrorist party[] shall be subject to execution," "[n]otwithstanding any other provision of law … in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism … to the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a).[36]

Because TRIA provides the relevant framework for analyzing whether a terrorist party "has an interest in the property the judgment creditor is trying to reach" under C.P.L.R. § 5225(b), and because it mandates that such property "shall be subject to execution" if so, courts in this district

---

[35] While the text of Section 5225(b) contemplates that enforcement actions under that statute will be brought as a "special proceeding," the Second Circuit has clarified that "a party seeking a money judgment against a non-party garnishee" in federal court "may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee." *CSX Transp.*, 879 F.3d at 469.

[36] An OFAC license is not required to execute against blocked assets under TRIA. *See Harrison v. Republic of Sudan*, 802 F.3d 399, 408–09 (2d Cir. 2015), *rev'd on other grounds*, 139 S. Ct. 1048 (2019).

routinely analyze whether assets are subject to TRIA in the first instance and then rely on the relevant TRIA holding to find that turnover is appropriate under the New York statute. *See, e.g.*, *Hausler v. JP Morgan Chase Bank, N.A.* (*Hausler III*), 127 F. Supp. 3d 17, 48 (S.D.N.Y. 2015); *Weininger*, 462 F. Supp. 2d at 499; *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013).

The DAB Assets are blocked assets pursuant to Executive Order 14,064. TRIA Section 201(a) thus authorizes the Doe Creditors to enforce their judgment against either (i) blocked assets of the Taliban or against (ii) blocked assets of an agency or instrumentality of the Taliban. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016) ("[T]he fact that Plaintiffs obtained their underlying judgments against [the Taliban] … does not prevent" them from executing against DAB's properties under TRIA if DAB is an "agenc[y] or instrumentalit[y] of [the Taliban] under the TRIA."), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

Therefore, the Doe Creditors are entitled to enforce their judgments under TRIA and New York law against the blocked assets at the FRBNY so long as they establish these elements: (1) possession of a "judgment against a terrorist party"; (2) arising from an act of terrorism; (3) seeking to execute against "blocked assets" within the meaning of TRIA (*i.e.*, blocked assets of that terrorist party or an agency or instrumentality of that terrorist party); (4) to the extent of their "compensatory damages." *Weininger*, 462 F. Supp. 2d at 479.

## IV.   Argument

The Doe Creditors have satisfied all four TRIA elements. They have obtained a judgment against a terrorist party (the Taliban), on a claim based on an act of terrorism (a suicide bomb attack in 2016) and seek to execute against the blocked assets of an agency or instrumentality of

that terrorist party (DAB). The Doe Creditors are thus entitled to execute against the DAB Assets to collect on their judgment for compensatory damages.

### A.     The Taliban Is A Terrorist Party Within The Meaning of TRIA

The Taliban is, without question, a terrorist party within the meaning of TRIA, as the United States agrees. *See* U.S. Statement 19. Section 201(d)(4) defines a "terrorist party" as, among other things, "a terrorist[.]" The United States has classified the Taliban as a Specially Designated Global Terrorist since July 2, 2002. *See* Exec. Order No. 13,268 § 1; *see also* 31 C.F.R. §§ 594.310, 594.311. In conformity with that designation, the United States has represented to courts in other matters both that the Taliban is a "terrorist party" and that its assets are subject to attachment under TRIA. *See* Brief of the United States in Response to Plaintiffs' Motion to Compel at 3–4, *Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169 (D.D.C. Feb. 2, 2005), 2005 WL 3518010, ECF No. 4.

### B.     The Doe Creditors Have A Judgment Against The Taliban Based On An Act Of Terrorism

There is also no question that the Doe Creditors have a judgment against the Taliban "based on an act of terrorism[,]" as the United States agrees. *See* U.S. Statement 19. TRIA Section 201(d)(1) defines an "act of terrorism" to include "(A) any act or event certified under section 102(1)"; or "(B) to the extent not covered by subparagraph (A), any terrorist activity" as defined in 8 U.S.C. § 1182(a)(3)(B)(iii). The attack on which the Doe Creditor's judgment is based was indeed certified as a terrorist attack under Section 102(1) of TRIA on April 13, 2016.[37] Had it not already been certified, this attack would qualify under subsection (B).

---

[37] *See International Terrorism Victim Expense Reimbursement Program–Terrorist Incident Designation List available at* https://ovc.ojp.gov/program/international-terrorism-victim-expense-reimbursement-program-itverp/terrorist-incident-designation-list.

**C.      The DAB Assets Are "Blocked Assets" Within The Meaning Of TRIA**

TRIA defines "blocked asset[s]" as "any asset seized or frozen by the United States under
… sections 202 and 203 of [IEEPA] (50 U.S.C. 1701; 1702)." TRIA § 201(d)(2)(A). On February
11, 2022, President Biden ordered, pursuant to IEEPA, that "[a]ll property and interests in property
of DAB that are held, as of the date of this order, in the United States by any United States financial
institution, including the Federal Reserve Bank of New York, are blocked and may not be
transferred, paid, exported, withdrawn, or otherwise dealt in[.]" Exec. Order No. 14,064 § 1(a).
President Biden did so fully cognizant of the enforcement proceedings before this Court. 87 Fed.
Reg at 8391 ("I also understand that various parties, including representatives of victims of
terrorism, have asserted legal claims against certain property of DAB or indicated in public court
filings an intent to make such claims. This property is blocked under this order."). The DAB Assets
are therefore blocked property under TRIA, as the United States agrees. U.S. Statement 19.

**D.      The DAB Assets Are Blocked Assets Of DAB, Which Is An Agency Or
Instrumentality Of The Taliban, And Is The Taliban's Alter Ego**

The Doe Creditors can execute against the DAB Assets if the Court finds that (1) they are
"held in the hands of" DAB, and (2) DAB is an agency or instrumentality of the Taliban.
*Kirschenbaum*, 830 F.3d at 132 (quoting *Weinstein*, 609 F.3d at 49). The Doe Creditors have met
these conditions.

**1.      DAB Holds The DAB Assets**

Section 201 of TRIA authorizes execution against "property held in the hands of an agency
or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in
the judgment." *Kirschenbaum*, 830 F.3d at 132 (citing *Weinstein*, 609 F.3d at 50). "[T]he fact that
Plaintiffs obtained their underlying judgments against [the Taliban] … does not prevent" them

16

from executing against DAB's properties under TRIA if DAB is an "agenc[y] or instrumentalit[y] of [the Taliban] under the TRIA." *Id.*

There is no question that the DAB Assets are "held in the hands" of DAB. They are in DAB's account at FRBNY,[38] and a property interest may thus be presumed. *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 86 (2d Cir. 2002) ("When a party holds funds in a bank account, possession is established, and the presumption of ownership follows."); *see also Hausler III*, 127 F. Supp. 3d at 49 ("There is no question that under New York law, the account holder of accounts containing assets belonging to the account holder has a property interest in those assets[.]"); *Miller v. City of Ithaca*, No. 10-cv-597, 2019 WL 2502712, at *3 (N.D.N.Y. June 17, 2019) (where funds in bank's possession were the judgment debtor's, the judgment debtor "necessarily ha[d] an interest in those funds"). Indeed, President Biden expressly recognized that DAB holds assets at FRBNY on February 11—and ordered all of DAB's assets in the United States transferred to a single consolidated account at the FRBNY. Exec. Order No. 14,064 § 1(a)–(b).

## 2.     DAB Is An Agency Or Instrumentality Of The Taliban Under TRIA

The Second Circuit has defined three independent ways in which DAB can qualify as an agency or instrumentality of a terrorist party under TRIA. First, DAB will be an agency or instrumentality if it is "a means through which a material function of the terrorist party is accomplished[.]" *Kirschenbaum*, 830 F.3d at 135. Second, DAB will be an agency or instrumentality of the Taliban if it provides "material services to, on behalf of, or in support of the terrorist party." *Id.* Or third, DAB will be an agency or instrumentality if it is "owned, controlled, or directed by the terrorist party." *Id.* The Eleventh Circuit has adopted a similar test. *See Stansell*

---

[38] *See* U.S. Statement 8 ("The DAB Assets at issue are housed in accounts held at FRBNY for DAB[.]").

*v. FARC*, 771 F.3d 713, 724 n.6, 732 (11th Cir. 2014) (cited with approval in *Kirschenbaum*, 830 F.3d at 135–36, 135 n.19). The Doe Creditors need to satisfy only one of the three alternative tests. Here, the Doe Creditors satisfy all three tests.

First, DAB is controlled and directed by the Taliban. It was controlled and directed by the Taliban in 2001.[39] It is again controlled and directed by the Taliban today—and has been since August 2021, when the Doe Creditors moved for their writ as Taliban-installed leadership took control of DAB and began managing DAB's operations and activities for the Taliban's benefit.[40] As demonstrated above and as more fully detailed in the Zerden Declaration, DAB is completely controlled by the Taliban.[41] Current and former U.S. government officials recognize the Taliban controls DAB.[42] DAB's own media relations show the Taliban controls DAB.[43] Public and private organizations that previously worked with or through DAB are now bypassing it because of the Taliban's control.[44] The reality is that "DAB is now operating under the Taliban's direct, operational control."[45]

Second, the Taliban is using DAB to accomplish material functions supporting its illicit activities. For example, the Taliban is using DAB to facilitate and enhance its illegal narcotics trafficking.[46] The Taliban can now use DAB's archive of highly sensitive Suspicious Activity Reports and financial investigation records to identify, punish, and retaliate against opponents.[47]

---

[39] H. Doc. No. 106-268, at 4; *see also* Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-center/press-releases/Pages/po943.aspx (DAB assets were "associated with the Taliban regime").
[40] Zerden Decl. ¶ 27.
[41] Zerden Decl. ¶ 14, 39, 49, 51, 54-55, 74, 86, 91, 98, 103, 110, 115-25, 126-35, 137-139, 143; *see also supra* Part II.A.2.
[42] Zerden Decl. ¶ 99-114.
[43] Zerden Decl. ¶ 115-35.
[44] Zerden Decl. ¶ 140-43.
[45] Zerden Decl. ¶ 14, 39, 49, 51, 54-55, 74, 86, 91, 98, 103, 110, 115-25, 126-35, 137-139, 143
[46] Zerden Decl. ¶ 146-55.
[47] Zerden Decl. ¶ 156-159.

By using DAB's authority to supervise Afghanistan's entire banking system, the Taliban has the power to remove all AML/CFT controls, monitoring systems, and enforcement mechanisms that previously interfered with its terror financing activities.[48] In fact, someone sanctioned for terror financing is now responsible for DAB's AML/CFT functions.[49] The Taliban's opportunity to expand its terrorist activities is also greatly enhanced by its ability to remove any oversight or attempts to regulate Afghanistan's hawala system, a centuries-old informal money exchange system used to fund terrorism throughout the world.[50]

Third, the same evidence shows that DAB is providing material services to the Taliban.

Indeed, the present circumstances are just a return to form for the Taliban's relationship with DAB—it is using DAB in the same way that it did during the period when it controlled Afghan territory and institutions between 1997 and 2001.[51] These same facts led the United States to conclude then that DAB was "controlled by the Taliban." H. Doc. No. 106-268, at 4. The Taliban has simply reimposed its former control and picked up where it left off twenty years ago.

Courts have found that entities are agencies or instrumentalities of terrorist organizations for purposes of TRIA based on far less than the circumstances of this case. *See, e.g.*, *Caballero v. FARC*, No. 18-CV-25337, 2021 WL 3927826, at *3 (S.D. Fla. Aug. 24, 2021) (individual who operated currency exchange program on behalf of terrorist party was an "agency or instrumentality" of that party under TRIA); *Caballero v. FARC*, No. 20-CV-1939, 2021 WL 6339256, at *2 (D. Conn. Jan. 14, 2021) (unaffiliated corporation was "agenc[y] or instrumentality" of terrorist party which "use[d]" it "to launder money"); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 241 (D.R.I. 2004) (subjecting assets of Holy

---

[48] Zerden Decl. ¶ 160-61, 166-67.
[49] Zerden Decl. ¶ 69.
[50] Zerden Decl. ¶ 161, 168-78.
[51] Zerden Decl. ¶ 25-27.

Land Foundation to execution as an agency or instrumentality of Hamas based on "strong evidence" it "operate[d] as a fund-raiser for Hamas in the United States").

Because DAB is an agency or instrumentality of the Taliban under governing Second Circuit precedent, its assets—including at the FRBNY—are subject to execution under TRIA.

### 3. Treating DAB As An Agency Or Instrumentality Of The Taliban Is Consistent With Binding Case Law, Statutory Text, And Congressional Purpose

In its Statement of Interest, the United States takes no position on whether DAB is an agency or instrumentality of the Taliban under TRIA. U.S. Statement 19–20. Instead, it points out areas of sensitivity that the Court should be careful to avoid when adjudicating this motion. *Id.* There is a clear path that this Court should take to recognize the Doe Creditors' entitlement to immediate relief without impinging upon Executive Branch prerogatives: a simple application of the binding standard in *Kirschenbaum*. To the extent that the Court must skirt legal territory related to the conduct of foreign relations as it walks down that path, that is so only because of Congress' choice in TRIA to prioritize the ability of victims of terrorism to recover judgments from terrorist parties (including from any agency or instrumentality of a terrorist party) over "any other provision of law," including the FSIA. *See* TRIA § 201(a); *Smith*, 280 F. Supp. 2d at 319. And the binding authority of *Kirschenbaum* does not compel—or even suggest—any different approach.

It is important to understand what the Doe Creditors are not asking this Court to do. The Court does not need to recognize any government of Afghanistan or to preempt any Executive Branch determination on that matter. *See* U.S. Statement 26. The Court does not need to consider whether DAB is or is not an active central bank of any particular state—that is a determination relevant only for purposes of the FSIA, not TRIA. *See* U.S. Statement 25. The Court does not need to decide that the funds at the FRBNY are "assets of" the Taliban by virtue of its claim to be the government of Afghanistan. *See* U.S. Statement 25, 26. The Court does not need to deem either

the Taliban or Afghanistan a state sponsor of terror. *See* U.S. Statement 20. The United States asserts that these are sensitive areas of executive competency that the Court should take care to avoid, and we agree that those interests need not be disturbed.

The only thing this Court needs to do is apply the plain text of the "agency or instrumentality of any terrorist party" clause of TRIA pursuant to the Second Circuit's well-established, binding *Kirschenbaum* test and conclude that, under that test and on the present record, DAB is an agency or instrumentality of the Taliban (as the evidence overwhelmingly shows).[52]

Nor is there any basis to depart from the text simply because a non-state party is the defendant or because that non-state party has taken control of a state institution. As the Second Circuit has recognized, TRIA's definition of "agency or instrumentality" was intentionally drafted to extend much further than the definition of an "agency or instrumentality" under the FSIA. *Kirschenbaum*, 830 F.3d at 132–135. The Second Circuit did not hint that this test should be applied differently based on the identity of the terrorist party or instrumentality—in fact, it did quite the opposite. *See id.* at 134 ("The plain language of the TRIA refers only to 'the blocked assets of any agency or instrumentality of that terrorist party,' and does not differentiate among the variety of entities that might qualify as a 'terrorist party.'"). Notably, the *Kirschenbaum* Court applied its TRIA test to an alleged instrumentality of Iran (even though that is precisely the circumstance in which the FSIA's test would have traditionally applied).[53] *Id.* This Court must apply the same *Kirschenbaum* test for the same statutory phrase in this case. After all, "[t]he meaning of words in a statute cannot change with the statute's application. To hold otherwise

---

[52] Section 201(d)(4) of TRIA does not provide or suggest any limitation on what assets of a terrorist party can be attached; it merely contains the definition of a "terrorist party." *See* U.S. Statement 25 n.8.

[53] A finding that DAB is an instrumentality of the Taliban thus does not require the Court to make any prerequisite finding about whether the Taliban is the government of Afghanistan, as would be necessary under FSIA, because under *Kirschenbaum* the definitions of "agency or instrumentality" under TRIA and the FSIA are entirely separate.

'would render every statute a chameleon,' and 'would establish within our jurisprudence … the dangerous principle that judges can give the same statutory text different meanings in different cases[.]'" *United States v. Santos*, 553 U.S. 507, 522–23 (2008) (plurality opinion) (quoting *Clark v. Martinez,* 543 U.S. 371, 382, 386 (2005)) (citations omitted). And at least one court in this circuit has already applied the *Kirschenbaum* test to hold that agencies or instrumentalities of foreign governments can also constitute agencies and instrumentalities of an entirely separate terrorist party under TRIA. *See Caballero v. FARC*, No. 20-MC-0040, 2021 WL 307558 (W.D.N.Y. Jan. 29, 2021) (Venezuelan state oil company was agency or instrumentality of Colombian terrorist group pursuant to TRIA); Order, *Caballero*, No. 20-MC-0040 (W.D.N.Y. Dec. 18, 2020), ECF No. 15 (same); *see also Caballero*, 2021 WL 6339256, at *2 (PDVSA subsidiary was agency or instrumentality of FARC).[54]

The idea that a non-state terrorist party might commandeer and control a state agency or instrumentality for its own purposes would not have been foreign to the 107th Congress when it enacted TRIA. Indeed, the very same Congress that passed TRIA had received a report from the President that, as of early 2001, the Taliban (in its role as a non-state actor) had taken control of DAB. H. Doc. No. 107-16, at 4. If that Congress had wanted to write a statute that limited the ability of terror victims to recover in these familiar circumstances—if it wanted terror victims to recover from only *private* agencies or instrumentalities of non-state terrorist actors or wanted to limit them to recovery only under the principles established under the FSIA—it could have done

---

[54] Likewise, in another district, the judgment creditor of a non-state terrorist judgment debtor successfully employed TRIA to satisfy his judgment from Venezuelan state-owned assets. The Government's Statement of Interest filed in that matter did not raise any objection to the fact that the execution to satisfy a judgment against a non-state terrorist group was against assets that were owned by a state that had not been designated as a state sponsor of terrorism. *See* Dkt. 272, Sealed Statement of Interest of the United States (now unsealed), dated Nov. 25, 2019, in *Doe v. ELN*, *et al.*, Case No. 10-cv-21517 in the United States District Court for the Southern District of Florida, attached hereto as Exhibit B. Clearly, assets of state entities that serve as agencies of terrorist organizations are subject to TRIA execution.

so. But it plainly did not. To exempt the DAB's assets in this instance would effectively immunize the Taliban (or any other similarly situated terrorist party in the future) from TRIA and would frustrate the very purpose of the law: making assets of any agency or instrumentality of a terrorist party, *i.e.*, any entity effectively controlled by or used for the benefit of that terrorist party, available for attachment by victims of that terrorist party.

And, as the United States agrees, in cases like this one the statutory text of FSIA is wholly superseded by TRIA, which makes blocked assets of any terrorist party or any agency or instrumentality of any terrorist party available for execution "[n]otwithstanding any other provision of law." TRIA § 201(a); *see also Kirschenbaum*, 830 F.3d at 134-135 ("The FSIA definition of 'agency or instrumentality' … do[es] not pertain to those terms in the TRIA."). It thus makes little sense to attempt to graft principles of law gleaned from decades of interpreting the FSIA onto a provision that was intentionally written to supersede the limits of that statute.

Finally, the fact that the assets were confiscated by a rogue regime is no bar to the application of TRIA. Indeed, it has long been the rule in this Circuit that blocked assets of a confiscated entity should be used to compensate victims. *See Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 56 (S.D.N.Y. 2015) (following *Banco Nacional de Cuba v. Chem. Bank N.Y. Tr. Co.,* 658 F.2d 903 (2d Cir. 1981) and authorizing TRIA collection against blocked assets of entity wrongfully confiscated by Cuba).

### 4. Alternatively, DAB Is The Taliban's Alter Ego

The Court should also conclude that DAB is an alter ego of the Taliban, subjecting its assets to TRIA as a "terrorist party" itself, because DAB "is so extensively controlled by [the Taliban] that a relationship of principal and agent is created[.]" *Kirschenbaum*, 830 F.3d at 128 (citation omitted); *see also Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 200 (2d Cir. 2019) (affirming TRIA collection where entity was "*both* an alter ego and an agency or instrumentality

of a terrorist party under TRIA …".) (emphasis added). As has been exhaustively shown, the Taliban exerts such extensive control over DAB that DAB qualifies as its alter ego. *See supra* Part IV.D.2.

### E.    The Doe Creditors Are Entitled To Possess The DAB Assets

The second prong of the C.P.L.R. Section 5225(b) turnover analysis—that the judgment debtor is "entitled to possession of [the] property"—is satisfied because the property is indisputably DAB's and the only restraint on DAB's possession is the blocked nature of the assets. In such cases, TRIA makes blocked property available to qualified judgment creditors like the Doe Creditors. *Weininger*, 462 F. Supp. 2d at 499; *see also Harrison*, 802 F.3d at 409 (funds subject to TRIA "may be distributed without a license from OFAC"). Courts thus routinely find that this prong is satisfied where the blocked assets at issue are subject to TRIA. *See Hausler III*, 127 F. Supp. 3d at 48; *Weininger*, 462 F. Supp. 2d at 499; *Heiser*, 919 F. Supp. 2d at 422; *accord Caballero*, 2021 WL 6339256, at *2 (Connecticut turnover statute satisfied based on TRIA agency/instrumentality analysis). Nothing else stands in the way of execution. *See Hill v. Republic of Iraq,* No. 99-CV-3346, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) (the "notwithstanding provision" is "unambiguous and effectively supersedes all previous laws"); *cf. Weinstein*, 609 F.3d at 53 ("notwithstanding" clause superseded U.S. treaty obligations).

### F.    There Is No Question Of Priority

No other creditors have priority over these Doe Creditors that would impact this collection. Regardless of whether the Doe Creditors' pending motion, "Plaintiffs' Motion for *Nunc Pro Tunc* Issuance and Service of Writ", DE 30, is granted, there are sufficient funds to satisfy the compensatory portions of both the Havlish Creditors' writ and the Doe Creditors' writs.

V.     **Conclusion**

For the foregoing reasons, the Court should grant the Doe Creditors' turnover motion as to

the blocked assets of the DAB (as an agency or instrumentality, or alter ego, of the Taliban) which

are in the possession, custody, or control of the Federal Reserve Bank of New York in an amount

sufficient to satisfy the award of compensatory damages in the amount of $138,284,213.26, plus

post-judgment interest since March 21, 2022, pursuant to Section 201(a) of TRIA.

Dated: March 20, 2022

                                        Respectfully submitted,

                                        **do Campo & Thornton, P.A.**
                                        150 S.E. 2nd Avenue, Ste. 602
                                        Miami, Florida 33131
                                        (305) 358-6600

                                                s/ *Orlando do Campo*
                                                Orlando do Campo
                                                Bar Code: OD1969
                                                od@dandtlaw.com

                                                *s/John Thornton*
                                                John Thornton *(pro hac vice)*
                                                jt@dandtlaw.com

                          **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 20, 2022, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

                                        s/ *Orlando do Campo*
                                          Orlando do Campo