**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *IN RE:* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |
| JOHN DOES 1-7,<br><br>                    CREDITORS,<br><br>                V.<br><br>THE TALIBAN, *ET AL.*,<br><br>                    DEBTORS,<br><br>FEDERAL RESERVE BANK OF NEW YORK,<br><br>                    GARNISHEE | Case No. 20-mc-740 (GBD)(SN) |
| FIONA HAVLISH, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DONALD HAVLISH, JR., DECEASED, *ET AL.*,<br><br>                    CREDITORS,<br><br>                V.<br><br>THE TALIBAN, *ET AL.*,<br><br>                    DEBTORS,<br><br>FEDERAL RESERVE BANK OF NEW YORK,<br><br>                    GARNISHEE | Case No. 03-cv-9848 (GBD)(SN) |

**BRIEF OF *AMICI CURIAE* AFGHAN CIVIL SOCIETY ORGANIZATIONS
OPPOSING PLAINTIFF-CREDITORS' TURNOVER MOTIONS**

## <u>TABLE OF CONTENTS</u>

**Page**

INTEREST OF *AMICI CURIAE* ............................................................... VI

PRELIMINARY STATEMENT ...................................................................1

FACTUAL, LEGAL, AND POLITICAL BACKGROUND ...........................................3

    A.    The Taliban Takeover, and Current Humanitarian and Human Rights Crisis ........................................................................3

    B.    The Identification of the Judgment Debtor.............................6

    C.    The Statement of Interest of the United States. ......................7

ARGUMENT ...................................................................................8

I.    UNDER FUNDAMENTAL PRINCIPLES OF U.S. FOREIGN RELATIONS AND INTERNATIONAL LAW, ASSETS OF THE DAB, AS AN AGENCY OF THE SOVEREIGN STATE OF AFGHANISTAN, BELONG TO THE PEOPLE OF AFGHANISTAN, NOT THE TALIBAN...........................................................8

    A.    THE STATE OF AFGHANISTAN, AND ITS AGENCY THE DAB, NOT THE TALIBAN, IS THE SOVEREIGN ENTITY OF AFGHANISTAN. ........................................................9

    B.    PRINCIPLES OF FOREIGN SOVEREIGN IMMUNITY PROTECT THE SOVEREIGN PROPERTY OF AFGHANISTAN, INCLUDING THE DAB, FROM TURNOVER IN U.S. COURTS. ...........................11

        1.    The DAB is an Instrumentality of the Sovereign State and Likewise Immune from Judicial Process in U.S. Courts. .........13

        2.    Title Over DAB's Assets Was Unaffected by the August Takeover and They Remain Assets of the Sovereign – Not the Taliban. .................15

    C.    TRIA's Ownership Requirements Cannot be Bypassed in an Attempt to Enforce a Judgment Against Funds Protected by Sovereign Immunity. ...............15

        1.    TRIA Does Not Allow Plaintiff-Creditors to Bypass Ownership. ............16

        2.    Plaintiff-Creditors Misapprehend the Relationship Between the FSIA and TRIA.........................................................18

CONCLUSION................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ................................................................................................18

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964) ..................................................................................................8

*Bank Markazi v. Peterson*,
    578 U.S. 212 (2016) ................................................................................................15

*Caballero v. FARC*,
    945 F.3d 1270 (2d. Cir. 2019) ...............................................................................13

*Caballero v. FARC*,
    No. 20-MC-0030, 2021 WL 307558 (W.D.N.Y. Jan 29, 2021) .............................17

*Caballero v. FARC*,
    No. 20-MC-00040-LJV, 2022 WL 633572 (W.D.N.Y. Mar. 4, 2022)............................17, 18

*EM Ltd. v. Repub. of Arg.*,
    473 F.3d 463 (2d Cir. 2007)...................................................................................15

*Gates v. Syrian Arab Republic*,
    2013 WL 1337223 (Mar. 29, 2013) .......................................................................13

*Guaranty Trust Co. v. United States*,
    304 U.S. 126 (1938)................................................................................................10

*Hausler v. JP Morgan Chase Bank, N.A.*,
    770 F.3d 207 (2d. Cir. 2014)..................................................................................16

*Heiser v. Islamic Republic of Iran*,
    735 F.3d 934 (D.C. Cir. 2013) ...............................................................................16

*Kirschenbaum v. 650 Fifth Avenue*,
    830 F.3d 107 (2016).........................................................................................16, 19

*Murray v. The Schooner Charming Betsy*,
    2 Cranch 64 (1804) .........................................................................................12, 16

*National City Bank v. Republic of China*,
    348 U.S. 356 (1955)................................................................................................10

*NML Capital, LTD v. Banco Central de la Republica Argentina*,
    652 F.3d 172 (2d Cir. 2011)..............................................................14

*The Paquete Habana*,
    175 U.S. 677 (1900)................................................................8, 9

*Permanent Mission of India to United Nations v. City of New York*,
    561 U.S. 193 (2007)..................................................................12

*S & S Machinery Co. v Masinexportimport*,
    706 F.2d 411 (2d. Cir. 1983)......................................................13, 14

*Samantar v. Yousuf*,
    560 U.S. 305 (2010)................................................................11, 12

*The Schooner Exchange v. McFaddon*,
    11 U.S. 116 (1812)....................................................................11

*Weininger v. Castro*,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006).............................................13

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015)......................................................................10

## Statutes

Foreign Sovereign Immunities Act, 28 U.S.C. § 1330, 1602-11 ......................... *passim*

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107–297, 116 Stat. 2322 ..................... *passim*

## Other Authorities

*Afghanistan 2021 Report*, AMNESTY INT'L,..............................................6

Certain Iranian Assets (*Islamic Republic of Iran v. United States of America*) I.C.J
    (2018)....................................................................................14

Executive Order No. 14064 (Feb.11, 2022)..............................................6

HAZEL FOX & PHILIPPA WEBB, *THE LAW OF STATE IMMUNITY* (3d ed., Oxford
    University Press, 2015)...........................................................11, 12, 14

Christina Goldbaum & Yaqoob Akbary, *Over a Million Flee as Afghanistan's
    Economy Collapses*, N.Y. TIMES (Feb. 3, 2022)....................................4

H.R. Rep. 94-1487 (1976)................................................................13

*Afghanistan: Economic Roots of the Humanitarian Crisis*, HUMAN RIGHTS
WATCH (Mar. 1, 2022)............................................................................................4, 5

*Afghanistan Facing Famine*, HUMAN RIGHTS WATCH (Nov. 11, 2021)..........................................5

*What's Next for Afghans Fleeing the Taliban*, HUMAN RIGHTS WATCH (Sept. 9,
2021) ........................................................................................................................4

ICC, Order Setting the Schedule for the Filing of Submissions in the Proceedings
Pursuant to Article 18(2) of the Rome Statute and Rule 55(2) of the Rules of
Procedure and Evidence, *Situation in the Islamic Republic of Afghanistan*,
ICC-02/17, Feb. 24, 2022 .......................................................................................9

*Stopping State Failure in Afghanistan*, INT'L CRISIS GRP.: COMMENTARY (Jan. 27,
2022) ........................................................................................................................5

Lindsay Maizland, *The Taliban in Afghanistan,* COUNCIL ON FOREIGN RELATIONS
(Sept. 15, 2021)......................................................................................................3

Barbara Marcolini, Sanjar Sohail & Alexander Stockton, *The Taliban Promised
Them Amnesty. Then They Executed Them*, N.Y. TIMES (Apr. 12, 2022) ................6

1 R. JENNINGS OPPENHEIM & A. WATTS, OPPENHEIM'S INTERNATIONAL LAW § I
(9th ed., 1992).......................................................................................................10

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES
(1987).......................................................................................................................9

*Second Statement of Interest of the United States, Rubin v. Islamic Republic of
Iran, No. 03-cv-9370 (N.D. Ill. Mar. 3, 2006)* ...............................................11

CLAYTON THOMAS, CONG. RSCH. SERV., R46955, TALIBAN GOV'T IN
AFGHANISTAN: BACKGROUND AND ISSUES FOR CONGRESS (Nov. 2, 2021) ............................3

CLAYTON THOMAS, CONG. RSCH. SERV., R46879, U.S. MILITARY WITHDRAWAL
AND TALIBAN TAKEOVER IN AFGHANISTAN: FREQUENTLY ASKED QUESTIONS
(Sept. 17, 2021)......................................................................................................4

Press Release, United Nations Assistance Mission in Afghanistan (UNAMA),
Civilian Casualties Set to Hit Unprecedented Highs in 2021 Unless Urgent
Action to Stem Violence (July 26, 2021)................................................................4

United Nations Convention on Jurisdictional Immunities of States and Their
Property (2004)......................................................................................................11

*World Can End 'Downward Humanitarian Spiral of Afghanistan,'* UN NEWS
(Mar. 22, 2022) ......................................................................................................5

ZAFIRIS TZANNATOS, UNDP, AFGHANISTAN SOCIO-ECONOMIC OUTLOOK 2021–
2022: AVERTING A BASIC NEEDS CRISIS 2 (2021)....................................................................5

# INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are Afghan civil society and grassroots organizations that have led human rights, legal, evacuation, and advocacy efforts, including in response to the Taliban takeover of Afghanistan in August 2021. In the midst of a case that raises significant economic, geopolitical and jurisprudential matters, *Amici* bring a critical perspective otherwise not directly before the court: the interests of the Afghan people. *Amici Curiae* have a direct and deep interest in the outcome of the Turnover Motions: ensuring that the remaining $3.5 billion of the Central Bank assets held in the U.S. as sovereign funds are to be used for the people of Afghanistan to prevent further deterioration of the economic, humanitarian, and human rights circumstances of Afghan civilians. Indeed, relieving the Taliban – a non-state, terrorist designated entity – of their financial responsibility for their crimes by punishing the sovereign Afghan people suffering under their rule, would result in a tragic injustice.

**Global Advocates for Afghanistan** ("GAA") is an independent, Afghan-led movement which began as an emergency response to the deteriorating human rights and humanitarian crises unfolding in Afghanistan in the wake of the Taliban takeover in August 2021. GAA has led UN advocacy efforts and international and domestic campaigns in the U.S., Canada, and Europe, as well as worked with civil society groups to organize legal intake clinics in the U.S. for hundreds of recently arrived Afghan refugees.

The **Afghan Network for Advocacy and Resources** ("Project ANAR") is an Afghan-led legal services and advocacy organization that has coordinated emergency response *pro bono* legal assistance efforts for Afghans.  Project ANAR has developed *pro se* materials for Afghans

---

[1] No party or party's counsel authored this brief in whole or in part and that no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief. The *Havlish* Creditors take no position on *Amici's* motion for leave, while the *Doe* Creditors do not consent to *Amici*'s motion on the grounds that *Amici* "do not have standing."

seeking immigration pathways, and led and contributed to advocacy efforts related to immigration.

**Afghans For A Better Tomorrow** ("AFBT") is an Afghan-led progressive community and advocacy organization that aims to bring about transformative change for Afghans in the United States and beyond. AFBT has taken the lead in rapid-response efforts in the wake of the U.S. withdrawal from Afghanistan, ranging from direct actions to evacuations with the aim of holding U.S. elected officials accountable for their actions and policies impacting the Afghan people.

The **Afghan-American Community Organization** ("AACO") is a 501(c)(3) nonprofit dedicated to advancing the Afghan-American community through education and outreach, and promoting civic and social engagement. Since 2015, AACO has brought the Afghan diaspora together to connect, uplift, and address the biggest issues facing the community through the largest annual conference for Afghan-Americans, the only scholarship program for Afghan-American students, fundraising efforts for humanitarian causes in Afghanistan, and civic advocacy on behalf of the diaspora.

This Court recognized that "adjudication of entitlement to Da Afghanistan Bank assets may well impact [the Afghan people's] social and economic circumstances." Order, Mar. 31, 2022, ECF #7823 at 2. As Afghan organizations, *Amici Curiae* confirm that granting the motions would have such an impact – a profoundly negative one – and accordingly, ask the Court to preserve the Afghan assets held in Afghanistan's Central Bank, Da Afghanistan Bank, for the Afghan people.

## PRELIMINARY STATEMENT

The matter before the Court arises out of a deeply painful event in United States' history, the September 11th attacks, which killed nearly 3,000 innocent people, including Donald Havlish, and loved ones of all the other Plaintiff-Creditors who come to this Court seeking some measure of justice and accountability for their losses in terrorist attacks. *Amici* support the Plaintiff-Creditors in their efforts to collect on the duly-obtained judgments against the Taliban and other named defendants. *Amici* cannot, however, support the manner in which Plaintiff-Creditors move this Court to do so, namely by taking assets from the Central Bank, Da Afghanistan Bank ("DAB"), which is an agency or instrumentality of the State of Afghanistan; these assets belong to the people of Afghanistan, not to the Taliban. The Taliban bears responsibility for payment of the judgments, but satisfaction of a judgment for their crimes cannot – and should not – come from the people of Afghanistan. *Amici* respectfully submit that the relief Plaintiff-Creditors are seeking is misdirected and their motions for turnover should be denied.

The assets at issue ("Afghan Assets") do not belong to the Taliban, which no country in the world has recognized as the legitimate government in Afghanistan. The Afghan Assets are sovereign assets of the State of Afghanistan, and as such, are the assets of and for the Afghan people. These assets should be kept as sovereign reserves to maintain the value of the Afghan currency, and not effectively be given to the Taliban, who are suppressing the rights of human rights defenders, ethnic and religious minorities, and women and girls, among others. It would be both unlawful and profoundly unjust to transfer assets belonging to the Afghan people to satisfy a judgment against the Taliban whose crimes caused Plaintiff-Creditors' grievous suffering. Under fundamental principles of foreign relations, the Court cannot authorize the seizure of the sovereign assets of the State of Afghanistan, which has never been designated a state-sponsor of

terrorism, which are protected by principles of foreign sovereign immunity under both international and U.S. statutory law, to pay the judgment against the Taliban.

To support their (erroneous) claim, Plaintiff-Creditors focus their argument on the Taliban's alleged *control* over the DAB. They do not, and cannot, however, establish the Taliban's *ownership* over the sovereign assets that are held by the Central Bank and that belong to the sovereign citizens of Afghanistan. The relevant question is not whether the DAB is an agency or instrumentality of the Taliban – the United States has already answered that question in the negative, finding instead that the DAB is an agency or instrumentality *of the State of Afghanistan*, Statement of Interest of the United States of America, Feb. 11, 2022, ECF #563 ("U.S. SOI") at 21 – but rather, who has title to the assets in the DAB account.  Consequently, the Plaintiffs-Creditors have no title to execute their judgement against the Afghan Assets.

More fundamentally, Plaintiff-Creditors' motions require consideration of numerous matters that have profound foreign policy and political ramifications for the United States – as well as for Afghanistan and the Afghan people – that are the prerogative of the Executive Branch and from which the judicial branch should abstain. The Court cannot reach the "straightforward application" of the Terrorism Risk Insurance Act of 2002 ("TRIA") Pub. L. No. 107–297, 116 Stat. 2322, that the Plaintiff-Creditors propose without first addressing key questions regarding sovereign identity, sovereign immunity, and government recognition. It would be contrary to the law of recognition, against U.S. foreign policy, and violative of the separation of powers for this Court to consider that sovereign assets can be stripped of their protection and seized to enforce a judgment against a non-state terrorist-designated entity.

Indeed, following the Taliban's recent, violent takeover of Afghanistan, *no* country has recognized it as the sovereign government of Afghanistan; it would be deeply anomalous for a

United States federal court to be the entity to do so – albeit implicitly. As the United States

warned, resolution of these questions is a political, not judicial, matter, and must be reserved for

resolution by the Executive Branch. *See* U.S. SOI 3, 20-27.

Attaching Afghan assets is not "extract[ing justice]" from the Taliban (*See* Havlish

Creditors' Motion for Partial Turnover of Assets from Garnishee Federal Reserve Bank of New

York, March 20, 2022, ECF #598 ("*Havlish* Turnover Motion") at 4); to the contrary, it would

permit the Taliban to be relieved of a judgment against them without bearing the punitive effects

of payment of the judgments. Moreover, recognizing the Taliban as the owners of the sovereign

assets of the State of Afghanistan held in the State's Central Bank, would necessarily – even if

implicitly - grant the Taliban a level of recognition that not only contravenes U.S. foreign policy

but also harms *Amici* and all Afghans who object to the Taliban's violent takeover of their

country.  It would also deprive the people of Afghanistan from funds they and their country need.

## FACTUAL, LEGAL, AND POLITICAL BACKGROUND

### A.    The Taliban Takeover, and Current Humanitarian and Human Rights Crisis

In the early 1990s, the Taliban was formed by Islamic guerilla fighters involved in

resistance efforts against the Soviet Union's 1979-1989 occupation of Afghanistan.[2] In 1996,

after Taliban forces seized Afghanistan's capital, Kabul, the extremist group ruled the country

until the 2001 invasion led by the U.S. military, following the September 11th attacks.[3] Despite

losing governing power, the Taliban waged a two-decade insurgency in Afghanistan.  In recent

years, the Taliban gained control of a sizable part of the country: as early as October 2018, up to

---

[2] Lindsay Maizland, *The Taliban in Afghanistan,* COUNCIL ON FOREIGN RELS., (Sept. 15, 2021).
[3] *Id.* The United States did not recognize the Taliban, maintaining that between 1996 and 2000, there was no functioning central government in Afghanistan. CLAYTON THOMAS, CONG. RSCH. SERV., R46955, TALIBAN GOV'T IN AFGHANISTAN: BACKGROUND AND ISSUES FOR CONGRESS 28 (Nov. 2, 2021).

40% of Afghanistan was either under the Taliban's rule or disputed territory.[4] By spring 2021, Taliban forces began capturing rural areas and, notably, districts that had previously resisted Taliban control in the 1990s. By early August, the Taliban had already seized border crossings of several neighboring countries and had taken over half of Afghanistan's provincial capitals. On August 15, 2021, the Taliban began their final effort to take over the country, seizing Kabul.

2021 was also devastating in terms of civilian casualties attributable to the Taliban.[5] From January to August 10, 2021, UN refugee agency estimations noted that more than 550,000 Afghans were displaced within Afghanistan.[6] After the Taliban takeover, over one million Afghans have attempted to flee the country seeking safety.[7]

Immediately after the Taliban's violent takeover of Afghanistan, the U.S. froze $7.1 billion of Afghan state reserves located primarily at the New York Federal Reserve, asserting that it was an effort to prevent the Taliban from accessing funds that would otherwise contribute to the sovereign wealth of the country.[8] This was part of a larger, coordinated effort between the U.S. and European governments, which began effectively blocking the DAB from accessing a sum of nearly $9 billion of Afghanistan's reserves held at their central banks. The DAB Central Bank was prevented from "accessing foreign currency reserves even as collateral to provide short-term liquidity to settle dollar transactions, make essential payments, purchase banknotes to hold auctions of dollars for private banks, or pay dues to the World Bank."[9]

---

[4] CLAYTON THOMAS, CONG. RSCH. SERV., R46879, U.S. MILITARY WITHDRAWAL AND TALIBAN TAKEOVER IN AFGHANISTAN: FREQUENTLY ASKED QUESTIONS 10 (Sept. 17, 2021).
[5] Press Release, United Nations Assistance Mission in Afghanistan (UNAMA), Civilian Casualties Set to Hit Unprecedented Highs in 2021 Unless Urgent Action to Stem Violence 1 (July 26, 2021).
[6] What's Next for Afghans Fleeing the Taliban, HUM. RTS. WATCH (Sept. 9, 2021).
[7] Christina Goldbaum & Yaqoob Akbary, Over a Million Flee as Afghanistan's Economy Collapses, NEW YORK TIMES, (Feb. 3, 2022).
[8] Afghanistan: Economic Roots of the Humanitarian Crisis, HUM. RTS. WATCH (Mar. 1, 2022).
[9] Id.

Because of the central role played by the DAB on the Afghan economy and the lives of Afghans, the U.S. government's decision to freeze the Afghan Assets has serious and widespread effects, including shortages of currency in U.S. dollars and Afghan afghanis so that banks were unable to lend money and citizens unable to withdraw their own funds.[10]  Indeed, the entire Afghan population is forced to bear the consequences of Taliban-specific sanctions and the cost of freezing U.S.- and Europe-based Afghan assets, which have further deepened the country's humanitarian crisis. [11] The poorly executed U.S. withdrawal and the Taliban takeover of Afghanistan have hurled the country into a catastrophic state. Food insecurity is rampant, leaving half the population facing acute hunger.[12]  his crisis is exacerbated by widespread poverty; water insecurity; shelter shortages; and a lack of access to healthcare (during a pandemic) compounding and intensifying an already dire humanitarian crisis.[13] A recent study revealed that 82% of families in Afghanistan have suffered from lost income since August 2021, a surge in the prices for main food commodities, cash flow shortages, and a liquidity crisis, leading families to sell their children or organs to prevent starvation.[14]  In the second half of 2022, it is expected that nearly the entire population will be living in poverty, and that the "[u]naddressed, the current humanitarian crisis could lead to more deaths than twenty years of war."[15]

Indeed, the United States has recognized the urgency of making DAB funds available "to address significant humanitarian and economic concerns and to avoid regional instability and other conditions contrary to the foreign policy interests of the United States" when it issued

---

[10] *Id.*; ZAFIRIS TZANNATOS, UNDP, AFGHANISTAN SOCIO-ECONOMIC OUTLOOK 2021–2022: AVERTING A BASIC NEEDS CRISIS 2 (2021).
[11] *Stopping State Failure in Afghanistan*, INT'L CRISIS GRP.: COMMENTARY (Jan. 27, 2022).
[12] *World Can End 'Downward Humanitarian Spiral of Afghanistan,'* UN NEWS (Mar. 22, 2022).
[13] *HRW: Economic Roots,* supra note 8.
[14] *Afghanistan Facing Famine*, HUM. RTS. WATCH (Nov. 11, 2021).
[15] *Id.*

Executive Order 14064 (Feb. 11, 2022) and the OFAC license purportedly to enable $3.5 billion of the Afghan Assets to be used "for the benefit of the People of Afghanistan." U.S. SOI 2.

The Taliban has escalated a severe human rights crackdown against the Afghan people which has only worsened the already appalling conditions brought by the humanitarian crisis. The Taliban has engaged in the systematic persecution of religious and ethnic minorities, women and girls, human rights defenders, journalists and media personnel, and former government officials and security forces, among others.[16]  The Taliban also targeted "women lawyers, judges and prosecutors [who] were effectively dismissed from their jobs and forced into hiding," and "faced reprisals from men whom they had convicted and imprisoned for domestic and other gender-based violence, who were subsequently freed from prison by the Taliban."[17]  Taliban fighters, aiming to find human rights defenders and journalists, conducted door-to-door searches: NGO workers—along with their family members—faced beatings, and "journalists were detained and beaten and had equipment confiscated, particularly when covering protests."[18]

### B.    The Identification of the Judgment Debtor.

There is no dispute that the *Havlish* and *Doe* judgments were rendered against the Taliban.[19]  The State of Afghanistan was not a party to the proceedings resulting in the judgments for which the Plaintiff-Creditors seek enforcement and collection, nor could it have been. Sovereign immunity from jurisdiction only allows for very limited exceptions.  While the

---

[16] *Afghanistan 2021 Report*, AMNESTY INT'L, https://www.amnesty.org/en/location/asia-and-the-pacific/south-asia/afghanistan/report-afghanistan/.
[17] *Id.* as has recently been reported, nearly 500 former Afghan government officials or security forces have been killed or disappeared since the August takeover. Barbara Marcolini, Sanjar Sohail and Alexander Stockton, *The Taliban Promised Them Amnesty. Then They Executed Them*, N.Y. TIMES (Apr. 12, 2022).
[18] *Id.*
[19] In *Havlish*, a case that involved both state and non-state entities, the Taliban were listed as "non-sovereign defendant." *Havlish*, Judgment on Liability, Dec. 22, 2011, ECF #294.

Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611, provides such an exception for "state sponsors of terrorism," Afghanistan has never been designated as such.

Because both judgments were rendered against the Taliban, a private party, neither set of Plaintiff-Creditors hold title to enforce their judgment against the State of Afghanistan – or its assets.  To the extent that a Writ of Execution designated the Taliban as, or equated the Taliban with, the sovereign of Afghanistan,[20] that is both legal and factual error; the Writ cannot convert the sovereign assets of Afghanistan into assets of the Taliban, a terrorist-designated organization.

### C.    The Statement of Interest of the United States.

In its Statement of Interest, the United States expressed its "strong interest in the President's constitutional authority to make decisions with respect to the recognition of foreign governments and his blocking and licensing authority … and in ensuring the proper construction of TRIA and the [FSIA]." U.S. SOI 3. It identified the only path for Plaintiff-Creditors to recover the Afghan assets as successfully "establishing a theory of *ownership* [of the assets] by the Taliban" that would either require this Court "to make its own determination as to the identity of Afghanistan's government or to make its own determination as to whether Afghanistan is a state sponsor of terrorism." U.S. SOI 27 (emphasis added). It set out certain findings and fundamental principles to guide resolution of the Turnover Motions:

➢    Determining whether blocked assets are assets "of" an agency or instrumentality of a terrorist-designated party, i.e., the Taliban, requires inquiring whether it has "an ownership interest" in the Afghan Assets – an inquiry that "implicate[s] significant issues of foreign policy" including "the prerogative of the President to recognize and conduct diplomacy with foreign states" (U.S. SOI 20)

➢    Neither the State of Afghanistan nor its agencies or instrumentalities have been designated as a state sponsor of terrorism, and the DAB is an agency or instrumentality of the State of Afghanistan under the FSIA's definition and thus is to be treated as a "foreign state" for purposes of the FSIA  (U.S. SOI 20-21)

---

[20] *See Havlish v. The Taliban*, Writ of Execution, Aug. 27, 2021, ECF #526-1 at 2.

➢ FSIA provides that property of a central bank, held in its own account, is immune from attachment and execution, absent explicit waiver; TRIA allows state assets to be attached "only" with respect to designated state sponsors of terrorism (U.S. SOI 24; 25)

➢ Permitting the assets of a state that is not designated as a state sponsor of terrorism "to be attached indirectly to satisfy the judgment against a non-state terrorist organization would supplant the discretion that Congress afforded to the Executive Branch in designating state sponsors of terrorism" (U.S. SOI 27, n. 9)

➢ Under U.S. foreign relations law and international law, there is a distinction between a foreign government and foreign state, and therefore a distinction between property "owned by" the state and property "owned by" a governing regime; if a regime is not recognized as the government of a state, it is not entitled to access property located in the United States belonging to the state (U.S. SOI 25-26)

➢ U.S. property abroad risks reciprocal challenges if the narrowly defined exceptions to execution immunity are not properly applied (U.S. SOI 26-27)

## **ARGUMENT**

I.  **UNDER FUNDAMENTAL PRINCIPLES OF U.S. FOREIGN RELATIONS AND INTERNATIONAL LAW, ASSETS OF THE DAB, AS AN AGENCY OF THE SOVEREIGN STATE OF AFGHANISTAN, BELONG TO THE PEOPLE OF AFGHANISTAN, NOT THE TALIBAN.**

Even though the predicate question of what government represents a nation's sovereign is classically a nonjusticiable question, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (affirming political recognition is exclusively a function of the Executive), it is important to recall that as a matter of governing international law, the assets held with the DAB, as an agency of the State of Afghanistan, belong to the people, not the *de facto* authority, the Taliban.

Ultimately, the matter before the Court turns on statutory interpretation of the FSIA and the TRIA, as set forth below in Section I (C). Those statutes, and that analysis, however, must be informed by fundamental principles of public international law, as incorporated into U.S. law, and U.S. foreign relations law governing recognition of sovereigns (and governments), ownership of sovereign assets, and immunities that apply to sovereign assets. *See The Paquete Habana,* 175 U.S. 677, 700 (1900) (finding "[i]nternational law is part of our law and must be

8.

ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination."); Restatement (Third) of the Foreign Relations Law of the United States (1987), § 111.

### A. THE STATE OF AFGHANISTAN, AND ITS AGENCY THE DAB, NOT THE TALIBAN, IS THE SOVEREIGN ENTITY OF AFGHANISTAN.

Granting Plaintiff-Creditors' Motion would implicitly credit a flawed premise that the current *de facto* rulers of Afghanistan, the Taliban, who assumed the levers of governmental power through a sustained campaign of violence and terror against Afghan citizens, represents the sovereign state of Afghanistan.  Elementary principles of constitutionalism and popular sovereignty recognizes that sovereignty inheres in the people – not in governments and certainly not in *de facto* authorities that seize power through violence.

Specifically, under international law, a sovereign state is "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities."  Restatement (Third) of Foreign Relations Law of the United States § 201.  Afghanistan, as a sovereign state, has been a member state of the United Nations since 1946.  A foreign state is distinct from a foreign government. *Id.* at §203 cmt. a ("A state can…recognize or treat an entity as a state while denying that a particular regime is its government").

Plaintiffs-Creditors confuse, if not conflate, notions of State and government. Changes of government (which *Amici* do not consider the situation here, where the Taliban is operating as a *de facto* authority) – even in the context of hostile takeovers or *coup d'états* – have no effect on the legal personality and the continuity of States *qua* states. *See* ICC, Order, *Situation in the Islamic Republic of Afghanistan*, ICC-02/17, Feb. 24, 2022, ¶15; Restatement (Third) of Foreign Relations Law of the United States § 208 cmt. a ("*Succession of states and governments*

9.

*distinguished*: Under international law, the capacities, rights, and duties […] appertain to the state, not to the government which represents it […]  They are not affected by a mere change in the regime or in the form of government or its ideology").

It is a truism that while governments come and go, the State's legal personality remains:

> the effect of a revolution resulting in a government which for a time fails to secure any recognition from foreign states, does not destroy the international personality of the state or free it, permanently at any rate, from existing treaty obligations; though it involves an interruption in that state's ability to exercise its legal capacity for international purposes.

Oppenheim, R. Jennings and A. Watts, Oppenheim's International Law, Vol. I, Part I, para. 44, pages 149-150 (9th ed., 1992).

U.S. courts have affirmed and upheld the distinction between State and government. For example, in a case involving the consequences of the nonrecognition of the Soviet Government by the U.S., the Supreme Court distinguished between the rights of the State and of the government. *See Guaranty Trust Co. v. U.S.*, 304 U.S. 126 (1938) ("the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it").

In any event, under the U.S. Constitution, the President has the power to recognize (or not recognize) foreign nations and governments – "an act with immediate and powerful signification for international relations." *Zivotofsky v. Kerry*, 576 U.S 1, 21 (2015). Indeed, it has long been recognized that such a power is "outside the competence" of courts. *National City Bank v. Republic of China*, 348 U.S. 356, 358 (1955). President Biden has not recognized the Taliban – a *de facto* authority, at best – as the government of Afghanistan – a position shared by every country in the world. The Taliban's takeover does nothing to change the sovereign status of the state of Afghanistan and the constituent people of Afghanistan. The Afghan Assets belong to the people of Afghanistan, not to its government or to anyone acting to control the people.

**B.   PRINCIPLES OF FOREIGN SOVEREIGN IMMUNITY PROTECT THE SOVEREIGN PROPERTY OF AFGHANISTAN, INCLUDING THE DAB, FROM TURNOVER IN U.S. COURTS.**

Under both customary international law and treaty law, foreign sovereigns enjoy immunity, in respect of the state itself and its property, for public acts in the national courts of other countries with limited exceptions and as specifically waived.  *See* Hazel Fox and Philippa Webb, *The Law of State Immunity*, 3d ed. (Oxford University Press, 2015); United Nations Convention on Jurisdictional Immunities of States and Their Property (2004) ("U.N. State Immunities Convention") *Preamble* (recognizing that "jurisdictional immunities of States and their property are generally accepted as part of customary international law");[21] *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010) (finding that the doctrine of foreign sovereign immunity was developed as a matter of "grace and comity" under common law).  The notion that a foreign State enjoys immunity is said to derive from principles of independence, equality, and dignity of States.  *See The Schooner Exchange v. McFaddon*, 11 U.S. 116, 123 (1812). Foreign sovereign immunity applies with regards to immunity from jurisdiction and immunity from enforcement.  *See, e.g.,* U.N. State Immunities Convention, art. 5 (adjudication) and art. 19 (enforcement). Notably, because "[e]nforcement against State property constitutes a greater interference with a State's freedom to manage its own affairs and to pursue its public purposes, immunity from enforcement has been called "the last fortress, the last bastion of State immunity" as it continues to provide immunity protections over State property even when exceptions allowed a State to be sued in another nation's court. *See* Fox and Webb, *The Law of State Immunity* 486, 484.  *See id.* at 519 (national courts recognize State ownership of assets, as well as the public use and purpose,

---

[21] Although the U.N. State Immunities Convention has not yet entered into force, provisions codifying sovereign immunity from jurisdiction and attachment have been found to reflect customary international law.  *See,* U.N. Introductory Note on U.N. State Immunities Convention, (Oct. 2017) https://legal.un.org/avl/ha/cjistp/cjistp.html.

as the basis for immunity from enforcement for categories of State property, including central banks).[22] The United States has expressed this same position. *See* Second Statement of Interest of the United States, *Rubin v. Islamic Republic of Iran*, Case No. 03-cv-9370, Mar. 3, 2006, ECF #145 at 6-7 (observing that lifting immunity from enforcement was "more difficult" than lifting immunity from jurisdiction because "judicial incursion on a foreign sovereign's property is often likely to be far more problematic from a foreign relations point of view than simply requiring the sovereign to appear to defend a lawsuit on the merits").

The United States codified the law of foreign sovereign immunity in the FSIA, which allows for certain exceptions arising out of commercial activities – the "restrictive immunity doctrine" – and later, designations as a state sponsor of terrorism, and courts regularly look to international law and practice to decide immunity questions arising from its application. *See Samantar*, 560 U.S. at 319-320 (Congress "recognized [the FSIA] was consistent with extant international law"); *Permanent Mission of India to United Nations v. City of New York*, 561 U.S. 193, 199 (2007) (same). Accordingly, U.S. statutes – including both the FSIA and TRIA – must be interpreted to accord with international law wherever possible and should be applied so as to conform with the United States' international obligations. *Murray v. The Schooner Charming Betsy*, 2 Cranch 64, 118 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains").

Afghanistan, as a state that has never been designated a state-sponsor of terrorism, enjoys both jurisdictional immunity (save for the exceptions set forth in the FSIA) and immunity of

---

[22] Blocking the assets of a foreign state is fundamentally different in nature than enforcement actions, and falls outside the protections of foreign sovereign immunity. For this reason (among others), that the United States *blocked* the DAB assets in 2000 because it determined DAB "to be owned or controlled by, or to act for or on behalf of the Taliban" (*see* U.S. SOI 22) has no bearing on whether enforcement actions involving DAB funds would or could have been successful even at that time.

attachment or execution of its sovereign property. *See Weininger v. Castro,* 462 F. Supp. 2d 457, 481 (S.D.N.Y. 2006); *see also* 28 U.S.C. §§ 1609, 1610-1611.  Immunity from attachment has been abrogated with regards to sovereign assets held in central banks under TRIA in cases involving states that have been designated as state-sponsors of terrorism, in accord with the political branches' determination that such odious conduct warrants the limitation or revocation of foreign sovereign immunity so that judgment against terrorist states are enforced.  *See Weininger* (Cuba)*; Gates v. Syrian Arab Republic,* 2013 WL 1337223 at *5-7 (Mar. 29, 2013) (Syria).  The State of Afghanistan has done no such offense to merit any such reduction in its statutory or customary international law immunities.

      **1.**    **The DAB is an Instrumentality of the Sovereign State and Likewise Immune from Judicial Process in U.S. Courts.**

The assets Plaintiff-Creditors seek to recover are held by the Afghanistan's central bank, the DAB. It is well-established that a foreign state's central bank constitutes an "agency or instrumentality" of that foreign state. *See, e.g., S& S Machinery Co. v Masinexportimport,* 706 F.2d 411, 414 (2d. Cir. 1983) (describing a sovereign's central bank as the "paradigm of a state agency or instrumentality"); H.R. Rep. 94-1487 (1976) at 15-16 (identifying a central bank as an entity that constitutes an 'agency or instrumentality of a foreign state' for purposes of Section 1603 of the FSIA.  The Plaintiff-Creditors have failed to rebut this fact, which is logically a prerequisite before the same assets can be deemed an agency or instrumentality of a non-state terrorist organization.  *See Caballero v. FARC*, 945 F.3d 1270, 1276 (2d. Cir. 2019) (holding that "[i]f the party wishes to execute against the assets of a terrorist party's agency or instrumentality, the party must further establish that the purported agency or instrumentality is *actually* an agency or instrumentality") (emphasis added).

In its submission before the International Court of Justice in *Certain Iranian Assets*,

counsel for the United States explained that:

> **When a State entity like a traditional central bank is entrusted with sovereign functions** like supervising and regulating the country's banking system, issuing currency, and holding and investing the State's foreign reserves, it is presumed to be acting on behalf of the State, not as a "company" with private comparators. ..such an entity acts not as a "creation of the State" that is, a company that is simply constituted in accordance with the State's laws but acts as **"the State as such."**[23]

Accordingly, central banks readily come within the statutory definition of a "foreign

State" under international law, with the assets therein qualifying as sovereign property entitled to

protection from attachment. 28 U.S.C. § 1609; *see S& S Machinery Co.,* 706 F.2d at 416. Central

banks often enjoy greater protections from enforcement under international law than other

agencies or instrumentalities. *See* Fox and Webb, *The Law of State Immunity* 255, 528. Central

bank assets are crucial for the State to exercise sovereign activities such as currency stabilization,

printing currency, holding currency auctions and more generally regulating and supporting the

banking sector. These are the very functions carried out by the DAB: "As Central Bank of

Afghanistan, Da Afghanistan Bank operates to stabilize price levels, strengthen the financial

sector, ensure the safety of payment system, manage currency reserves effectively, print Afghani

banknotes and act as state banker." DAB, About Us: https://dab.gov.af/index.php/departments.

Under the FSIA and principles of foreign sovereign immunity, the Second Circuit held

the "funds of foreign central banks" are, in fact, the "reserves of the foreign states' themselves."

*NML Capital, Ltd. v. Banco Central de la República Argentina,* 652 F.3d 172, 189 (2d Cir.

2011). Thus, the United States opined in its State of Interest, assets of a foreign central bank

belong "to the foreign state and thus would not be the assets of a private party." U.S. SOI 25.

---

[23] Excerpts from the transcript of the hearing held on October 8, 2018 in the case concerning Certain Iranian Assets (*Islamic Republic of Iran v. United States of America*) (emphasis added).

In accord with international law, and in light of their specific functions, the FSIA "shields from execution property 'of a foreign central bank or monetary authority for its own account.'" *Bank Markazi*, 578 U.S. at 217, quoting 28 U.S.C. §1611(b)(1). Notably, the Second Circuit has opined that foreign central banks enjoy heightened immunities from enforcement "to provide an incentive for foreign central banks to maintain their reserves in the United States." *EM Ltd. v. Repub. of Arg.*, 473 F.3d 463, 473 (2d Cir. 2007).

The assets held by the DAB are the sovereign assets belonging to the State of Afghanistan – and to the people of Afghanistan – and thus, cannot be subject to execution.

> **2.      Title Over DAB's Assets Was Unaffected by the August Takeover and They Remain Assets of the Sovereign – Not the Taliban.**

In an effort to seize State assets that are otherwise immune from execution, the Plaintiff-Creditors suggest that the Central Bank assets actually went from being sovereign funds to being private funds when the Taliban overtook the previous regime. The alleged *control* that Plaintiff-Creditors claim the Taliban have of *DAB*, as an entity (*if* established) does *not* translate to *ownership* over *DAB funds,* including the Afghan Assets at issue. The Afghan Assets *cannot* be simultaneously be the property "of" *both* the sovereign state of Afghanistan *and* a terrorist-designated organization, the Taliban – even if the latter may be operating as the *de facto* authority, but universally unrecognized, government. Blocking property does not change title; it only limits the powers and privileges associated with ownership. *See* U.S. SOI 7.

> **C.      TRIA's Ownership Requirements Cannot be Bypassed in an Attempt to Enforce a Judgment Against Funds Protected by Sovereign Immunity.**

There is no basis in the legislative history, text of the Statute, or caselaw to conclude that the TRIA "preempts" the FSIA with regard to foreign sovereigns that have not been designated a state-sponsor of terrorism. Regardless, because it has never been designated as a state-sponsor of terrorism, Afghanistan's immunities have not been modified and limited under TRIA, as happens

to those foreign states whose actions warrant this odious label. And, it would be improper to interpret any ambiguity in the application of TRIA in a way that conflicts with the immunity foreign sovereigns enjoy under international law. *Schooner Charming Betsy*, 2 Cranch at 118.

### 1.    TRIA Does Not Allow the Plaintiff-Creditors to Bypass Ownership.

As the United States made clear in its Statement of Interest (U.S. SOI 20), TRIA does not allow the Plaintiffs to bypass the issue of ownership of the assets:

> In assessing whether the DAB Assets constitute the 'blocked assets of [a] terrorist party' or the 'blocked assets of any agency or instrumentality of that terrorist party,' the word 'of' plays an important role. TRIA's standard requires an inquiry into whether a terrorist party (or an agency or instrumentality thereof) has an ownership interest in the DAB Assets.

Section 201 of TRIA and § 1610(g) "denotes ownership" and in fact requires that the terrorist party "own" the contested assets. *Heiser v. Islamic Republic of Iran,* 735 F.3d 934, 937-38 (D.C. Cir. 2013).  Here, the Afghan Assets, as assets in the State of Afghanistan's central bank belong to the state and *only the state*. A "relationship" between the Taliban (even as a *de facto* government) and the contested assets or an interest in the assets is not enough under TRIA; legal title is required. *Id.* at 938, 941. Like in *Hausler v. JP Morgan Chase Bank, N.A.,* 770 F3d 207, 212 (2d. Cir. 2014), because the Taliban "does not have any property interest" in the Afghan Assets, they are not the blocked assets "of" the Taliban and are not attachable under TRIA §201.  To allow property that does not belong to the Taliban to be used to satisfy judgments against it "punish[es] innocent third parties" – the people of Afghanistan – not the Taliban, as Congress intended. *See Heiser,* 735 F.3d at 939, 940.

The Plaintiff-Creditors reliance on *Kirschenbaum v. 650 Fifth Avenue*, 830 F.3d 107 (2d Cir. 2016) is misplaced. As the United States explained, *Kirschenbaum* "arose in a different posture than here," in a case where the entity with the assets was a non-state entity and the state at issue had been designated a state sponsor of terrorism, and accordingly, "[t]he Second Circuit

had no occasion . . . to consider whether, and under what circumstances (if any), an agency or instrumentality of a foreign state can simultaneously also be an agency or instrumentality of a non-state entity" for which "the relevant considerations may differ." (U.S. SOI 21-22). There, the risk of breaching fundamental principles of sovereign immunity were minimal and the foreign relations and separation of powers implications that are so significant in this case were largely absent. Regardless, Plaintiff-Creditors' claim still fails. Ownership of the contested assets is required under TRIA. Notably, nowhere in their Turnover Motions do Plaintiff-Creditors make the assertion that the DAB assets are the assets "of" the Taliban.[24] Indeed, such an assertion cannot be made when the DAB assets are the assets "of" the sovereign state of Afghanistan.

Additionally, *Caballero v. FARC*, No. 20-MC-0030, 2021 WL 307558 (W.D.N.Y. Jan 29, 2021), upon which the Plaintiff-Creditors rely, did not involve sovereign assets held in a state's central bank. Rather, the asset at issue was a state-owned commercial enterprise, an oil company. In that case, FARC was alleged to have utilized the Venezuelan state-owned enterprise (PDVSA) to fund its activities – a fact-pattern that bears no resemblance to the instant case, and indeed, the district court did not have to grapple with the legal questions or foreign policy considerations present here that arise from seizing a non-designated sovereign's central bank assets to pay a terrorist-designated organization's judgement-creditors.

Moreover, PVDSA has since intervened in *Caballero* and raised concerns about the very issue raised in the Turnover Motions: "where the plaintiff holds a judgment against a non-state terrorist party and seeks to execute that judgment against an entity that is alleged to be both an agency or instrumentality of that non-state terrorist party and an agency or instrumentality of a foreign state." *Caballero v. FARC*, No. 20-MC-00040-LJV, 2022 WL 633572 (W.D.N.Y. Mar.

---

[24] Rather, the Plaintiff-Creditors argue the Taliban "has an interest" in these assets "through its agency or instrumentality, DAB." *Havlish* Turnover Motion at 2.

4, 2022). The district court issued an invitation to the United States to submit its views, particularly in light of the concerns it expressed in this case. Any such brief was scheduled to be filed on April 18, 2022.  However, on that day, the plaintiff filed a motion to temporarily stay the proceedings until a decision is issued in this case.  The United States did not oppose the motion, provided that it can file a Statement of Interest upon resumption of the proceedings.

**2.    Plaintiff-Creditors Misapprehend the Relationship Between the FSIA and TRIA.**

For those foreign states that, like Afghanistan, are *not* designated as a state sponsor of terrorism, the FSIA provides the exclusive basis to bring suit against the state or its agencies or instrumentalities.  *See Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428 (1989). The Plaintiff-Creditors seek to make an end-run around the FSIA and lay claim to sovereign assets under TRIA by enforcing a judgment against a non-sovereign terrorist party, the Taliban, with funds in which the Taliban have no ownership interest.

TRIA only provides for attachment of blocked assets belonging to a "terrorist party."  A "terrorist party" is defined as "a terrorist, a terrorist organization . . . or a foreign state designated as a state sponsor of terrorism." Afghanistan has never been designated a state sponsor of terrorism and Title II of TRIA, therefore, does not provide a sound legal basis to attach the State of Afghanistan's assets.  As the property at issue in this case belongs to the central bank of a foreign state that enjoys the full protections of the FSIA, including 28 U.S.C. §1611(b)(1), the Plaintiff-Creditors' reliance on cases involving the blocked property of either a foreign state designated as a state sponsor of terrorism or a non-state terrorist-designated party is inapposite.[25] Of course enforcement requires the judicial authority to ensure that the title (here, the judgment)

---

[25] Plaintiff-Creditors pronouncement that EO 14064 had the effect of "ensuring that the property is subject to execution" under the TRIA lacks foundation. *See Havlish* Turnover Motion, 1. The EO does not state that the DAB assets are the property of a terrorist party, let alone that the DAB is an agency or instrumentality of the Taliban.

matches the entity it is enforced against.  That is clearly not the case here, as Plaintiff-Creditors

are seeking to attach assets whose ownership does not rest with the Taliban.  The Taliban

themselves have no title over the Central Bank's assets; such title rests with the State.

While the TRIA goes beyond the FSIA, it would run contrary to the carefully crafted

scheme set forth by the political branches in the FSIA, in accord with international law and U.S

foreign relations law, to protect the assets of foreign states that are *not* state-sponsors of terrorism

and instead allow TRIA to serve as a backdoor to seize such sovereign assets– especially those

held in a foreign state's central banks, which enjoy heightened immunity protections under the

FSIA, as explained above.[26] Indirectly trying to attach the immunized assets of a sovereign state,

using TRIA, is not permissible. The United States has warned against doing so in its Statement

of Interest in no uncertain terms: "Where a state is not designated as a state sponsor of terrorism,

TRIA does not authorize the attachment of a foreign state's assets to satisfy a judgment against

the foreign state. Permitting a foreign state's assets to be attached indirectly to satisfy the

judgment against a nonstate terrorist organization would supplant the discretion that Congress

afforded to the Executive Branch in designating state sponsors of terrorism." U.S. SOI 27.

### CONCLUSION

For the foregoing reasons, Plaintiff-Creditors motions for turnover should be denied.

Dated: April 20, 2022                                    Respectfully submitted,

                                                         */s/ Katherine Gallagher*

                                                         _____
                                                         Katherine Gallagher (KG-2222)
                                                         Baher Azmy
                                                         Center for Constitutional Rights

---

[26] *Kirschenbaum* involved enforcement of judgments against a state that had been designated as a state-sponsor of terrorism, Iran, and not a foreign state never tainted with such a label like Afghanistan, which fundamentally alters the analysis and the impact on foreign relations.

666 Broadway, 7th Floor
New York, NY 10012

*Counsel for amici curiae*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 21, 2022, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

<u>/s/ <i>Katherine Gallagher</i></u>
Katherine Gallagher
