**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN DOES 1 THROUGH 7, | |
| Plaintiffs, | |
| *v.* | No. 20 Misc. 740 (KPF) |
| THE TALIBAN, *et al.*, | |
| Defendants. | |
| IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2011 | No. 03 MD 1570 (GBD) (SN) |
| FIONA HAVLISH, *et al.*, | |
| Plaintiffs, | |
| *v.* | No. 03 Civ. 9848 (GBD) (SN) |
| SHEIKH USAMAH BIN-MUHAMMED BIN-LADEN, a.k.a. OSAMA BIN-LADEN, *et al.*, | |
| Defendants. | |

**[PROPOSED] BRIEF OF AMICUS CURIAE NASEER A. FAIQ, CHARGÉ D'AFFAIRES, PERMANENT MISSION OF THE ISLAMIC REPUBLIC OF AFGHANISTAN TO THE UNITED NATIONS, IN SUPPORT OF NO PARTY**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................................................................................ii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ........................................................... 1

BACKGROUND ........................................................................................................................ 5

ANALYSIS ............................................................................................................................... 11

    I.    AUTHORIZING EXECUTION ON DAB'S ASSETS WOULD HAVE SIGNIFICANT
        ADVERSE CONSEQUENCES FOR THE UNITED STATES AND THE PEOPLE OF
        AFGHANISTAN ........................................................................................................... 11

    II.   DAB'S ASSETS CANNOT LAWFULLY BE USED TO SATISFY JUDGMENTS AGAINST
        THE TALIBAN ............................................................................................................ 13

        A.  The TRIA Does Not Eliminate the Requirement to Obtain Subject Matter Jurisdiction
              Against a Foreign State Under the FSIA ................................................................. 13

        B.  "Agency or Instrumentality" Status Under the TRIA Is Determined as of the Date the
              Underlying Complaints Were Filed ......................................................................... 17

        C.  The TRIA Requires Ownership to Execute on Debtor's Property .......................... 18

CONCLUSION ......................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bank Markazi v. Peterson*, 578 U.S. 212 (2016) ................................................... 9, 18

*Bolivarian Rep. of Venezuela v. Helmerich & Payne Intern'l Drilling Co*., 137 S. Ct 1312 (2017).. *passim*

*Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999)............................................4

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 2021 WL 6135758 (C.D. Cal. Dec. 29, 2021) ................................................................. 14

*Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993 (2d Cir. 2014) ......................................... 10

*Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002) ................................ 9

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) ................................................... 19

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007).................................................. 9

*Epperson v. Entertainment Express, Inc.*, 242 F.3d 100 (2d. Cir. 2001) ................................... 15

*Geveke & Co., Int'l v. Kompania Di Awa I Elektrisidat Di Korsou N.V.*, 482 F. Supp. 660 (S.D.N.Y. 1979) ................................................................. 8

*Hausler v. JP Morgan Chase, NA*, 770 F.3d 207 (2d Cir. 2014)........................................... 19

*Heiser v. Islamic Repub. of Iran*, 735 F.3d 934 (D.C. Cir. 2013).................................. 19, 20

*Hibbs v. Winn*, 542 U.S. 88 (2004) ................................................................. 15

*Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147 (2d Cir. 2007) ........................................... 7

*Kirschenbaum v. Assa Corp*., 934 F.3d 191 (2d Cir. 2019) ........................................... 19

*Kirschenbaum v. 650 Fifth Avenue and Related Properties*, 830 F.3d 107 (2d Cir. 2016) ........... 16, 17, 19

*Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009)................................................ 11, 16

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96 (2d Cir. 2017)............... 14, 15

*Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 448 F. Supp. 622 (S.D.N.Y. 1978)...................................... 14

*Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 597 F.2d 314 (2d Cir. 1979)............................................... 14

*NML Cap., Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172 (2d Cir. 2011) ................ 9, 19

*Peacock v. Thomas*, 516 U.S. 349 (1996)................................................ 14

*Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct 2250 (2014) ......................................... 8

*Rubin v. Islamic Republic of Iran*, 138 S. Ct 816 (2018)................................................ 16, 18

*Samanter v. Yousuf*, 560 U.S. 305 (2010) ................................................................. 7, 8

*Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York*, 346 F.3d 264 (2d Cir. 2003)...... 15, 16

*United States v. Assa Co. Ltd*., 934 F.3d 185 (2d Cir. 2019) ........................................ 8, 14

*United States v. Holy Land Found. for Relief & Dev*., 722 F.3d 677 (5th Cir. 2013).............................. 16

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120 (2d Cir. 2019)........................................... 17

*Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480 (1983) ................................................ 13

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2010) ........................................................ 17

**Statutes**

28 U.S.C. § 1330(a) .................................................................................................... 7, 8, 14

28 U.S.C. § 1604 ........................................................................................................ 7, 13, 14

28 U.S.C. § 1605 .......................................................................................................... *passim*

28 U.S.C. § 1605A ........................................................................................................ *passim*

28 U.S.C. § 1609 .......................................................................................................... 8, 13

28 U.S.C. § 1610 ............................................................................................................... 9

28 U.S.C. § 1611 ............................................................................................................ 9, 11

8 U.S.C. § 1182(a)(3)(B)(vi) .............................................................................................. 11

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2002 (2000) ......... 10

Foreign Sovereign Immunities Act ........................................................................................ *passim*

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat.  2322 § 201 ......................... *passim*

**Other Authorities**

*Afghanistan*, The Humanitarian Crisis and U.S. Response: Hearing Before the Subcomm. on Near East Asia, South Asia, Central Asia & Counterterrorism of the S. Comm. on Foreign Relations (Feb. 9, 2022) ........................................................................................................................... 2

*Afghanistan*, The Humanitarian Crisis and U.S. Response: Hearing Before the Subcomm. on Near East Asia, South Asia, Central Asia & Counterterrorism of the S. Comm. on Foreign Relations (Feb. 9, 2022) (Written Testimony of David Milliband, President and CEO of the International Rescue Committee) .......................................................................................................... 3

Afghanistan, *The Humanitarian Crisis and U.S. Response: Hearing Before the Subcomm. on Near East Asia, South Asia, Central Asia & Counterterrorism of the S. Comm. on Foreign Relations* (Feb. 9, 2022) (Written Testimony of Graeme Smith, Senior Consultant of International Crisis Group) ............ 3

Alex Zerden, *Establishing a Humanitarian Financial Corridor for Afghanistan*, LawFare (Nov. 15, 2021) ........................................................................................................................... 13

Brief for FRBNY as Amicus Curiae, *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172 (2d Cir. 2011) (No. 10-1487), 2010 WL 3032829 ........................................... 6, 7, 12

Brief for the United States as Amicus Curiae, *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172 (2d Cir. 2011) (No. 10-1487), 2010 WL 4597226 ............................... 7

Brief of United States, *In re: Fifth Avenue & Related Props. Nos. 17-3258(L)*, (2d Cir. Aug. 31, 2018), 2018 WL 4193437 ...................................................................................................... 16

Clayton Thomas, Cong. Research Serv., *Taliban Government in Afghanistan: Background & Issues for Congress* (2021) ........................................................................................................ 18, 19

Executive Order No. 14064 (Feb. 11, 2022) ......................................................................... 19

H.R. Conf. Rep. 107-779, 2002 WL 31529126 .................................................................. 10, 11

Human Rights Watch, *Afghanistan: Economic Roots of the Humanitarian Crisis* (Mar. 1, 2022) ............ 2

Jane Ferguson, *Afghanistan Has Become the World's Largest Humanitarian Crisis*, New Yorker (Jan. 5, 2022) ........................................................................................................................... 3

Paul L. Lee, *Central Banks and Sovereign Immunity*, 41 Colum. J. Transnat'l L. 327 (2003) ................... 5

Press Release, United Nations Children's Fund, *One Million Children at Risk of Dying from Starvation in Afghanistan Within Weeks – UNICEF* ....................................................................................... 3

*Restatement (Third) of Foreign Relations Law of the United States* ........................................................ 19

Senate Banking, Housing and Urban Affairs Committee Holds Hearing on Afghanistan, CQ Congressional Transcripts, October 19, 2021 ............................................................................... 2

Sune Engel Rasmussen, *'No Father Wants to Sell His Son's Kidney.' Afghans Pushed to Desperate Measures to Survive*, Wall St. J. (Apr. 19, 2022)................................................................... 3

UN Development Program, *Economic Instability and Uncertainty in Afghanistan after August 15* (Sept. 9, 2021) ..................................................................................................................... 2

UN Development Program, *The Afghan Banking & Financial Sys. Situation Report* (Nov. 22, 2021) ....... 2

**Regulations**

Presidential Determination No. 2001-03, 3 C.F.R. § 405 .......................................................... 10

Presidential Determination No. 99-1, 3 C.F.R. § 302 ................................................................ 10

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

His Excellency Mr. Naseer A. Faiq heads the Permanent Mission of the Islamic Republic of Afghanistan (Afghanistan) to the United Nations (UN) in New York. Mr. Faiq assumed the position of Chargé d'Affaires (Permanent Representative) after Afghanistan's former representative resigned from the position in December 2021. Prior to this, since September 2019, Mr. Faiq served as the Mission's Minister Counselor and Political Coordinator.

Mr. Faiq has served Afghanistan as a diplomat for nearly two decades in various senior-level capacities, including at the country's Ministry of Foreign Affairs as Deputy Director General (2012-13, 2016-19) and in other high-level posts (2005-07); the Permanent Mission of Afghanistan to the UN as Economic Counsellor (2013-16) and Third Secretary (2008-10); as well as an Advisor to the Deputy Foreign Minister (2011-12).

The Taliban, whose hostile occupation has terrorized Afghanistan, opposes Mr. Faiq's service in his current position, noting that he does not represent the Taliban regime—a regime that is not recognized as the government of Afghanistan by the international community or any individual country, including the United States. As Mr. Faiq stated in a speech to the UN Security Council, he does "not represent[] the former government of Afghanistan . . . nor . . . the interest of any political group." Mr. Faiq maintains that he represents the interests of the Afghan people, who, according to the UN, are enduring the "world's largest humanitarian crisis."

For more than forty years, the Afghan people have suffered from war, violence, conflict and terrorism. Millions have lost their lives, been severely injured, or have been forced to flee the nation all together. The Afghan hope after decades of suffering was the achievement of a durable and inclusive peace and a new age of prosperity. But, following the reemergence of the Taliban, all fundamental rights are under attack, and Afghanistan is grappling with imminent famine and rampant poverty—a dire situation caused in large part by an economic collapse.

A U.S. government hold on the assets of Afghanistan's central bank (Da Afghanistan Bank, or DAB) directly impacts the humanitarian and economic well-being of the Afghan people. For nearly twenty years, the United States worked with Afghanistan to build a banking system that was independent of the government. In November 2001, the Taliban was removed from power, leaving behind just $90,000 in foreign reserves at the central bank. By the time of the U.S. withdrawal in August 2021, DAB had accumulated over $10 billion in assets, with some $7 billion held in U.S. banks. On August 15, 2021, the day the Taliban entered Kabul, the U.S. Treasury Department blocked the U.S.-based assets to prevent Taliban access. As stated by Deputy Treasury Secretary Wally Adeyemo, "I see . . . no situation in which we would allow the Taliban to have access to the reserves that *belong to the Afghan people*." Senate Banking, Housing and Urban Affairs Committee Holds Hearing on Afghanistan, CQ Congressional Transcripts, October 19, 2021 (emphasis added).

In November 2021, the UN called for urgent action to prop up Afghanistan's banking system, warning that the economic cost and negative social impact of its collapse "would be colossal."[1] This prediction has borne out, as Afghanistan has become the world's largest humanitarian crisis.[2]  The collapse of the banking sector sent business and trade into a downward spiral as inflation and mass unemployment have skyrocketed; an estimated 97 percent of

---

[1] UN Development Program (UNDP), *The Afghan Banking and Financial System Situation Report* (Nov. 22, 2021), *available at* www.af.undp.org/content/afghanistan/en/home/library/knowledge-products/Policy-brief-banking-crisis.html; *see also* UNDP, *Economic Instability and Uncertainty in Afghanistan after August 15* (Sept. 9, 2021). *available at* www.undp.org/library/economic-instability-and-uncertainty-afghanistan-after-august-15.

[2] *See generally Afghanistan*, *The Humanitarian Crisis and U.S. Response: Hearing Before the Subcomm. on Near East Asia, South Asia, Central Asia & Counterterrorism of the S. Comm. on Foreign Relations* (Feb. 9, 2022), www.foreign.senate.gov/hearings/afghanistan-the-humanitarian-crisis-and-us-response020922; Human Rights Watch, *Afghanistan: Economic Roots of the Humanitarian Crisis* (Mar. 1, 2022), www.hrw.org/news/2022/03/01/afghanistan-economic-roots-humanitarian-crisis.

Afghans could fall into poverty this year.[3] According to UNICEF, one million children are at risk of dying of starvation[4]; many already have[5] This humanitarian crisis could result in more deaths than those caused by the last twenty years of war combined.[6] Afghans have been selling their belongings, bodies, and organs to survive.[7]

As the only recognized Afghan diplomat in the United States, Mr. Faiq—and the Afghan people he represents—have a paramount interest in the continued safeguarding the $3.5 billion in blocked foreign reserves of the State of Afghanistan, which Afghanistan needs—presumably to recapitalize a central bank, whenever and however that can be done in compliance with sanctions against the Taliban. As Mr. Faiq explains below, U.S. law does not permit taking Afghanistan's foreign reserves to satisfy judgments against the Taliban. To the contrary, central bank reserves are generally immune from attachment under the Foreign Sovereign Immunities Act (FSIA). While there is an exception to FSIA immunity, section 201(a) of the Terrorism Risk Insurance Act (TRIA), it authorizes attaching a foreign state's assets only if that foreign state has been designated as a state sponsor of terror by the U.S. Secretary of State—which Afghanistan is not and has never been. Even if the TRIA could be read to abrogate attachment immunity, U.S.

---

[3] *See, e.g.*, *Afghanistan*, *The Humanitarian Crisis and U.S. Response: Hearing Before the Subcomm. on Near East Asia, South Asia, Central Asia & Counterterrorism of the S. Comm. on Foreign Relations* (Feb. 9, 2022) (Written Testimony of David Milliband, President and CEO of the International Rescue Committee), *available at* www.rescue.org/press-release/david-milibands-testimony-senate-foreign-relations-committee-subcommittee-afghanistan; *id*. (Written Testimony of Graeme Smith, Senior Consultant of International Crisis Group), *available at* www.crisisgroup.org/asia/south-asia/afghanistan/afghanistan-humanitarian-crisis-and-us-response.

[4] Press Release, United Nations Children's Fund, *One Million Children at Risk of Dying from Starvation in Afghanistan Within Weeks – UNICEF,* www.unicef.ie/2021/12/02/one-million-children-at-risk-of-dying-from-starvation-in-afghanistan-within-weeks-unicef.

[5] *See, e.g.*, Jane Ferguson, *Afghanistan Has Become the World's Largest Humanitarian Crisis*, New Yorker (Jan. 5, 2022), www.newyorker.com/news/dispatch/afghanistan-has-become-the-worlds-largest-humanitarian-crisis.

[6] *See* Miliband Testimony, *supra* note 3.

[7] *See, e.g.*, United Nations Children's Fund, *supra* note 4; Sune Engel Rasmussen, *'No Father Wants to Sell His Son's Kidney.' Afghans Pushed to Desperate Measures to Survive*, Wall St. J. (Apr. 19, 2022), *available at* https://on.wsj.com/3OvAbVZ

courts are not permitted to exercise statutory jurisdiction over a foreign state's property without jurisdiction over the foreign state itself, *see, e.g.*, *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 253 (2d Cir. 1999) (explaining how the FSIA was designed "to prevent the location of the property from conferring jurisdiction on the court—i.e., to prevent *in rem* and *quasi-in-rem* actions from undermining the general principles codified in the FSIA)—and there is no legal basis here to obtain or exercise jurisdiction over the State of Afghanistan. What is more, even if the Court did have jurisdiction over the State of Afghanistan, the TRIA does not authorize executing on property that the judgment debtor (the Taliban) does not own—and as a matter of law, these reserves belong to the Afghan people, not to the Taliban, who will not (and should not) gain access to DAB's assets regardless of what this Court does.

Finally, Mr. Faiq seeks to highlight the significant—but perhaps overlooked—adverse consequences to the United States of any interpretation of the TRIA that would authorize attaching the central bank reserves of a foreign state. This case concerns less than one-eighth of one percent of the $3 *trillion* in foreign exchange reserves held just at the Federal Reserve Bank of New York (FRBNY). A ruling that the DAB's assets are available to satisfy judgments against the Taliban could potentially render other foreign reserves held in the United States newly vulnerable to attachment and litigation. Such a decision would have profoundly destabilizing consequences for the international financial system and New York's place in it, which only confirms the congressional judgment to immunize these assets, save for the exceedingly narrow exception in the TRIA applying only to states designated by the Executive as terrorist sponsors.

Mr. Faiq fully supports compensation for the victims of the Taliban, including those who have obtained judgments against the Taliban in American courts. But that compensation cannot come from the Afghan people, who are neither morally nor legally responsible for the tragic

events of September 11, 2001 or the other acts of terrorism committed by the Taliban. To the contrary, countless Afghans worked alongside the United States as allies to keep the Taliban from power, in furtherance of the United States' global fight against terrorism. To this day, in the face of reprisal, including death, brave Afghans continue to resist the Taliban regime, motivated by the hope that they, too, can someday enjoy the liberty, freedom, and democracy found elsewhere. The Afghan people's access to the DAB assets is crucial to achieving those ideals.

## **BACKGROUND**

1.      <u>Central bank reserves</u>. This case concerns a foreign sovereign's central bank reserves, a unique category of assets that Congress has comprehensively shielded for important reasons. First, such reserves play a crucial role in promoting and maintaining regional and global economic stability, particularly in times of crisis. In addition, the deposit of central bank funds in the United States, primarily in the FRBNY—without fear of litigation or attachment—brings tremendous benefits to public and private enterprise in this country contributes to New York's status as the world's premiere financial center.

Central banks use their assets to perform a variety of critical stabilizing functions. To maintain price stability and to control inflation, for example, central banks auction dollars or other reserve currencies. They also seek to ensure that the local economy is sufficiently capitalized to support its everyday activity, such as purchasing supplies, investing in businesses, and paying employee salaries. In times of crisis, central banks can absorb solvency shocks by using their reserves—which are typically maintained in stable currencies, such as the dollar—to inject liquidity into an otherwise frozen financial market. *See generally* Paul L. Lee, *Central Banks and Sovereign Immunity*, 41 Colum. J. Transnat'l L. 327, 356-59 (2003).

The importance of a central bank and its reserves can be seen plainly today in Afghanistan. Along with other factors, the blocking of DAB's assets in August 2021 brought

economic activity in Afghanistan to a standstill. The currency, the afghani, collapsed to record low values, while inflation has since soared. By the end of 2021, the Afghan economy had contracted by some 40 percent. As a result, government workers and teachers are today going without paychecks. Everyday Afghans have lost access to their savings held in local banks. Exporters are unable to access capital to keep operating their businesses, and importers cannot access the credit necessary to front even the most crucial imports upon which Afghans heavily depend, like food, electricity, and fuel. More than 90 percent of Afghans do not have enough to eat, and millions face literal starvation. *See generally* notes 1-7, *supra*, and accompanying text.

In addition to promoting regional and global economic stability, the assets of foreign central banks are also extremely important to the U.S. economy. As of 2010, some 250 foreign central banks and monetary authorities held accounts at the FRBNY, with assets totaling more than $3 trillion—about half of the world's official dollar reserves. *See* Brief for FRBNY as Amicus Curiae at 3, *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172 (2d Cir. 2011) (No. 10-1487), 2010 WL 3032829 [hereinafter, "FRBNY Amicus"]. Those reserves increase the depth and liquidity of U.S. financial markets; reduce transaction costs for private enterprises, particularly those engaging in cross-border transactions; lower the debt servicing costs of the United States in financing its public debt, by exerting downward pressure on interest rates; and promote the dollar as the preferred currency reserve of the world. *See id.* at 2-5. The maintenance of those foreign reserves at FRBNY "is an important component of what makes the United States, and New York in particular, one of the world's premier financial centers, augmenting this nation's ability to exercise leadership on the world stage." *Id.* at 4.

Foreign central banks can of course choose to maintain their reserves elsewhere. What has been "critical" to their decision to hold their resources in the United States "has been the

assurance long provided by United States law that central banking funds held in this country are

immune from attachment, save for very narrow exceptions." Brief for the United States as

Amicus Curiae at 2, *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d

172 (2d Cir. 2011) (No. 10-1487), 2010 WL 4597226. "Central banks and monetary authorities,"

the FRBNY has explained, "are extremely attentive to the safety and security of their reserves,

and look for assurance that their accounts at the FRBNY are protected under U.S. law." FRBNY

Amicus at 4. "If central banks perceive the United States as having a hostile legal environment in

comparison to other nations," or if our "immunity law" is "inadequate or uncertain," foreign

banks will take their money elsewhere. *Id.* at 4-5.

        2.    <u>Foreign sovereign immunity</u>. Precisely because of the benefits they provide to the

United States and their importance to other countries, foreign central bank reserves are protected

by the Foreign Sovereign Immunities Act (FSIA), which is the "sole source for subject matter

jurisdiction" over a foreign state.[8] *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir.

2007) (citation omitted); *accord Samanter v. Yousuf*, 560 U.S. 305, 314 (2010). The FSIA "starts

from a premise of immunity and then creates exceptions to the general principle." *Bolivarian

Republic of Venezuela v. Helmerich & Payne Intern'l Drilling Co*., 137 S. Ct. 1312, 1320 (2017).

There are two kinds of immunity under the FSIA: "jurisdictional" and "execution" immunity.

        As to the former, courts in the United States may only exercise subject matter jurisdiction

over a foreign state under one of the narrow exceptions set out in sections 1605 through 1607 of

the FSIA. *See* 28 U.S.C. §§ 1330(a), 1604. Those statutory exceptions generally "codify the

restrictive theory of sovereign immunity," retaining immunity for sovereign or public acts, but

---

[8] *See* U.S. Statement, ECF No. 7661 at 21 (explaining why the DAB, as the central bank of Afghanistan, must "be treated as a 'foreign state' for purposes of the FSIA."  (quoting 28 U.S.C. § 1603(a)).

abrogating immunity in suits arising from a foreign state's commercial activities. *Samantar*, 560 U.S. at 312-13. Even where an exception to jurisdictional immunity applies, Congress has limited subject matter jurisdiction to *in personam* claims,[9] *id.* § 1330(a), to eliminate the previously "common method of obtaining jurisdiction over foreign states," which had been merely "to attach their property in the United States," *Geveke & Co., Int'l v. Kompania Di Awa I Elektrisidat Di Korsou N.V.*, 482 F. Supp. 660, 664 (S.D.N.Y. 1979); *see also United States v. Assa Co. Ltd.*, 934 F.3d 185, 190 (2d Cir. 2019) ("Congress sought to clamp down on *quasi in rem* suits because they 'caused significant irritation to many foreign governments' and could potentially 'give rise to serious friction in United States' foreign relations.'" (citation omitted)).

Since 1996, the FSIA has had a terrorism-related exception to the jurisdictional immunity of foreign states. Thereunder, a court in the United States can entertain certain claims seeking money damages for personal injury or death caused by certain terroristic acts of a foreign state, if—but *only* if—that foreign state was designated "as a state sponsor of terrorism" by the U.S. Secretary of State "at the time the act occurred" or later "as a result of such act." 28 U.S. § 1605A(a)(2)(A)(i)(I); 28 U.S.C. § 1605(a)(7) (2007).[10]

In addition to jurisdictional immunity, the FSIA separately provides for execution (or "attachment") immunity, making the property of a foreign state presumptively immune from attachment even to satisfy a judgment against that state. 28 U.S.C. § 1609. The FSIA's exceptions to execution immunity are "narrower" than its exceptions to jurisdictional immunity, *Republic of Argentina v. NML Capital, Ltd*., 134 S. Ct. 2250, 2256 (2014), reflecting that, "at the time the FSIA was passed, the international community viewed execution against a foreign

---

[9] The one exception is that the FSIA authorizes some maritime liens.  *See* 28 U.S.C. § 1605(b).

[10] In 2008, Congress repealed the terrorism exception it created in 1996 (former 28 U.S.C. § 1605(a)(7)) and replaced it with another (28 U.S.C. § 1605A); for present purposes, the differences between them are not material.

state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action." *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 255-256 (5th Cir. 2002). Consistent with the "restrictive" theory, the FSIA generally abrogates the attachment immunity of a foreign state's property to satisfy a judgment against that state only if the property to be attached is "used for a commercial activity in the United States" *and* some other exception within section 1610 applies. *See* 28 U.S.C. § 1610(a)(1)-(7), (b)(1)-(3).

Certain special types of foreign state property remain immune even if their commercial use would otherwise have made them attachable. *See* 28 U.S.C. § 1611. These include the property "of a foreign central bank or monetary authority held for its own account." *Id.* § 1611(b)(1). Congress granted central bank property these "special protections" because of the "the particular sovereign interest" they implicate; to provide an incentive for foreign central banks to maintain their reserves in the U.S. banks; to protect against reciprocal treatment of U.S. assets held abroad;[11] and to avoid the "significant foreign relations problems" that come with "execution against the reserves of foreign states." *NML Cap., Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 188-89 (2d Cir. 2011) (citations omitted); *see also EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 473 (2d Cir. 2007).

Plaintiffs who have secured judgments against state sponsors of terror under sections 1605(a)(7) or 1605A have faced many challenges identifying attachable assets to satisfy these judgments. *See Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016). Although Congress has sought to address these challenges, its efforts have in no way undermined the core principle of foreign sovereign immunity applicable in this case. Congress first took steps to address some of

---

[11] "At any given time the Department of Justice's Office of Foreign Litigation represents the United States in about 1,000 cases in 100 courts around the world." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1322 (2017).

the difficulties in enforcing judgments against terrorist states in 1998. That year, Congress added

section 1610(f) to the FSIA, permitting execution on blocked property (without an OFAC

license) claimed by a foreign state sponsor of terror to satisfy a judgment against that state under

sections 1605(a)(7) (later amended to cover 1605A judgments).  But when Congress added

section 1610(f), it authorized the President to waive this exception to attachment immunity "in

the interest of national security." On the same day he signed the legislation, President Clinton

waived the exception in its entirety. *See* Pres. Determination No. 99-1, 3 C.F.R. § 302. Two

years later, Congress amended section 1610(f) slightly and re-codified the President's waiver

authority. *See* Pub. L. No. 106-386, § 2002(a)-(c) and (f) (2000). Once more, President Clinton

signed the legislation and, the same day, waived section 1610(f) entirely. *See* Pres.

Determination No. 2001-03, 3 C.F.R. § 405. Section 1610(f) has never gone into effect. *See*

*Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 1002 (2d Cir. 2014).

Two years later, in 2002, Congress tried again, when enacting the TRIA. As in 1998 and

2000, and in largely the same language, Congress again abrogated the attachment immunity of

the blocked assets of designated state sponsors of terror to satisfy judgments against those states

obtained under section 1605(a)(7) (and later, section 1605A). *See* TRIA § 201; *see also* H.R.

Conf. Rep. 107-779, at *27 (2002), 2002 WL 31529126 ("Section 201 builds upon and extends

the principles in section 1610(f)(1) of the [FSIA]."). But to avoid the fate of section 1610(f), the

TRIA gives the President only limited waiver authority,[12] and Congress made the abrogation of

attachment immunity "[n]otwithstanding any other provision of law" to override the effect of the

President's prior determinations that abrogating the immunity of such blocked assets would be

---

[12] The TRIA authorizes the President to waive section 201(a) only "on an asset-by-asset basis" and only in response
to a court order directing execution against or attachment of certain diplomatic or consular property subject to
international treaties protecting it from attachment.  TRIA § 201(b).

contrary to the national security of the United States. *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009). Also unlike section 1610(f), the TRIA authorizes attaching the property of individual "terrorist[s]" and "terrorist organization[s]" (as defined in 8 U.S.C. § 1182(a)(3)(B)(vi)) to satisfy judgments against them that are based on "an act of terrorism" (as defined in TRIA § 201(d)(1)); *see also* H.R. Conf. Rep. 107-779, at *27 ("Section 201 . . . authorizes the enforcement of judgments against terrorist organizations.").

## <u>ANALYSIS</u>

I.     **AUTHORIZING EXECUTION ON DAB'S ASSETS WOULD HAVE SIGNIFICANT ADVERSE CONSEQUENCES FOR THE UNITED STATES AND THE PEOPLE OF AFGHANISTAN**

Before detailing why the property of DAB cannot be lawfully used to satisfy judgments against the Taliban, it is worth emphasizing the destabilization effects on dollar reserves in the United States, the economy of Afghanistan and the international financial system that would result were execution nonetheless authorized. Absent an explicit waiver, the reserves of foreign central banks held in the United States are absolutely immune from attachment and execution, even to satisfy a judgment against the bank itself, 28 U.S.C. § 1611(b)(1), except for the TRIA's narrow exception that applies only to satisfy section 1605A or 1605(a)(7) judgments against the handful of designated state sponsors of terror.

Permitting execution on DAB's assets to satisfy judgments obtained against the Taliban would be a radical departure from the current understanding of central bank immunity. For the first time, the reserves of foreign states *other* than those designated as state sponsors of terror—which is to say, every other country in the world—would be vulnerable to attachment and execution under the TRIA. They would be vulnerable to satisfy judgments, moreover, that are not even against them, but rather against third parties. And those judgments would arise from

proceedings in which the foreign states themselves were not even parties—and, in fact, could not have been made parties, due to their jurisdictional immunity. Even the terms under which these foreign state assets could be attached would be highly uncertain: all it would take is a single judge, often in a non-adversarial setting, to decide that, as a factual matter, a terrorist individual or organization is exerting a statutorily undefined level of control over a foreign state entity. *Cf. Bolivarian Republic of Venezuela*, 137 S. Ct. at 1321-22 (rejecting an interpretation of the FSIA that "would create increased complexity in respect to a jurisdictional matter where clarity is particularly important. And clarity is doubly important here where foreign nations and foreign lawyers must understand our law."). And it apparently would not even matter if that terrorist individual or organization were exercising such control unlawfully, and were not recognized as legitimate by the U.S. government; the terrorist organization's victimization of the foreign state would itself be the grounds upon which the foreign state's property could be taken.

Such an outcome would not only be contrary to congressional intent and common sense; it would also have significant impacts that would reverberate well beyond this case and the comparatively small amount of Afghanistan's foreign reserves. As the FRBNY has explained: "If the clarity and certainty of central bank immunity in the United States is compromised, the potential disruptive effects on deposits of dollar reserves here and the resulting impact on the international financial system could be profound." FRBNY Amicus at 6; *see also id.* at 12 (expressing concern about an interpretation of central bank immunity that is "imprecise, lacks legal certainty, and requires a fact finding before immunity can attach").

Executing on the DAB's assets would also have significant adverse consequences for Afghanistan. The Afghan people need their reserves—for example, to recapitalize a central bank, or a bank serving those functions, in whatever manner that is ultimately done. *See, e.g.*, Alex

Zerden, *Establishing a Humanitarian Financial Corridor for Afghanistan*, LawFare (Nov. 15,

2021), www.lawfareblog.com/establishing-humanitarian-financial-corridor-afghanistan

(discussing the importance of central banking functions to Afghanistan and ways to restore

them—using the blocked DAB assets—without involving the Taliban).

## II.   DAB'S ASSETS CANNOT LAWFULLY BE USED TO SATISFY JUDGMENTS AGAINST THE TALIBAN

For a multitude of independent reasons, the property of DAB cannot be lawfully attached

or otherwise used to satisfy judgments against the Taliban.

### A. The TRIA Does Not Eliminate the Requirement to Obtain Subject Matter Jurisdiction Against a Foreign State Under the FSIA

As set forth above, through the FSIA, Congress has made DAB presumptively immune

from this Court's exercise of jurisdiction and has made its assets presumptively immune from

attachment or execution. *See* 28 U.S.C. § 1604, 1609; *see also Verlinden B.V. v. Cent. Bank of

Nigeria*, 461 U.S. 480, 493 n.20 (1983) ("[E]ven if the foreign state does not enter an appearance

to assert an immunity defense, a District Court still must determine that immunity is unavailable

under the Act."). Executing on those assets requires (at minimum) an exception to both

jurisdictional immunity and attachment immunity. Here there is neither.

Nothing in U.S. law, including the TRIA, permits taking the property of Afghanistan to

satisfy judgments against the Taliban. At most, the TRIA abrogates the attachment immunity of

the blocked assets of designated foreign state sponsors of terror to satisfy judgments obtained

against them. *See* TRIA § 201(a). Afghanistan is not and has never been designated as a state

sponsor of terror, *see* U.S. Statement, ECF No. 7661 at 9 n.2, and thus no party has ever secured

a judgment against Afghanistan or one of its agencies or instrumentalities under a terrorism

exception to the FSIA's grant of jurisdictional immunity. The TRIA is thus wholly inapplicable

to the foreign reserves of the Afghan people, which remain fully immune from attachment under section 1611 of the FSIA. *See* U.S. Statement at 25 n.8 ("[W]hile TRIA allows attachability of state assets in certain circumstances, it only does so with respect to designated state sponsors of terrorism.").

Even if the TRIA could somehow be read to abrogate the attachment immunity of the DAB's assets—which it cannot, because Afghanistan has never been a state sponsor of terror— this Court would still lack a basis to exercise subject matter and personal jurisdiction, because Afghanistan's jurisdictional immunity would remain. *See* 28 U.S.C. §§ 1330, 1604. The Court cannot proceed against a foreign state's property absent jurisdiction over the foreign state itself: in the FSIA, Congress eliminated *in rem* and *quasi in rem* jurisdiction over the property of foreign sovereigns, and instead required plaintiffs in civil actions involving foreign sovereigns or their property to proceed *in personam*. 28 U.S.C. §§ 1330(a), 1604; *Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 448 F. Supp. 622, 638 (S.D.N.Y. 1978), *aff'd*, 597 F.2d 314 (2d Cir. 1979) ("The liberal standards for acquiring *in personam* jurisdiction find their quid pro quo in the elimination of jurisdictional attachments."); *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 124 (2d Cir. 2017) (noting with its enactment, the FSIA "for the first time in U.S. law, provide[d] a statutory procedure for making service upon, and obtaining *in personam* jurisdiction over, a foreign state" (citation omitted)); *see also Assa Co. Ltd.*, 934 F.3d at 190; *Brenntag Int'l Chemicals, Inc.*, 175 F.3d at 253.[13] Any basis for exercising *in personam*

---

[13] A district court in California recently interpreted the TRIA as authorizing *quasi in rem* actions as to non-state entities, but that decision did not involve foreign states or immunity issues, and the underlying judgment was not obtained under the FSIA.  *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 2021 WL 6135758, at *9 (C.D. Cal. Dec. 29, 2021).

jurisdiction over DAB would have to come from the FSIA.[14] *See Mobil Cerro Negro, Ltd.*, 863 F.3d at 124 ("[W]e we have consistently described the FSIA as providing the sole source of subject matter jurisdiction over foreign sovereigns. We continue to do so today."). There is no such basis here.

The TRIA plainly does not abrogate jurisdictional immunity. The text itself defines the scope of attachment immunity with reference to the FSIA's exceptions to the jurisdictional immunity of foreign state sponsors of terror. *See* TRIA § 201(a) (referring to a "judgment . . . for which a terrorist party is not immune under [28 U.S.C.] section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008)"). In doing so, Congress implicitly acknowledged that a waiver of jurisdictional immunity would be required before the TRIA comes into play. *See, e.g.*, *Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York*, 346 F.3d 264, 271 (2d Cir. 2003) (holding that by defining "blocked assets" with reference to another statute, the TRIA implicitly acknowledges the limitations of that other statute). Reading the TRIA to itself abrogate jurisdictional immunity would render its own references to section 1605A and 1605(a)(7) as wholly superfluous, in violation of fundamental tenets of statutory interpretation. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004). The TRIA's requirement of a "judgment"—which obviously cannot be obtained absent jurisdiction—reinforces that it concerns only attachment immunity.

The TRIA's "notwithstanding" clause does not change the analysis. It "applies only when some 'other provision of law' conflicts with TRIA." *Smith*, 346 F.3d at 271. There is no conflict here. The TRIA itself references—in the same *sentence* as the "notwithstanding" clause—

---

[14] Even absent the FSIA, the Court could not rely on ancillary jurisdiction to shift liability from a judgment debtor to a nonparty. *See Peacock v. Thomas*, 516 U.S. 349, 357 (1996) ("We have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."); *Epperson v. Entertainment Express, Inc.*, 242 F.3d 100, 104-06 (2d Cir. 2001) ("[A]n action to establish liability on the part of a third party" through, e.g., "alter ego liability and veil-piercing," "must have its own [independent] source of federal jurisdiction").

exceptions to the jurisdictional immunity of foreign sovereigns. TRIA § 201(a). Congress could

not have intended the "notwithstanding" clause to dispense with a requirement that is

incorporated in the same sentence of the statutory text. *See, e.g.*, *Elahi*, 556 U.S. at 386

("Congress could not have intended" the "notwithstanding" clause in the TRIA to override

another provision "that it inserted in the same statute"); *Smith*, 346 F.3d at 271 (rejecting, for

similar reasons, another argument regarding the application of the TRIA's "notwithstanding"

clause); *see also United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 688-89 (5th

Cir. 2013) (rejecting argument that the TRIA overrides "all statutes that, by their purpose or

effect, shield assets from attachment or execution"); *accord* Brief of United States at 307-09, *In

re: Fifth Avenue & Related Props. Nos. 17-3258(L)*, (2d Cir. Aug. 31, 2018), 2018 WL 4193437,

at \*307-09 (explaining how the TRIA's "notwithstanding" clause is not "legal kryptonite," and

instead "comes into play to resolve conflicting legal principles that dictate irreconcilable legal

outcomes. It does not, however, lay waste to all other statutes that might have some *effect* within

the realm of the operative statute." (citation omitted, emphasis in original)).[15]

The Second Circuit's *Kirschenbaum* decision—which concerned what can be considered

an "agency or instrumentality" of a "terrorist party" within the meaning of the TRIA—dictates

the conclusion that the DAB's assets remain immune. *See Kirschenbaum v. 650 Fifth Avenue

and Related Properties*, 830 F.3d 107, 131-37 (2d Cir. 2016), *abrogated on other grounds by

Rubin v. Islamic Republic of Iran*, 138 S. Ct 816 (2018). Most importantly for present purposes,

the Second Circuit in *Kirschenbaum* interpreted the TRIA's authorization for attachment and

---

[15] Although not necessary to consult it, the legislative history of the TRIA confirms the limited scope of its text.  *See
Elahi*, 556 U.S. at 386 ("[T]he [legislative] history suggests that Congress placed the 'notwithstanding' clause in §
201(a) . . .  to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the
TRIA's enactment" (citation omitted)); *accord id.* at 391-92 (Kennedy, J., concurring in part and dissenting in part)
("The effect of [TRIA § 201(a)] is to ensure that other laws do not bar victims' efforts to enforce judgments against
terrorist states.").

execution proceedings against a foreign state to require "a judgment for which there was original jurisdiction under the FSIA." *Id.* at 131 (citing *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 52 (2010)); *see also id.* ("Here, neither party disputes that there was original jurisdiction under the FSIA for the Plaintiffs' underlying judgments.").

A few years later, the Second Circuit was even more explicit, holding that attachment of state assets under section 201(a) of the TRIA requires determining "whether [the creditors] held judgments that were based on an exception to immunity from jurisdiction established by the FSIA." *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 133 (2d Cir. 2019); *see also id.* ("TRIA section 201(a) provides for federal court jurisdiction over execution and attachment proceedings involving the assets of a foreign sovereign, however, only where 'a valid judgment has been entered' *against the sovereign*." (citation omitted, emphasis added and omitted)). After determining that the plaintiff creditors did not hold judgments against a "state sponsor of terror," as required by the TRIA, the Second Circuit held that the district court "lacked jurisdiction over the enforcement proceeding," and that its orders to various banks to turn over state assets "were void for want of jurisdiction." *Id.* at 142. Binding precedent is thus clear that applying the TRIA to foreign state property requires a source of original subject matter jurisdiction within the FSIA. *See id.* at 133-43; *Kirschenbaum*, 830 F.3d at 131.

**B.   "Agency or Instrumentality" Status Under the TRIA Is Determined as of the Date the Underlying Complaints Were Filed**

Even if the Court finds there is no requirement to demonstrate original jurisdiction under the FSIA here, there is a second and independent reason that DAB's assets remain immune. Per *Kirschenbaum*, "agency or instrumentality" status under both the FSIA and the TRIA "'is determined at the time of the filing of the complaint,' and not necessarily 'as of the time an alleged tort or other actionable wrong occurred.'" 830 F.3d at 126 (citation omitted); *see also id.*

at 136 (same holding as to the TRIA). The current situation, whatever it may be, is thus irrelevant, and there is no reason to undertake such a fact-intensive inquiry: the Taliban plainly had *no* control over DAB between November 2001 and August 2021, *see* Clayton Thomas, Cong. Research Serv., *Taliban Government in Afghanistan: Background & Issues for Congress* 38-39 (2021), *available at* crsreports.congress.gov/product/pdf/R/R46955—and seemingly all relevant complaints against the Taliban were filed during that nearly twenty year period.[16]

This *Kirschenbaum* rule makes sense: a contrary one would mean the attachability of a foreign sovereign's assets could vary over time, based on facts as found by a single federal district court.[17] That outcome could be wildly unpredictable and would invite a deluge of discovery requests and protracted litigation on an issue of supreme importance to foreign sovereigns—the immunity of their central bank reserves. There is simply no evidence that Congress intended the TRIA to effect such a destabilizing change to the statutory scheme. *Cf. Rubin*, 138 S. Ct at 825 ("Out of respect for the delicate balance that Congress struck in enacting the FSIA, we decline to read into [28 U.S.C. § 1610(g)] a blanket abrogation of attachment and execution immunity for § 1605A judgment holders absent a clearer indication of Congress' intent."); *Bolivarian Republic of Venezuela*, 137 S. Ct at 1320 (rejecting an interpretation of the FSIA that would constitute a "radical departure" from the statutory scheme's "basic principles," absent a clear statement of intent from Congress).

## C.  The TRIA Requires Ownership to Execute on Debtor's Property

There is yet another reason that the DAB's assets cannot be taken to satisfy judgments

---

[16] *See, e.g.*, Complaint, Havlish v. Bin Laden, No. 1:02-cv-00305 (D.D.C. filed Feb. 19, 2002), ECF No. 1; Complaint, John Does 1 Through 7 v. The Taliban, No. 4:20-cv-00605 (N.D. Tex. filed Mar. 20, 2020), ECF No. 1.

[17] Measuring from the date of the filing of the complaint also makes sense, because "execution proceedings are continuations of merits proceedings, not new lawsuits." *Bank Markazi*, 578 U.S. at 233 n.26; *see also id*. at 232-33.

against the Taliban. Even setting aside the jurisdictional and immunity issues, the TRIA only

authorizes executing on property that the judgment debtor actually *owns*. *See Hausler v. JP*

*Morgan Chase, NA*, 770 F.3d 207, 211 (2d Cir. 2014); *Heiser v. Islamic Repub. of Iran*, 735 F.3d

934, 937-40 (D.C. Cir. 2013); *accord* U.S. Statement at 20; *see also* ECF No. 7769-2 at 4-11

(2019 U.S. Statement of Interest in *Doe v. ELN* (hereinafter, "U.S. *ELN* Statement")). DAB's

assets are the reserves of Afghanistan itself.[18] *See NML Capital*, 652 F.3d at 189. Since the

United States does not recognize the Taliban as the government of Afghanistan, the Taliban has

no property interest in the State of Afghanistan's assets that this Court can recognize. *See*

*Restatement (Third) of Foreign Relations Law of the United States* §§ 203, 205; *see generally*

U.S. Statement at 25-26.

The degree to which the Taliban might control a state institution or its assets is irrelevant:

"Control and ownership . . . are distinct concepts," *Dole Food Co. v. Patrickson*, 538 U.S. 468,

477 (2003), and the TRIA requires ownership. *Hausler*, 770 F.3d at 211; *Heiser*, 735 F.3d at

937-40. Nor does it matter that these assets were blocked to keep the Taliban from accessing

them. As the United States explained, the Executive's blocking authority goes well beyond

ownership: "ownership is not required to block an asset, although it is required to attach that

asset under the TRIA." U.S. *ELN* Statement at 4; *see also id.* at 8-9. And to the extent that the

blocking is relevant, Executive Order 14064 is explicit: DAB's assets are the property of the

Afghan people that were blocked *protectively* "for the Benefit of the People of Afghanistan," and

---

[18] The principal sources of DAB's reserves are international donors and the savings of ordinary Afghans accrued during the time that the U.S. military was in Afghanistan.  When the Taliban was pushed from power more than 20 years ago, Afghanistan's central bank had just $90,000 in foreign reserves.  *See* Clayton Thomas, Cong. Research Serv., *Taliban Government in Afghanistan: Background and Issues for Congress* 38 (2021), *available at* crsreports.congress.gov/product/pdf/R/R46955.

the same purpose can be seen in OFAC's protective licensing of DAB's unencumbered assets.[19]

Nor would it make sense to expand the TRIA here to permit taking property that the Taliban does not own. The TRIA's aim is to punish terrorist states, organizations, and individuals by making their assets available to pay judgments against *them*. *See* U.S. *ELN* Statement at 7, 10. To instead use the assets of Afghanistan would—quite perversely—*benefit* the Taliban, and not just financially: the Taliban would undoubtedly use the prospect of Americans confiscating billions of dollars from the State of Afghanistan to further its own radical agenda. None of this would serve the goals of the TRIA. *See Heiser*, 735 F.3d at 940 ("If potentially innocent parties pay plaintiffs' judgment, then the punitive purpose of these provision is not served. Quite the opposite. . . . Congress could not have intended such a result.").

<u>**CONCLUSION**</u>

The TRIA does not authorize paying the bills of the Taliban off the backs of the Afghan people, who have been persistently victimized by the Taliban. This Court should, consistent with Congress' intent, hold that the DAB assets remain immune from attachment. Given what is at stake for the international financial system and New York's place at the center of it—and what is at stake for Afghanistan—should the Court have any doubt that DAB's assets remain immune under the statutory framework Congress created, it could solicit the views of the FRBNY or others, to ensure all sides of the many relevant issues are adequately briefed for the Court's consideration.[20]

---

[19] Even if the Taliban could be considered *joint* owners with the State of Afghanistan—and again, it cannot—Afghanistan would be entitled to an innocent owner defense under the TRIA.  *See Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 199 & nn. 8-9 (2d Cir. 2019) (noting concerns that, "if broadly construed, [the earlier] *Kirschenbaum*'s reading of TRIA could invite lawsuits against a third-party institution, such as a bank, that had only incidental and perhaps unintentional involvement with a terrorist party," and that an innocent owner defense may be available in appropriate circumstances).

[20] If it would be helpful to the Court, counsel for Mr. Faiq is willing to participate in any oral argument.

Dated: April 24, 2022                          Respectfully submitted,

_/s/ Natasha Arnpriester_

Natasha Arnpriester (5673678)
James A. Goldston*
A. Azure Wheeler (5245493)
Open Society Justice Initiative
224 West 57th Street
New York, NY 10019

_/s/ Justin B. Cox_

Justin B. Cox*
Law Office of Justin B. Cox
P.O. Box 1106
Hood River, OR 97031

_Counsel for Amicus Curiae_

* _Pro hac vice_ application forthcoming